UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

-v-

DAJAHN MCBEAN, a/k/a "Jeezy Mula,"
a/k/a "Freeze,"

                     Defendant.

---

24 Cr. 541 (PAE)

<u>OPINION & ORDER</u>

**PAUL A. ENGELMAYER, District Judge:**

This decision resolves a motion to suppress evidence seized from the Metropolitan Detention Center ("MDC") cell of defendant Dajahn McBean.

On October 17, 2024, a grand jury in this District returned Indictment S2 24 Cr. 541 (PAE). It charged McBean and two others with offenses including participation in a murder-for-hire conspiracy. *See* Dkt. 32 ("Indictment"). The charges center on the allegation that, in late 2023, McBean, while detained at the MDC awaiting sentencing on a separate case, orchestrated a murder-for-hire plot aimed at killing Laquan Williams, with whom he had been feuding. As alleged, that plot resulted, on December 26, 2023, in a shooting outside a Queens, New York nightclub that wounded Williams and killed Clarisa Burgos, a woman who had accompanied Williams to the nightclub. Salient here, on December 29, 2023, three days after the shooting, prison officials searched McBean's MDC cell. They recovered, among other contraband, a cellphone, broken in pieces, that McBean had evidently attempted to destroy while the prison officials sought entry into his cell.

McBean now moves to suppress that cellphone and its contents.[1]  He claims that the warrantless search of his cell violated his right to be free from unreasonable searches under the Fourth Amendment.  For the reasons that follow, the Court denies McBean's motion.

## I.    Overview

### A.    The Alleged Murder-for-Hire-Scheme

The Indictment charges McBean and two others—Chelsey Harris and Karl Smith—with conspiracy to commit murder for hire resulting in personal injury and death, in violation of 18 U.S.C. § 1958; stalking resulting in life-threatening bodily injury and death, in violation of 18 U.S.C. § 2261; and conspiracy to destroy records, in violation of 18 U.S.C. § 371.  The following is a summary of pertinent events as alleged by the Government, drawn from the Indictment and the Government's statements in pretrial hearings and written submissions.

In December 2023, McBean and Williams were engaged in a feud over social media.  At the time, McBean was in custody at the MDC, awaiting sentencing on a charge of assault in-aid-of racketeering, to which he had pled guilty in the Eastern District of New York on September 8, 2023.  *See United States v. McBean*, No. 20 Cr. 260 (E.D.N.Y. 2020) (Dkt. 123) (the "EDNY case").  While at the MDC, McBean used a contraband cell phone to recruit and communicate with Harris and Smith, to arrange a plot to lure Williams to a Queens nightclub, where shooters recruited by or at the behest of McBean would murder Williams.

On December 24, 2023, McBean, assisted by Smith and Harris, lured Williams to Hush, a nightclub in Queens.  Outside the nightclub, gunmen shot and hit Williams's car multiple times, but their shots missed him.

---

[1] The Government represents that it is seeking to gain access to the contents of the damaged cellphone but has not yet succeeded in doing so. Dkt. 74 at 8 n.3. The search of McBean's prison cell also recovered marijuana, but the Government represents that it does not intend to introduce it as evidence at trial. *Id.* at 14 n.4.

On December 26, 2023, McBean, Smith, and Harris lured Williams to Xscape, a different Queens nightclub. Outside the nightclub, three gunmen opened fire at a car in which Williams sat in the driver's seat. The shots struck Williams numerous times and killed Burgos, who was seated in the front passenger seat.

### B.    Pertinent Investigative Steps

In the investigation that followed, the New York City Police Department ("NYPD") soon identified McBean as a person of interest.

On December 27, 2023, the NYPD received an anonymous tip that an inmate named Dajahn McBean, housed in federal prison, had "put a $200k hit" on Williams from prison, where "he [McBean] has a phone." Dkt. 74, Ex. 2, ¶ 4(g) (filed under seal) ("McBean SW"). The tip further indicated that McBean had recruited a woman, whose Instagram account was associated with Harris, to set up a meeting with Williams to effectuate the hit. *Id.* ¶¶ 4(g)–(h). The NYPD found social media evidence of a feud between McBean and Williams. And surveillance videos of the area around Xscape reviewed by NYPD showed Harris interacting with person(s) in Williams's car just before the shooting. Later on December 27, 2023, law enforcement officers interviewed Harris at the 107th precinct in Queens.

That same day, an NYPD detective contacted the U.S. Attorney's Office for the Southern District of New York ("USAO") regarding McBean, whom the NYPD had identified as a federal inmate detained at the MDC. As developed below, the USAO thereafter conveyed to the MDC the NYPD's request that McBean's cell be searched.

On December 29, 2023, MDC officials conducted a search of McBean's cell at the MDC, and recovered the damaged contraband cellphone that McBean moves here to suppress.

C.    **McBean's Suppression Motion: Procedural History**

Trial is scheduled to begin on July 28, 2025. On February 18, 2025, McBean moved to suppress the fruits of the search of his cell, claiming that it violated the Fourth Amendment. Dkt. 71.[2] He filed a supporting memorandum of law, Dkt. 73 ("McBean Br."), and exhibits, including factual affirmations by himself and by his counsel, Dkt. 72 ("Spilke Decl."). On March 4, 2025, the Government opposed. Dkt. 74 ("Gov't Br."). On March 10, 2024, McBean replied. Dkt. 77 ("McBean Reply Br."). On March 12, 2025, the Court scheduled an evidentiary hearing on McBean's suppression motion.[3]

On April 3, 2025, the Court held an evidentiary hearing. The Government called one witness, Lieutenant Sandra Ubiera, the MDC official who organized and led the search of McBean's cell. It also presented video and documentary evidence. The defense cross-examined Ubiera, but did not offer live testimony.

II.    **Findings of Fact**

A.    **Evidence Considered**

The factual findings below are based on the hearing testimony of Lieutenant Ubiera, McBean's pre-hearing affidavit, Dkt. 72 at 23–24 ("McBean Aff."),[4] exhibits annexed to McBean's brief, Dkt. 73, and exhibits received at the hearing. These consisted of: (1) a video

---

[2] Harris has separately moved to suppress two cellphones and their contents. Dkt. 70. Those cellphones were seized by NYPD officers at the conclusion of Harris's interview at a police precinct on December 27, 2023. The Court has denied that motion in a separate decision. *See* Dkt. 91.

[3] "Tr." refers to the transcript of the April 3, 2025 evidentiary hearing.

[4] The Court affords McBean's account less weight because he did not testify, and as a result, his account was not subjected to cross-examination. *See, e.g.*, *United States v. Rodriguez*, 368 F. App'x 178, 180 (2d Cir. 2010) (summary order); *United States v. Medina*, 19 F. Supp. 3d 518, 535 n.13 (S.D.N.Y. 2014) (collecting cases).

recording of MDC officials' search of McBean's cell on December 29, 2023, GX 1;

(2) McBean's disciplinary record while detained at the MDC, GX 2; (3) Federal Bureau of

Prisons ("BOP") Program Statement No. 5270.09, which describes the BOP's inmate discipline

program, GX 3 (the "Inmate Discipline Program");[5] (4) the BOP Inmate Admission and

Orientation Handbook, which provides inmates with notice of the BOP's disciplinary rules, GX

4 (the "BOP Inmate Handbook"); and (5) a photograph of the cellphone recovered from

McBean's cell, GX 5.  In recounting the background to McBean's MDC detention, the Court

also draws upon the docket history of the EDNY case.

### B.    Facts Established

The Court finds the following facts established by a preponderance of the evidence.[6]

These are largely undisputed, including as to the circumstances that brought about the MDC's

search of McBean's cell and the manner in which the search was carried out. The Court found

the testimony of Lieutenant Ubiera—the only live witness—credible, based on, *inter alia*, her

demeanor, competence, potential bias, and the extent to which her testimony was inherently

logical and consistent with physical evidence.

---

[5] The BOP operates the MDC.  Congress has charged the BOP with "the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States." 18 U.S.C. § 4042 (a)(3).

[6] On a motion to suppress, the defendant bears the burden of proving that evidence was seized unlawfully.  Where, however, as here, the defense shows that the underlying search occurred without a warrant, the Government bears the burden of proving that the search was lawful. *See United States v. Goulbourne*, No. 23 Cr. 544, 2024 WL 4025997, at *4 (S.D.N.Y. Sept. 3, 2024); *United States v. Gonzalez*, 111 F. Supp. 3d 416, 433 (S.D.N.Y. 2015); *United States v. Echevarria*, 692 F. Supp. 2d 322, 332 (S.D.N.Y. 2010).  The Government must establish the legality of such a search by a preponderance of the evidence. *United States v. Rivera*, 700 F. Supp. 3d 60, 67 (S.D.N.Y. 2023); *United States v. Hagood*, No. 20 Cr. 656 (PAE), 2021 WL 2982026, at *2 (S.D.N.Y. July 15, 2021), *aff'd*, 78 F.4th 570 (2d Cir. 2023).

1.     **Background to McBean's MDC Detention: The EDNY Case[7]**

As of the search of his MDC cell, McBean was awaiting sentencing in the EDNY case, in which he had been indicted in July 2020. *See* Dkt. 1.  A Superseding Indictment, returned February 2023, charged that McBean had been a member of Real Ryte, a street gang based in Brooklyn, and that McBean and others had engaged in violent hostilities with a rival gang, Breadgang. Dkt 64 at 3–7.

On September 8, 2023, McBean pled guilty, before United States District Judge Hector Gonzalez, to assault with a dangerous weapon in aid of racketeering, in violation of 18 U.S.C. §§ 1959(a)(3), 2, 3551. Dkt. 123 ("Plea Tr.").  McBean admitted, *inter alia*, that, on January 3, 2017, he had assaulted with a firearm an individual whom he believed was a member of a rival gang, and that he did so to maintain his position in Real Ryte. *Id.* at 21–24.[8]

2.     **Pre-Search Communications to the MDC**

McBean's brief attaches as exhibits certain email communications between law enforcement and MDC officials in the days leading up to the search of McBean's cell.[9]  These establish that (1) on the day the NYPD received an anonymous tip that McBean had used a contraband cellphone in the MDC to orchestrate the murder-for-hire scheme, an NYPD detective

---

[7] Docket citations in this subsection are to the docket of the EDNY case, *McBean*, 20 Cr. 260 (filed July 2020).

[8] On May 9, 2024, Judge Gonzalez sentenced McBean to 150 months' imprisonment. *See* Dkt. 146 (judgment entered May 14, 2024).

[9] The emails indicate, on their face, that the officials also communicated over telephone. *See* Spilke Decl., Ex. C at 11–12.

sought to contact MDC officials; and (2) the USAO thereafter served as a go-between conveying to the MDC the NYPD's request that McBean's cell be searched.[10]

### 3.    MDC Officials Search McBean's Cell and Recover the Cellphone

Lieutenant Ubiera is a member of the Special Investigations Unit of the MDC. Tr. at 19. In that capacity, she oversees operations to ensure the safety of inmates, staff, and visitors, and investigates inmate misconduct, including violent incidents such as stabbings and slashings. *Id.* She is responsible for conducting searches of inmates' cells to find contraband. *Id.* Weapons, illicit drugs, and cellphones are among the most frequent targets of cell searches. *Id.* at 53.

Relevant here, an inmate is forbidden to possess a cellphone, and such poses a serious security concern. *Id.* at 30–32. As a result, BOP regulations, and BOP officials enforcing them, treat such possession as a severe disciplinary infraction. *Id.* That is because an inmate can use a cellphone to orchestrate crime (including violent crime) inside and outside the MDC. *Id.* MDC officials frequently search inmates' cells for contraband, including cellphones. They do so prompted by, *inter alia*, reports from prison staff, other inmates, members of the public, and "outside" law enforcement agencies, such as the Federal Bureau of Investigation, Drug

---

[10] A limited timeline of these pre-search communications over email is as follows. On December 27, 2023, at 10:30 a.m., Assistant United States Attorney Andrew Chan emailed USAO Special Agent Stefano Braccini, asking whom NYPD Detective Daniel Alessandrino could contact to request a search of McBean's MDC cell, and copying Detective Alessandrino on the email. *Id.* at 11–12. Special Agent Braccini responded by offering to speak with Detective Alessandrino. *Id.* The record does not memorialize the immediately ensuing communications. But at 2:14 p.m. that day, Special Agent Braccini notified Detective Alessandrino by email that McBean's cell would be searched that night. *Id.* at 11.

On December 28, 2023, at 6:45 a.m., Detective Alessandrino emailed Special Agent Braccini, seeking an update as to the planned cell search. *Id.* at 10. Special Agent Braccini responded that he had heard "nothing" but that he would inquire by telephone (the record does not disclose of whom). *Id.* At 8:46 a.m., Detective Alessandrino sent another email to Special Agent Braccini at 8:46 a.m., listing the names Mark Waiters and Semaj Smith (who were McBean's co-defendants in the EDNY case). *Id.* at 9.

Enforcement Administration, and the Bureau of Alcohol, Tobacco, Firearms, and Explosives. About half of such reports come from law enforcement. *Id.* at 21–24. During her nine-year tenure at the MDC, Lieutenant Ubiera has participated in hundreds of cell searches. *Id.* at 19, 21.

On December 29, 2023, sometime before the 4 p.m. inmate count, Lieutenant Ubiera's superior, Captain Carlos Rodriguez, notified her that McBean might possess a contraband cellphone, and directed her to search his cell. *Id.* at 32–34, 54, 75. He told her that the cellphone might have been used to facilitate a crime outside the MDC's walls, based on information he had received from Special Agent Braccini. *Id.* at 33, 56–57. Lieutenant Ubiera perceived a sense of "urgency" in Rodriguez's communication and decided to search McBean's cell that day. *Id.* at 33.

Lieutenant Ubiera prepared for the search operation during the next few hours. She reviewed video surveillance and conducted due diligence to gauge the risks presented to the search team by and around McBean's cell. *Id.* at 34, 58. She was aware that McBean shared his cell with another inmate, as is customary at the MDC; McBean's cellmate was Mark Waiters, a co-defendant of his in the EDNY case. *Id.* at 20, 32. Having previously searched McBean's cell on multiple occasions, Lieutenant Ubiera did not have to do extensive background research. *Id.* at 49, 58. She nevertheless proceeded deliberatively, aware of the safety risks faced by the prison officials who would be conducting the search. *Id.* at 58–60. She was also mindful that, if the search were conducted when the general population was away from its cells, there was a higher likelihood that the contraband cellphone would not be found; for example, if McBean had "rent[ed]" it to another inmate. *Id.* at 58, 61. She assembled a search team of around 8 to 12 officers, and prepared a tactical plan outlining team members' roles. *Id.* at 34, 61–63.

At or around 7:07 p.m. that day, Ubiera's search team entered Housing Unit I61 in the MDC. Tr. at 55; GX 1, at 00:01. As the team made its way to the Unit's upper tier, where McBean's cell was located, Ubiera heard inmates "catcalling" to alert other inmates that a search team was nearby. Tr. at 34, 76. She also noticed that the vertical rectangular window, set in the otherwise solid door to McBean's cell, appeared to have been covered from the inside by an opaque object. *Id.* at 42. When the search team attempted to unlock the door of McBean's cell by normal means—inserting the key and turning the knob—it did not budge. *Id.* at 62–66; GX 1, at 00:20–00:35. McBean and/or Waiters had barricaded the door. Tr. at 42, 76–77. They also refused to comply with the search team's instructions to allow the door to be opened. *Id.* at 35–36, 49, 76–77. A struggle ensued. *Id.* Ultimately, the search team opened the door using a crowbar. *Id.* at 41, 43; GX 1, at 00:35–00:55.

After gaining entry, the search team placed McBean and Waiters in handcuffs and led them out of the cell. *See* GX 1, at 2:09–2:27. The search team seized part of a cellphone, which contained the glass exterior or its remnants, from McBean's hand. Tr. at 72–73. The team found other parts of the cellphone scattered throughout the cell, which was in a state of "disarray." *Id.* at 81. These were handed to Ubiera, who collected and entered them into evidence. *Id.* The search continued for approximately 20 minutes. *See* GX 1, at 23:16.

### 4.    McBean Is Disciplined for Possessing Dangerous Contraband

After discovery of the contraband cellphone, the BOP charged McBean with violating, *inter alia*, Section 108 of the BOP Inmate Discipline Program. Tr. at 48. That provision prohibits inmates and detainees from "[p]ossess[ing] . . . a hazardous tool" that is "most likely to be used in an escape or escape attempt or to serve as weapons capable of doing serious bodily

harm to others; or those hazardous to institutional security." Inmate Discipline Program at 45

tbl. 1. It lists among those tools "portable telephone, pager, or other electronic device." *Id.*[11]

On January 4, 2024, Officer Rogers conducted the disciplinary hearing. Gov't Br, Ex. 5

at 1. McBean denied having "a phone in [his] hand" and "taking a swing" at a member of the

search term who had entered his cell. *Id.* Officer Rogers found, however, that the "weight of the

evidence" contradicted McBean's account. *Id.* He found that McBean had been in possession of

a hazardous tool, in violation of Section 108. *Id.* He also found McBean guilty of assaulting an

officer, in violation of Section 224A. Gov't Br, Ex. 5 at 1. The MDC imposed corresponding

sanctions on McBean. *Id.*

### 5.    Law Enforcement Obtains a Search Warrant for the Cellphone

On January 3, 2024, NYPD sought, and a state-court judge issued, a warrant authorizing

a search of the cellphone seized by MDC officials. *See* McBean SW at 2. A supporting affidavit

by NYPD Detective Philip Degorter described the search of McBean's cell, the recovery of "a

damaged red Apple iPhone with a shattered and detached screen," and the factual basis to find

probable cause supporting a forensic search of the phone. *Id.* at 1. It recounted, *inter alia*, that

the NYPD had received a Crimestoppers tip on December 27, 2023, which accused McBean of

orchestrating the shooting of Burgos and Williams. It stated that:

> [the shooting] happened because of an individual known as Dajahn McBean who
> is currently in Federal Prison in Washington D.C; that Dajahn McBean ordered the
> hit; that Dajahn McBean has a phone in prison and that he used a female [Harris],
> whose Instagram account name is Ms. Chinn, to set up a meet with a male
> [Williams], whose Instagram name is Chinaman; Dajahn McBean wanted
> Chinaman killed; Dajahn McBean put a $200k hit on Chinaman and that the female
> was shot by accident.

---

[11] This prohibition applies to "sentenced and unsentenced inmates in [BOP] custody." Inmate
Discipline Program at 2.

*Id.* ¶ 4(g). It reported aspects of NYPD officers' December 27, 2023 interviews of Williams, at Jamaica Hospital, in which he informed law enforcement that he had a "beef" with McBean, *id.* ¶ 4(k), and of Harris, *id.* ¶ 4(j).

The affidavit further identified Instagram posts confirming the "beef" between McBean and Williams. *See id.* ¶ 4(*l*). Several, attributed to Williams, derided McBean. One included a photo of McBean with the following text: "[H]e lives in the basement of his moms house he never paid rent or paid a phone bill in his life he's a mother boy he beg me for money when he came home in 2015 none of his friends had money." *Id.* Another stated: "[I]f code 33 post anything it's comin from the biggest hater which is jeezy mula he have no old friends looking for new ones." *Id.*[12] A third addressed the shooting at Hush. Williams mocked the individuals involved in the shooting: "[S]hots fire im not dead I'm up; threw 10 shots and missed all 10 is crazy go get a refund twin; excuse me rookies y'all did a terrible job last night refund me my money plz (laughing emojis) my mother wig is all over the net I need my name ifs all I got (laughing emojis); and get your refund." *Id.*

## III.    Discussion

McBean argues that the warrantless search of his cell violated the Fourth Amendment, requiring suppression of the cellphone and its contents. The Government counters that, under *Hudson v. Palmer*, 468 U.S. 517 (1984), McBean, as an inmate, lacked an objectively reasonable expectation of privacy in his cell, and thus cannot claim a Fourth Amendment violation.

The Court denies McBean's motion. Under *Hudson* and its progeny, McBean lacked an objectively reasonable expectation of privacy in his MDC cell, barring him from challenging the search of his cell under the Fourth Amendment. That is so even assuming that, under this line of

---

[12] The Government has represented that McBean goes by the nickname "Jeezy Mula."

authority, McBean retained a limited privacy interest with respect to searches undertaken solely

for law enforcement investigative purposes that did not implicate prison security interests,

because that interest of his was not implicated here. The Court therefore denies his motion to

suppress.

### A.     Applicable Law

The Fourth Amendment protects "[t]he right of the people to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.

A search under the Fourth Amendment "occurs when the government violates a subjective

expectation of privacy that society recognizes as reasonable." *Kyllo v. United States*, 533 U.S.

27, 33 (2001); *see also, e.g.*, *Carpenter v. United States*, 585 U.S. 296, 304 (2018). Relevant

here, a person claiming the Fourth Amendment's protection must have "a legitimate expectation

of privacy in the invaded place." *Minnesota v. Carter*, 525 U.S. 83, 88 (1998).

A prison cell, generally, is not such a place. The Supreme Court so held in *Hudson*, a

seminal case. And, as reviewed below, a body of ensuing caselaw has reinforced that prison

inmates lack a reasonable expectation of privacy in their cells.

In *Hudson*, an inmate claimed that prison officials' "shakedown" search of his prison cell

violated the Fourth Amendment. 468 U.S. at 520. The inmate argued that the cell search was

unreasonable because it had been conducted solely to "harass" him, and not for any reason

related to institutional security. *Id.* The Supreme Court rejected the premise of this claim: It

held that the Fourth Amendment's "proscription against unreasonable searches does not apply

within the confines of the prison cell." *Id.* at 526. That was so, the Court explained, because the

inmate lacked a "legitimate expectation of privacy" in his prison cell. *Id.* at 530. And it framed

that holding broadly:

> Notwithstanding our caution in approaching claims that the Fourth Amendment is inapplicable in a given context, we hold that society is not prepared to recognize as legitimate *any* subjective expectation of privacy that a prisoner might have in his prison cell . . . . The recognition of privacy rights for prisoners in their individual cells simply cannot be reconciled with the concept of incarceration and the needs and objectives of penal institutions.

*Id.* at 525–26 (emphasis added). Because prison cells are "[v]irtually the only place inmates can conceal weapons, drugs, and other contraband," the Court stated, "unfettered access to these cells by prison officials . . . is imperative if drugs and contraband are to be ferreted out and sanitary surroundings are to be maintained." *Id.* at 527. Thus, the Court held, in evaluating a Fourth Amendment claim by an inmate, it does not matter whether prison officials searched the inmate's cell pursuant to "an enunciated general policy," based on "suspicion . . . directed at [that] particular inmate," or "wholly [at] random." *Id.* at 529 (quoting *Marrero v. Commonwealth*, 284 S.E. 2d 809, 811 (Va. 1981)). Such a claim, the Court held, does not lie, and the Fourth Circuit thus had erred in recognizing a "limited privacy right" under the Fourth Amendment where a cell search had been conducted "solely" to harass a prisoner and/or to destroy his property. *Id.* at 521–22.[13]

   *Hudson* grew out of a series of decisions by the Supreme Court that limited prisoners' constitutional rights where necessary to accommodate the "institutional needs and objectives" of prisons. *Bell v. Wolfish*, 441 U.S. 520, 546–47 (1979). These prison interests centered on internal security, but also were held to include retribution for unlawful conduct, deterrence, and rehabilitation. *See id.* at 537 ("Loss of freedom of choice and privacy are inherent incidents of confinement."); *accord Block v. Rutherford*, 468 U.S. 576, 588 (1984); *Wolff v. McDonnell*, 418

---

[13] The Court held that the remedy for misconduct of this nature, if any, was under the Fourteenth Amendment (for a state inmate), the Eighth Amendment, and/or state tort law. *See id.* at 530; *see also id.* at 540 (O'Connor, J., concurring) (identifying "constitutional sources" other than Fourth Amendment).

U.S. 539, 556 (1974); *Pell v. Procunier*, 417 U.S. 817, 826 (1974); *Lanza v. New York*, 370 U.S. 139, 144 (1962).

Important here, two years after *Hudson*—in a decision that is the focus of McBean's present motion—the Second Circuit recognized a narrow exception to *Hudson*, for a pretrial detainee awaiting resolution of the criminal charges against him. *United States v. Cohen*, 796 F.2d 20 (2d Cir. 1986), arose from a prison official's warrantless search of an inmate's papers while he was held pending trial on drug distribution conspiracy charges. *Id.* at 21. The lead prosecutor had initiated the search and dictated its scope. The prosecutor had "directed" the prison official "to look for certain types of documents" that "may have contained the names and phone numbers of [the defendant's] co-conspirators and witnesses" whom the defendant "had already contacted and was still in the process of trying to contact." *Id.* The prison official then carried out the prosecutor's instructions: after entering the inmate's cell, the official examined, for approximately half an hour, papers of the type identified by the prosecutor. *See id.* The prison official then left, only to return a short time later to examine those papers for another hour. *See id.* The Second Circuit held that, notwithstanding *Hudson*, this search breached the Fourth Amendment. It held that a pretrial detainee retains a "much diminished" Fourth Amendment right, against unreasonable searches of his prison cell that (1) are instigated by "non-prison officials," and (2) do not serve an "institutional security" purpose. *Id.* at 24. Because the cell search breached the "small remnant" of the Fourth Amendment right held by a pretrial inmate, the Circuit held, the evidence obtained in the search was required to be suppressed. *Id.*

The Second Circuit in *Cohen* pointedly emphasized three limits to its holding that the defendant inmate could challenge his cell search under the Fourth Amendment. First, the inmate

in *Cohen* was a pretrial detainee who, at the time of the search, had not been adjudged guilty of the crimes for which he was being held. Because a defendant's pretrial confinement is not penal in nature, the Circuit stated, it does not "necessarily entail[] a restriction or withdrawal of constitutional rights . . . justified by the considerations underlying our penal system." *Id.* at 22–23. Second, the search of the defendant's cell had been "initiated by the prosecution *solely* to obtain information for a superseding indictment." *Id.* at 24 (emphasis added). Had the search been "initiated" by a prison official, the Circuit stated, it "would not [have] be[en] subject to constitutional challenge, regardless of whether security needs could justify it." *Id.* Third, the prison officials lacked any independent rationale for the search, as was revealed by the prison official's unilateral focus on the inmate's papers. *See id.* at 21. On the contrary, the record "clearly reveal[ed]" that the decision to conduct the search "was not made by those officials in the best position to evaluate the security needs of the institution"—the prison officials—nor was it "even colorably motivated by institutional security concerns." *Id.* at 23; *cf. Wolfish*, 441 U.S. at 546 ("There is no basis for concluding that pretrial detainees pose any lesser *security* risk than convicted inmates." (emphasis added)).

The Second Circuit has twice rejected efforts by inmates to extend the limited Fourth Amendment right recognized in *Cohen*.

In *Willis v. Artuz*, 301 F.3d 65 (2d Cir. 2002), the Circuit reaffirmed that the Fourth Amendment right recognized in *Cohen* is held only by pretrial detainees. The inmate there, serving a life sentence, sued for damages under 42 U.S.C. § 1983, claiming that prison officials' warrantless search of his cell had violated the Fourth Amendment. *See id.* at 66. Aspects of the search in *Willis* resembled that in *Cohen*: It had been conducted "at the behest of the police" to uncover evidence of an as-yet-uncharged crime, and it "did not serve any purpose related to

prison security." *Id.*  But, the Circuit held, these circumstances did not give rise to a Fourth

Amendment right.  The decisive fact, the Circuit held, was that the inmate had already been

convicted when his cell was searched, and thus he lacked an objectively reasonable expectation

of privacy. *Id.* at 69.  In contrast to a pretrial detainee, the Circuit stated, a convicted prisoner's

privacy interests must yield—even where institutional security was not at issue—to society's

interests in retribution and deterrence. *See id.*  For this reason, the Circuit held, *Hudson* governs

once an inmate's guilt has been established, regardless whether the search was motivated by the

prison's interests in maintaining internal security and order.  *Accord United States v. Stanishia*,

687 F. App'x 183, 186 (3d Cir. 2017) ("[C]onvicted prisoners . . . have no Fourth Amendment

right with respect to searches of their cells."); *United States v. Huart*, 735 F.3d 972, 975 (7th Cir.

2013) ("It is well settled that prisoners have no reasonable expectation of privacy in the

belongings they keep with them.").

        In *United States v. Willoughby*, 860 F.2d 15 (2d Cir. 1988), the Circuit again reinforced

*Cohen*'s limits. The *Cohen* exception to *Hudson*, it held, did not apply to a federal inmate who

was simultaneously held both as a convicted prisoner *and* as a pretrial detainee on new charges.

Under these circumstances, the Circuit held, the inmate lacked a reasonable expectation of

privacy in his calls to non-attorneys on the prison's telephones. *See id.* at 20 (citing *United*

*States v. Amen*, 831 F.2d 373 (2d Cir. 1987)); *see Amen*, 831 F.2d at 383 ("If security concerns

can justify . . . wholly random cell searches, then surely it is reasonable to monitor prisoners'

telephone conversations." (citing *Hudson*, 468 U.S. at 530)); *cf. Ford v. Hunter*, 534 F. App'x

821, 826 (11th Cir. 2013) ("[N]o other circuit has adopt[ed] *Cohen*'s rule.").[14]

---

[14] Indeed, even assuming that the inmate had been held only as a pretrial detainee, the Circuit
held, prison officials' taping and monitoring of these calls did not violate any "residual privacy
interests" that he "may" have had under *Cohen*. *Id.* at 21. The Circuit rendered this alternative

Consistent with the Second Circuit's decisions in *Willis* and *Willoughby*, other courts have narrowly construed the exception recognized in *Cohen*. *See United States v. Ross*, 771 F. App'x 345, 348 (9th Cir. 2019) (assuming that *Cohen* was good law in the Ninth Circuit, finding no Fourth Amendment violation, because the cell search "was not intended *solely* to bolster the prosecution's case" (emphasis added)); *United States v. Hogan*, 539 F.3d 916, 923 (8th Cir. 2008) (similar); *United States v. Reece*, 28 F.3d 114, 114 (10th Cir. 1994) (*Cohen*'s "exception . . . was created to cover situations where a pretrial detainee's cell is searched by non-prison officials for non-security related reasons"); *Ford*, 534 F. App'x at 826 (similar). *Compare United States v. Schulte*, No. 17 Cr. 548, 2019 WL 5287994, at *2 n.1 (S.D.N.Y. Oct. 18, 2019) ("[A]lthough pretrial detainees may have some residual privacy interests that are protected by the Fourth Amendment[,] courts must weigh those interests against the requirements of preservation of institutional security and order."), *with West v. City of New York*, No. 13 Civ. 5155 (PAE), 2014 WL 4290813, at *6 (S.D.N.Y. Aug. 28, 2014) ("[I]nmates do not have the right to be free from searches of any kind; even searches conducted solely for harassment do not implicate the Fourth Amendment."), *Rodriguez v. McClenning*, 399 F. Supp. 2d 228, 239 (S.D.N.Y. 2005) (same), *and Salahuddin v. Mead*, No. 95 Civ. 8581, 2002 WL 1968329, at *5 (S.D.N.Y. Aug. 26, 2002) (collecting cases holding the same).

---

holding, because the record was "opaque" as to the basis for the inmate's detention in the federal facility. *Id.* at 20. The defendant had been convicted of a state crime and sentenced to a prison term for that offense, and had been transferred to the federal facility from state prison. But the record was unclear whether, before being transferred, the inmate had completed his state sentence. The Circuit's decision thus was written to cover both the scenario in which the inmate had been transferred to federal custody from state prison while still serving his state sentence and that in which he had completed his state sentence and was being held in state prison solely as a pretrial detainee on the new federal charge. *Id.* at 20–21.

The post-*Hudson* caselaw is thus fairly summarized as follows:  Under *Hudson*, a prisoner lacks an objectively reasonable expectation of privacy in his cell.  He therefore cannot challenge prison officials' search of his cell under the Fourth Amendment.  The only exception to this general prohibition is that recognized in *Cohen*, but it has been limited to circumstances where (1) a pretrial detainee's cell was searched (2) at the instigation of the prosecution (3) solely to gather information in connection with a pending case and unsupported by institutional prison interests.

**B.    Application**

Measured against these principles, McBean's motion to suppress the fruits of the search of his MDC cell fails.  The search was undisputedly for contraband—a cellphone which BOP rules identify as dangerous and forbid inmates to possess.  Under the caselaw, McBean lacked an objectively reasonable expectation of privacy in his cell against a search for such contraband, precluding his claim of a Fourth Amendment violation.

For the search of McBean's cell to constitute a "search" under the Fourth Amendment, it must have implicated "a subjective expectation of privacy that society recognizes as reasonable." *Kyllo*, 533 U.S. at 33; *see also Smith v. Maryland*, 442 U.S. 735, 740 (1979); *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring).  *Hudson*, however, broadly holds that a prisoner does not have an objectively reasonable expectation of privacy within the confines of his prison cell.  *See Hudson*, 468 U.S. at 526 ("[S]ociety is not prepared to recognize as legitimate *any* subjective expectation of privacy that a prisoner might have in his prison cell and . . . accordingly, the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell." (emphasis added)); *see also, e.g., Carpenter*, 585 U.S. at 304 (asserted privacy interest must be "one that society is prepared to recognize as reasonable").  Insofar as the MDC officials here were searching for an item that BOP regulations

define as dangerous contraband, the search of McBean's cell squarely implicated *Hudson*'s rationale. As the Supreme Court stated: "Unfettered access to [inmates'] cells by prison officials . . . is imperative if drugs *and contraband* are to be ferreted out." 468 U.S. at 527 (emphasis added); *see also Lanza*, 370 U.S. at 143–44 (a prison cell "shares none of the attributes of privacy of a home, an automobile, an office, or a hotel room" because, *inter alia*, "official surveillance has traditionally been the order of the day").

The Fourth Amendment thus was not implicated by the search of McBean's prison cell. Indeed, courts in this District, applying *Hudson*, have routinely rejected inmates' Fourth Amendment challenges to cell searches. *See, e.g.*, *West*, 2014 WL 4290813, at *6 ("[I]nmates do not have the right to be free from searches of any kind; even searches conducted solely for harassment do not implicate the Fourth Amendment."); *Rodriguez*, 399 F. Supp. 2d at 239 ("[Defendant] correctly asserts that [plaintiff] had no constitutional right to be free from cell searches of any kind, including retaliatory cell searches."); *Salahuddin*, 2002 WL 1968329, at *5 (even "arbitrary" or "retaliatory" searches in prisons do not implicate the Fourth Amendment); *Walker v. Keyser*, 98 Civ. 5217, 2001 WL 1160588, at *9 (S.D.N.Y. Oct. 2, 2001) (same); *Walker v. Goord*, 98 Civ. 5217, 2000 WL 297249, at *4 (S.D.N.Y. Mar.22, 2000) (same); *Bey v. Eggleston*, 96 Civ. 3302, 1998 WL 118158, at *4 (S.D.N.Y. Mar.17, 1998) ("A search of an inmate—even for retaliatory reasons—does not implicate a constitutional right."); *Gadson v. Goord*, 96 Civ. 7544, 1997 WL 714878, *7 (S.D.N.Y. Nov.17, 1997) ("[S]earches of cells implicate no constitutional rights, even if the search is arbitrary or retaliatory in nature."); *see also Hayes v. Cal. Dep't of Corr. & Rehab.*, 19 Civ. 9513, 2020 WL 3963882, at *2 (C.D. Cal. Apr. 28, 2020) ("Plaintiff has no Fourth Amendment right to prevent a prison search of the contents of his contraband phone without a warrant.") (citing *Hudson*, 468 U.S. at 524)); *United*

*States v. Bash*, 20 Cr. 238, 2021 WL 3207252, at *6 (E.D. Cal. July 29, 2021) ("[B]ecause he was incarcerated in state prison and not allowed to possess a contraband cellphone, defendant has failed to establish that he had a reasonable expectation of privacy in the contents of that contraband cellphone.").

McBean seizes on *Cohen*, arguing that he fits within the narrow exception *Cohen* recognizes to *Hudson*'s general rule. He notes that, as in *Cohen*, the search of his cell was initiated by a request by outside law enforcement agents—the NYPD officers investigating the murder-for-hire scheme. That feature is indeed common to *Cohen* and this case. But, as *Cohen* and the cases that have applied it underscore, the exception recognized there was further limited: to searches (1) of pretrial detainees (2) undertaken solely to gather evidence to assist the pending prosecution, and not at all to advance institutional prison interests. McBean's case is properly distinguished on both grounds.

First, McBean was not a pretrial detainee. He had pled guilty to an offense—assaulting an individual with a dangerous weapon in aid of racketeering—and the judge in that case had accepted his guilty plea. He was in custody awaiting sentencing on the basis of that adjudicated charge. As such, McBean cannot invoke the presumption of innocence in the eyes of the law that the Second Circuit highlighted in *Cohen* as one basis for a limited exception to *Hudson*. As the Circuit noted in *Cohen*, the inmate was "awaiting his day in court" when the prosecution asked that a search of cell for documents be undertaken for the "sole[]" purpose of obtaining information for a superseding indictment. 796 F.2d at 24. "A person lawfully committed to pretrial detention has not been adjudged guilty of any crime. He has had only a judicial determination of probable cause as a prerequisite to the extended restraint of his liberty following arrest." *Wolfish*, 441 U.S. at 536 (cleaned up). For this reason, the Circuit held in *Cohen*, the

penal interests in punishment and rehabilitation that were bases for *Hudson*'s holding that an inmate does not have a reasonable expectation of privacy in his cell were not present. Consequently, a pretrial detainee retained "a small remnant" of a legitimate privacy interest. *Cohen*, 796 F.2d at 24.

Contrary to McBean's depiction of his felony guilty plea as an anodyne procedural waypoint, his sworn admission to the racketeering assault was a consequential juridical event with meaningful bearing on his expectation of privacy while in custody. As the Supreme Court has recognized: "A plea of guilty is more than a confession which admits that the accused did various acts; it is itself a conviction." *Boykin v. Alabama*, 395 U.S. 238, 242 (1969); *see also, e.g., United States v. Broce*, 488 U.S. 563, 570 (1989) ("By entering a plea of guilty, the accused is not simply stating that he did the discrete acts described in the indictment; he is admitting guilt of a substantive crime."); *North Carolina v. Alford*, 400 U.S. 25, 32 (1970) (same). Upon the entry of McBean's plea, his guilt was established; the court "ha[d] nothing to do but give judgment and sentence," *Kercheval v. United States*, 274 U.S. 220, 223 (1927); *see also United States v. Madoff*, 316 F. App'x 58, 59 (2d Cir. 2009) (defendant who has pled guilty "is no longer entitled to the presumption of innocence"). For this reason, the federal bail statute sharply distinguishes between defendants based on whether they have pled guilty. Before a guilty plea, the Government bears the burden—subject to exceptions for certain offenses—of establishing that the defendant is a risk of flight or presents a danger to the community. *See* 18 U.S.C. § 3142(e)–(f) . Upon a guilty plea or verdict, however, a presumption arises, rebuttable only by clear and convincing evidence, that the defendant merits detention on both grounds. *Id.* § 3143(a)(1); *see, e.g., United States v. Perez*, No. 23-7090-Cr, 2023 WL 7276651, at *1 (2d Cir. Nov. 3, 2023). As a convicted felon awaiting sentencing, McBean did not have a reasonable

basis to expect privacy in his cell on account of his presumed innocence. *See, e.g., Willis*, 301

F.3d at 69 (refusing to extend *Cohen* because penal interests, including punishment and

rehabilitation, justified convict's "loss of privacy rights"); *Hudson*, 468 U.S. at 526; *Salahuddin*,

2002 WL 1968329, at *5 (collecting cases).[15]

Second, the search of McBean's cell by MDC officials, although initiated by the NYPD

with the goal of helping solve the Burgos murder, was supported by a bona fide—and indeed,

weighty—prison institutional interest. As the evidence at the suppression hearing established,

BOP policy prohibits inmates from possessing contraband cellphones. BOP regulations identify

cellphones as dangerous contraband. *See* BOP Inmate Handbook § 108 (prohibiting inmates

from possessing "tools . . . hazardous to institutional security or personal safety" and identifying

among such tools a "portable telephone, pager, or other electronic device"); *see also* Tr. at 30

(Ubiera testimony about regulations); 18 U.S.C. § 1791(a)(2), (d)(1)(F) (barring federal inmates

from possessing "a prohibited object," including "a phone or other device used by a user of

commercial mobile service"). As Lieutenant Ubiera testified, such phones present security risks,

because inmates can use them to organize criminal activity, including coordinating violent

attacks against members of the public, prison staff, and other inmates. *See* Tr. at 19, 30–31. The

caselaw reinforces this interest. *See, e.g., Florence v. Bd. of Chosen Freeholders of Burlington*,

566 U.S. 318, 332 (2012) ("Cell phones are used to orchestrate violence and criminality both

---

[15] Underscoring the importance of this factor to the exception recognized in *Cohen*, the Supreme Court has noted that the State has more limited interests when it detains persons who have not "been adjudged guilty of any crime." *Wolfish*, 441 U.S. at 536–37; *accord Sandin v. Conner*, 515 U.S. 472, 487 (1995); *Benjamin v. Fraser*, 264 F.3d 175, 187 n.10 (2d Cir. 2001) ("Although some of the concerns of pretrial detention, especially protection against further criminal conduct, overlap with the concerns of penology, there are important differences. Penological interests are therefore arguably not an appropriate guide for the pretrial detention of accused persons.").

within and without jailhouse walls."). Indeed, crediting the allegations in the Indictment, the shootings of civilians Burgos and Williams, organized by MDC inmate McBean, exemplify the dangers presented by a prisoner's contraband cellphone.

For this reason, upon being alerted by the NYPD that McBean was believed to harbor a contraband cellphone—not to mention have criminally used it—the MDC had a compelling institutional interest, independent of the NYPD's investigative interest, in searching for and seizing that phone. As Lieutenant Ubiera testified, she believed that, under BOP regulations, the MDC was required to search McBean's cell upon learning from the NYPD that it might contain a contraband cellphone. Tr. at 51. She further testified that MDC officials would have searched McBean's cell had they learned of a possible contraband cellphone in his possession by means other than a request by law enforcement to investigate a possible crime. *Id.*[16] The MDC's strong and independent security interest in searching for the cellphone, which existed alongside the NYPD's investigative interest, sharply distinguishes this case from *Cohen*. There, the Government failed to show that the search of the inmate's papers was "even colorably motivated by institutional security concerns," and search was undertaken "solely to obtain information for a superseding indictment." 796 F.2d at 23–24.

In light of the MDC officials' independent basis for initiating the search, anchored in regulations aimed at assuring safety inside and outside the MDC, McBean, like the inmate in

---

[16] Lieutenant Ubiera testified that MDC officials routinely undertake cell searches to root out contraband cellphones because an inmate's possession of a cellphone is among the most severe of disciplinary infractions under BOP regulations. Tr. at 24, 28–32. Consequently, Lieutenant Ubiera testified, she believed BOP regulations "required" her to search McBean's cell upon receiving information that McBean may be in possession of a cellphone. *Id.* at 51. Also consistent with her testimony that such an infraction is serious, the MDC, upon adjudging McBean guilty of possessing the cellphone, administratively sanctioned McBean for this misconduct. *See* Gov't Br, Ex. 5 at 1.

*Hudson*, cannot assert a reasonable expectation of privacy with respect to it. And the strength and obviousness of the institutional interest in ferreting out dangerous contraband was reinforced by the officers' observations as the search team approached his cell. Other inmates "catcalled," which Lieutenant Ubiera perceived as an attempt to alert McBean that the recognizable search team was approaching. Tr. at 34, 76. The search team also noted that the window of McBean's cell had been covered from the inside by an opaque object. *Id.* at 41. This concealment, itself a violation of BOP regulations, was a transparent attempt (by McBean and/or cellmate Waiters) to prevent the officials from seeing into the cell. *Id.* at 41, 44, 76. The inmates also jammed the door, impeding entry. *Id.* at 41–42. In Lieutenant Ubiera's reasonable view, these ploys confirmed that McBean was seeking to avoid or delay detection of forbidden and dangerous contraband. Tr. at 76–78.[17] The Court credits that assessment of an experienced official. *See Cohen*, 796 F.2d at 23 ("[P]rison officials are presumed to do their best to evaluate and monitor objectively the security needs of the institution and the inmates in their custody, and then to determine whether and when such concerns necessitate a search of a prison cell."); *Hudson*, 468 U.S. at 528 (deference warranted to prison officials engaged in "the constant fight against the proliferation of knives and guns, illicit drugs, and other contraband"); *Florence*, 566 U.S. at 332 (similar).

The Court rejects McBean's attempts to discredit Lieutenant Ubiera. Her testimony was highly credible. And her central point—that the MDC views contraband cellphone as a serious breach of institutional meriting cell searches—was persuasively articulated and in accord with BOP regulations. She explained that the MDC routinely undertakes cell searches based on tips

---

[17] On previous occasions when MDC officials had searched his cell, McBean had been compliant and calm. Tr. at 49.

24

about such contraband from outside law enforcement like the NYPD, and that the MDC does so anytime it receives such a report, including from other inmates. Tr. at 51. Indeed, she and other MDC officials had searched McBean's cell on prior occasions, based on reports of contraband cellphones, and found them, leading to imposition of sanctions. *Id.* at 49. She recounted the steps she took upon the report of McBean's cellphone, which entailed "due diligence" and assembly of a search team. *Id.* at 25–26, 49–50. As she credibly testified, the search's initiation and manner were not shaped in "any way" by law enforcement's investigative interest in the cellphone. *Id.* at 51; *cf. Cohen*, 796 F.2d at 23 (prosecutor "directed" prison official "to look for certain types of documents" that "may have contained the names and phone numbers of the defendant's co-conspirators and witnesses").

Finally, under foundational Fourth Amendment principles, the coexistence of multiple motivations for the search of McBean's cell does not support suppression. The Court has found that (1) the NYPD's request for a cell search was motivated by its investigative interest in the Burgos murder, and (2) the MDC's ensuing decision to undertake the search was based on its interest in security and seizing dangerous contraband such as the cellphone reported to be in McBean's cell. As the Supreme Court has repeatedly held, whether a search or seizure is justified under the Fourth Amendment turns on *objective* considerations: whether the facts known to law enforcement objectively justified the step under the governing standard. Where these facts objectively justify the search or seizure, it is irrelevant what the officers' subjective motivations were, and courts are "unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual officers." *Whren v. United States*, 517 U.S. 806, 813 (1996); *see, e.g., id.* at 813–16 (unanimously rejecting Fourth Amendment challenge to traffic stop based on claim that officers used traffic violation as pretext to search car of suspected drug dealer;

because officers had reasonable cause to believe that the driver of the car committed a traffic infraction, they were authorized to stop the car, and their subjective motivations were irrelevant); *Kentucky v. King*, 563 U.S. 452, 463 (2011) (Supreme Court has "repeatedly rejected 'a subjective approach, asking only whether 'the circumstances, viewed *objectively*, justify the action.'" (emphasis in original) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 404 (2006))); *Graham v. Connor*, 490 U.S. 386, 397 (1989) ("[O]ur prior cases make clear" that "the subjective motivations of the individual officers . . . ha[ve] no bearing on whether a particular seizure is 'unreasonable' under the Fourth Amendment"). Here, there was an objective basis for the cell search: the report that it housed dangerous contraband. That the NYPD officers who set in motion the events that led to the search had criminal investigative motives is irrelevant, as such does not "invalidate [the MDC officials'] objectively justifiable behavior under the Fourth Amendment." *Whren*, 517 U.S. at 812.

For all these reasons, *Hudson v. Palmer* controls this case, and the narrow exception recognized in *Cohen* does not apply. McBean lacked an objectively reasonable expectation of privacy in his MDC cell. His Fourth Amendment challenge therefore fails.[18]

---

[18] The Government alternatively defends the search as justified by the exigent-circumstances exception to the Fourth Amendment's warrant requirement. Even assuming that McBean had a reasonable expectation of privacy in his cell, it argues, the MDC officials' need to prevent the imminent destruction of evidence justified a warrantless search. *See* Gov't Br. at 21–23; Tr. at 86 (amplifying argument); *King*, 563 U.S. at 460 (noting "well-recognized exception" to warrant requirement "when 'the exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment" and that "the need to prevent the imminent destruction of evidence" is "a sufficient justification for a warrantless search" (quoting *Mincey v. Arizona*, 437 U.S. 385, 394 (1978))); *see also, e.g.*, *Georgia v. Randolph*, 547 U.S. 103, 116, n.6 (2006); *Minnesota v. Olson*, 495 U.S. 91, 100 (1990). The Government's alternative argument is substantial. However, because the Court resolves this motion based on the antecedent ground that McBean lacked an objectively reasonable expectation of privacy, the Court does not have occasion to address it.

## CONCLUSION

For the foregoing reasons, the Court denies McBean's motion to suppress.  The Clerk of Court is respectfully directed to terminate the motion pending at Docket 71.

SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge

Dated: April 15, 2025
      New York, New York