UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| -v- | 24 Cr. 541 (PAE) |
| DAJAHN MCBEAN, *a/k/a* "Jeezy Mula," *a/k/a* "Freeze," | OPINION & ORDER |
| Defendant. | |

PAUL A. ENGELMAYER, District Judge:

This decision resolves pretrial motions by the defense in this capital case.

Dajahn McBean is charged with participating in a murder-for-hire conspiracy resulting in death and personal injury, stalking resulting in death and life-threatening injury, and conspiracy to destroy records. These charges arise from a plot McBean allegedly conceived, while incarcerated on separate charges at the Metropolitan Detention Center ("MDC") in Brooklyn, to hire gunmen to murder a rap-music rival, Laquan Williams. The shooting attacks that followed resulted in grievous injuries to Williams and the murder of Williams's girlfriend, Clarisa Burgos. The Government has elected to pursue the death penalty against McBean.

In the present motions, McBean makes a series of arguments. He brings facial challenges to the Federal Death Penalty Act ("FDPA"), 18 U.S.C. § 3591 *et seq.*, under the Fifth, Sixth, and Eighth Amendments. He brings as-applied challenges to the grand jury proceedings, including under the Fifth and Sixth Amendments. In his most sustained argument, he argues that the Government's notice of intent to seek the death penalty (the "death notice") was untimely under 18 U.S.C. § 3593(a). McBean separately moves for an informative outline of the Government's

evidence underlying certain statutory and non-statutory aggravating factors contained in the death notice.

For the following reasons, the Court denies McBean's challenges to the FDPA, the grand jury proceedings, and the death notice. It also denies his motion for an informative outline, without prejudice to his right to make a renewed motion closer to trial.

## I.    Background

### A.    Relevant Procedural History

On September 12, 2024, the grand jury returned the original indictment in this case. Dkt. 2 ("Original Indictment"). It charged Chelsey Harris with one count of participating in a murder-for-hire conspiracy resulting in personal injury and death, in violation of 18 U.S.C. § 1958. It alleged that Harris and others had conspired to lure Williams to a nightclub in Queens on December 24 and 26, 2023; that gunmen had shot at Williams both nights; and that, on December 26, 2023, they had wounded Williams and killed Burgos.

On October 2, 2024, the grand jury returned a superseding indictment, adding Karl Smith as a defendant. Dkt. 16 ("S1 Indictment"). It charged Smith and Harris with the murder-for-hire conspiracy resulting in personal injury and death, and added charges of stalking resulting in life-threatening bodily injury and death, in violation of 18 U.S.C. §§ 2261(b)(1)–(2), 2261A(2)(A), and 2; and conspiracy to destroy records related to those offenses, in violation of 18 U.S.C. § 1519. On October 4, 2024, the Government filed a letter stating that it would not seek the death penalty against Harris. Dkt. 23.

On October 1, 2024, the grand jury returned a second superseding indictment, Dkt. 33 ("S2 Indictment"), which was unsealed on October 17, 2024, Dkt. 164 at 40 n.14. It added McBean as a defendant on all charges. It also set out "Special Findings Regarding the Murder of Clarisa Burgos," pursuant to 18 U.S.C. §§ 3591 and 3592. These alleged that McBean had been

age 18 or older at the time of the offense, and had "intentionally participated in an act, contemplating that the life of a person would be taken and intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim died as a result of the act." It alleged three statutory aggravating factors under § 3592(c): that McBean had (1) knowingly created a grave risk of death to others; (2) procured the commission of the offense by payment; and (3) committed the offense after substantial planning and premeditation to cause a person's death.[1]

On October 18, 2024, the case was reassigned to this judge. On October 29, 2024, the Court held an initial conference. The Government stated that it had not determined whether to pursue the death penalty against McBean or Smith, and had requested a mitigation submission from McBean. Dkt. 58 ("Oct. 29, 2024 Tr.") at 22. McBean, through counsel, stated that he sought a trial as quickly as possible, and would, alongside pretrial proceedings, make a mitigation submission to the Government. *Id.* at 24–26. The Court accordingly scheduled trial of all three defendants for July 28, 2025, on the premise that the Government would not seek the death penalty against these defendants. *Id.* at 25–26, 35; *see also* Dkt. 53. On November 4, 2024, the Government filed a letter stating that it would not seek the death penalty against Smith. Dkt. 54.

Pretrial litigation proceeded with respect to all three defendants. The Court, *inter alia*, held evidentiary hearings on suppression motions brought by Harris and McBean, which it denied. *See* Dkts. 91–92.

---

[1] The earlier indictments against Harris and Smith had also alleged special findings pursuant to §§ 3591 and 3592. *See* S1 Indictment ¶¶ 6–7 (against Harris and Smith); Original Indictment ¶ 2 (against Harris).

On May 5, 2025, the grand jury returned a third superseding indictment, the operative indictment. Dkt. 98 ("S3 Indictment"). It added Julissa Bartholomew, McBean's business agent, as a defendant.[2] Count One charged all defendants except Bartholomew with murder-for-hire conspiracy resulting in personal injury and death. Count Two charged all defendants with stalking resulting in life-threatening bodily injury and death. Count Three charged all defendants with conspiracy to destroy records.[3] As to McBean, the S3 Indictment alleged the same special findings, and statutory aggravating factors, as the S2 Indictment.

On June 6, 2025, the Government filed a notice of its intent to seek the death penalty against McBean, based on the murder-for-hire conspiracy count. Dkt. 119 ("Death Notice"). It set out two statutory threshold factors, under 18 U.S.C. § 3591(a)(2)(C)–(D): (1) intentional participation in an act resulting in death; and (2) intentional engagement in an act of violence, knowing that it created grave risk of death. It set out four statutory aggravating factors, under 18 U.S.C. § 3592(c): (1) prior conviction of a violent felony involving a firearm; (2) grave risk of death to other people; (3) procurement of the offense by payment; and (4) substantial planning and premeditation. It also set out two non-statutory aggravating factors, under 18 U.S.C. § 3593(a)(2): victim impact and future dangerousness.

On June 10, 2025, the Court held a conference, at which McBean and the Government agreed that, in light of the death notice, McBean could not be tried with Smith and Harris on July 28, 2025. June 10, 2025 Tr. at 8. The Court severed McBean from the July 28 trial.

---

[2] On May 29, 2025, the Court held a pretrial conference, at which it severed Bartholomew's trial from the July 28, 2025 trial of McBean, Smith, and Harris. Dkt. 123 ("May 29, 2025 Tr.") at 48–49.

[3] Counts Four and Five, brought against Bartholomew only, charged destruction of records and obstruction of justice.

Dkt. 122.  It directed the parties to file a joint letter as to next steps in McBean's prosecution. The Court did not set a date for McBean's trial.  *See id.*  As of this decision, the Court, heeding the requests of McBean and the Government, *see, e.g.*, Dkt. 133 at 2, has not scheduled his capital trial yet, pending resolution of these motions and other pretrial matters.

On June 26, 2025, Harris pled guilty to the stalking offense, and using and carrying a firearm in furtherance of that crime.  Dkt. 167 ("Harris PSR") at 4.  On July 17, 2025, Smith pled guilty to the same two offenses.  Dkt. 190 ("Smith PSR") at 4.[4]  On September 15, 2025, Bartholomew pled guilty to conspiracy to destroy documents and obstruct justice.  Dkt. 188 ("Bartholomew PSR") at 4.

On December 22, 2025, the Court sentenced Harris to 23 years' imprisonment.  Dkt. 193 ("Harris Judgment") at 2.  On February 27, 2026, it sentenced Bartholomew to 66 months' imprisonment.  Dkt. 213 ("Bartholomew Judgment") at 2.  On March 27, 2026, it sentenced Smith to 25 years' imprisonment.  Dkt. 231 ("Smith Judgment") at 2.

### B.    McBean's Pending Motions

On September 29, 2025, McBean moved to strike the death notice and the special findings in the Indictment.  Dkts. 162 ("Mot."), 163 ("Spilke Decl."), 164 ("Mem.").  On November 14, 2025, the Government opposed.  Dkt. 186 ("Opp'n").  On January 26, 2026, McBean replied.  Dkt. 204 ("Reply").

On January 22, 2026, McBean moved for an order directing the Government to produce an informative outline.  Dkts. 200 (motion and exhibits), 201 ("Discovery Mem.").  On

---

[4] Harris and Smith's guilty pleas carried five- and ten-year mandatory minimum sentences, respectively, under 18 U.S.C. § 924(c)(1)(A)(i) and (c)(1)(A)(i)–(iii).  Harris PSR at 2; Smith PSR at 2.

February 19, 2026, the Government opposed.  Dkt. 210 ("Discovery Opp'n").  McBean did not file a reply.  *See* Dkt. 216.[5]

On March 26, 2026, the Court heard argument on the pending motions.

## II.      Discussion

McBean brings four sets of motions.  The Government opposes each.

First, he challenges the FDPA as facially unconstitutional under the Fifth, Sixth, and Eighth Amendments.  Second, he challenges the Indictment, claiming that the grand jury proceedings violated the Fifth and Sixth Amendments and the separation-of-powers and non-delegation doctrines.  Third, he moves to strike the death notice as untimely under § 3593(a).  Finally, he seeks an order directing the Government to give him an "exhaustive informative outline" within two months, which would set out its evidence in support of the non-statutory aggravating factors of future dangerousness and victim impact, and the statutory aggravating factor of grave risk of harm to people other than Burgos.

### A.      Facial Constitutional Challenges to the FDPA

McBean argues that the FDPA is facially unconstitutional in multiple respects.  First, he argues that the FDPA violates the Eighth Amendment's prohibition against arbitrary punishment because it lacks adequate procedural safeguards, allows for unfettered prosecutorial discretion, and produces "information overload" among jurors that impairs their rational decision-making.  Second, he argues that the FDPA violates the Eighth Amendment's prohibition against cruel and unusual punishment because the delays caused by prolonged death-penalty litigation result in the decades-long solitary confinement of persons on death row.  Third, he argues that the FDPA violates the Sixth Amendment because the process of death qualification yields conviction-prone

---

[5] On May 18, 2026, McBean filed a short supplemental letter supporting this motion.  Dkt. 246.

juries and disproportionately excludes racial, religious, and political groups.  Fourth, he argues

that the FDPA violates the Fifth Amendment because it does not explicitly require the grand jury

to vote on statutory intent and aggravating factors.  Fifth, he argues that the FDPA violates the

separation-of-powers and the non-delegation doctrines by allowing the executive branch to

decide when to seek the death penalty and which aggravating factors to allege.  McBean seeks an

evidentiary hearing to develop a factual record as to these issues.

The Court first considers whether an evidentiary hearing is warranted.  Finding not, the

Court considers McBean's facial challenges to the FDPA.

### 1.    Whether an Evidentiary Hearing Is Warranted

McBean argues that the Court should hold an evidentiary hearing to develop a factual

record to enable an appellate court to reconsider the FDPA's constitutionality.  Mem. at 23–24.

Such a hearing, he notes, was held in *United States v. Fell*, 224 F. Supp. 3d 327 (D. Vt. 2016),

which addressed a similar facial challenge to the FDPA.  The court there received evidence on,

*inter alia*: (1) whether death qualification of jurors leads to conviction-prone juries, (2) whether

the death penalty is imposed in an arbitrary manner, (3) whether there are excessive delays

between conviction and execution, and (4) the effects on death-row prisoners of long-term

solitary confinement.  *Id.* at 329–30.  It held, after a two-week hearing, that "the FDPA operates

in an arbitrary manner in which chance and bias play leading roles," but it rejected the

defendant's challenge to the statute's constitutionality as foreclosed by Supreme Court

precedent.  *Id.* at 329.  McBean argues that, if the Court declines to hold a hearing, it should take

judicial notice of the record in *Fell*, to ensure that the evidence adduced there is properly

considered on an appeal by McBean.  Mem. at 24.

The Court declines to hold an evidentiary hearing. Whether to do so is committed to the Court's discretion. *See Zappia Middle E. Const. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000). A hearing is appropriate where material facts are in dispute. *See Puglisi v. United States*, 586 F.3d 209, 213 (2d Cir. 2009). McBean initially argued that there are such disputes here, including whether death qualification skews the demographics of capital juries, and whether the FDPA's framework produces a substantial risk of juror confusion. Reply at 9–10. At argument, however, he acknowledged that the defense's objective was to ensure that a factual record exists in the event of appellate review. *See* Mar. 26, 2026 Tr. ("Oral Arg. Tr.") at 7 ("It is a preservation argument."). That goal is met by taking judicial notice of the record in *Fell*. The defense here has not identified any evidence lacking from that record that it contends is material to McBean's constitutional challenges.[6]

The Court accordingly denies the request for an evidentiary hearing. *See, e.g.*, *United States v. Schlesinger*, 2021 WL 5578900, at *12 (D. Ariz. Nov. 29, 2021) (on facial challenge to FDPA, testimony "not needed for the Court to resolve the claims raised by defendant"); *United States v. Bowers*, 2020 WL 1675916, at *4 n.2 (W.D. Pa. Apr. 6, 2020) (same); *United States v. Sampson*, No. 01 Cr. 10384, 2015 WL 7962394, at *5 (D. Mass. Dec. 2, 2015) (same); *United States v. Williams*, 2013 WL 1335599, at *41 (M.D. Pa. Mar. 29, 2013) (same); *United States v. Taylor*, 635 F. Supp. 2d 1243, 1244 (D.N.M. 2009) (same). The Court takes judicial notice of the *Fell* record relevant to McBean's facial challenges.

---

[6] The Court's independent assessment is that an evidentiary hearing would not assist in resolving the pending motions. Only two of McBean's facial challenges—based on prolonged detention and jury confusion—are not foreclosed by binding precedent. And for the reasons reviewed below, those arguments fail as a matter of law. *See, e.g.*, *United States v. Schlesinger*, 2021 WL 5578900, at *12 (D. Ariz. Nov. 29, 2021) (denying request for evidentiary hearing where challenges "fail[ed] as a matter of law").

### 2.    Whether the FDPA Violates the Eighth Amendment's Prohibition Against Arbitrary and Capricious Punishment

#### a.    *Procedural Safeguards*

McBean argues that the FDPA's procedural protections do not guard against arbitrariness and inconsistency in imposition of the death penalty.  Mem. at 21.  That argument is foreclosed by *Gregg v. Georgia*, 428 U.S. 153 (1976) and *United States v. Aquart*, 912 F.3d 1 (2d Cir. 2018).

In *Gregg*, the Supreme Court considered whether the death penalty "invariably violate[s] the Constitution."  428 U.S. at 169.  It held the death penalty not *per se* unconstitutional.  *Id.* at 187.  It then considered the circumstances under which the death penalty can be constitutionally imposed.  It explained that, under its precedents, a capital-punishment statute violates the Eighth Amendment where its sentencing procedures create a "substantial risk" that the penalty will be imposed in an "arbitrary and capricious manner."  *Gregg*, 428 U.S. at 188 (citing *Furman v. Georgia*, 408 U.S. 238, 313 (1972)).  Accordingly, the sentencing authority's discretion must "be suitably directed and limited" by a "carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance."  *Id.* at 189, 194.  The Court found that, as a general matter, arbitrariness concerns could be "met by a system that provides for a bifurcated proceeding at which the sentencing authority is apprised of the information relevant to the imposition of sentence and provided with standards to guide its use of the information."  *Id.* at 195.  The Court upheld Georgia's capital-sentencing procedures, which narrowed the class of defendants subject to capital punishment; authorized the jury to consider aggravating and mitigating circumstances; required the jury to find a statutory aggravating circumstance before recommending a death sentence; and provided for automatic appeal of all death sentences.  *Id.* at 196–98.

9

In *Aquart*, the Second Circuit considered whether the FDPA satisfies the criteria set out in *Furman* and *Gregg*. *See* 912 F.3d at 54 ("a capital sentencing system must: (1) rationally narrow the class of death-eligible defendants; and (2) permit a jury to render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime" (quoting *Kansas v. Marsh*, 548 U.S. 163, 173–74 (2006))). The Circuit held that it does, noting the following statutory safeguards. First, the FDPA provides that the death penalty is available only for an enumerated list of crimes, and requires a bifurcated trial (first to determine guilt, then punishment). *Id.* at 52 (citing 18 U.S.C. §§ 3591 & 3593(b)). Second, if a defendant is convicted of a death-eligible crime, a sentence of death may be imposed only if the jury finds beyond a reasonable doubt that certain statutory requirements (that the defendant acted with specific culpable intent, under circumstances specified in at least one statutory aggravating factor) are satisfied. *Id.* (citing 18 U.S.C. §§ 3591(a)(2), 3592(c) & 3593(e)(2)). Third, if the jury so finds, then it must consider non-statutory aggravating factors (which must be established beyond a reasonable doubt) and mitigating factors (which need only be established by a preponderance of the evidence). *Id.* (citing 18 U.S.C. § 3593(c)–(d)). Fourth, the jury must "carefully weigh" those aggravating and mitigating factors. *Id.* (citing 18 U.S.C. § 3593(e)). It may return a death verdict only if it unanimously concludes that the aggravating factors so outweigh the mitigating factors as to justify a capital sentence. And the jury is never required to return such a verdict. *Id.* (citing 18 U.S.C. § 3593(e)). Fifth, the jury is prohibited from considering certain characteristics of the defendant (*e.g.*, race, color, national origin), and each juror must certify that such factors did not inform his or her decision. *Id.* (citing 18 U.S.C. § 3593(f)). Sixth, if the jury does not vote for death, its decision is unreviewable, and if the jury does so vote, a defendant is entitled on appeal

to "comprehensive record review." *Id.* These procedures, the Circuit held, "sufficiently safeguard against arbitrary and capricious death sentences to satisfy the Eighth Amendment." *Id.*

*Gregg* and *Aquart* bind this Court, notwithstanding the empirical data which, McBean argues, *see* Mem. at 21, calls into question the effectiveness of the statutory protections cited in those decisions. The Court accordingly denies McBean's first challenge to the FDPA based on the Eighth Amendment's prohibition against arbitrary and capricious punishment. *See, e.g.*, *United States v. Saipov*, 2023 WL 371531, at *3 (S.D.N.Y. Jan. 24, 2023) (argument that "FDPA operates in an unconstitutionally arbitrary and capricious manner" foreclosed by *Aquart*); *United States v. Arnold*, 412 F. Supp. 3d 732, 738 (E.D. Mich. 2019) (rejecting arbitrariness argument because "Supreme Court has directly decided" the issue); *United States v. Sampson*, 486 F.3d 13, 19 (1st Cir. 2007) (similar).

### b.    Prosecutorial Discretion

McBean argues that the FDPA violates the Eighth Amendment because prosecutors' "all-but-unbounded" discretion in deciding whether to seek the death penalty "invites abuse" and leads to arbitrary and unpredictable outcomes. Mem. at 24. That argument, too, is foreclosed by *Gregg* and its progeny.

In *Gregg*, the Court rejected the argument that the Georgia death penalty statute was unconstitutional based on the "unfettered authority" of the state prosecutor "to select those persons whom he wishes to prosecute for a capital offense and to plea bargain with them." *Gregg*, 428 U.S. at 199. The Court distinguished the prosecutor's charging discretion from the jury's sentencing discretion: whereas the prosecutor makes a decision that "may remove a defendant from consideration as a candidate for the death penalty," the jury makes the decision to impose the death penalty. *Id.* The Court stated: "Nothing in any of our cases suggests that the

11

decision to afford an individual defendant mercy violates the Constitution." *Id.* The Court held that "opportunities for discretionary action," by the prosecution or a state board of pardons and paroles, do not render a capital scheme unconstitutional. *Id.* In later cases, the Court reiterated this conclusion. *See, e.g.*, *McCleskey v. Kemp*, 481 U.S. 279, 307–08 (1987) ("opportunities for discretionary leniency" do not render capital sentences "arbitrary and capricious"); *Jurek v. Texas*, 428 U.S. 262, 274 (1976) (rejecting prosecutorial discretion argument, which "fundamentally misinterprets the *Furman* decision").

The Supreme Court's rejection of challenges to prosecutorial discretion under the FDPA reflects the principle that "courts normally must defer to prosecutorial decisions as to whom to prosecute." *Town of Newton v. Rumery*, 480 U.S. 386, 396 (1987).[7] And the Government "retains broad discretion as to whom to prosecute." *Wayte v. United States*, 470 U.S. 598, 607 (1985) (citation omitted); *see also Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978) ("[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand

---

[7] In rejecting challenges to prosecutorial discretion under the FDPA, courts have also noted that the FDPA limits such discretion, including by requiring the Government, in filing a notice of its intent to seek the death penalty, to set out the offense circumstances that justify a death sentence and the aggravating factors the Government proposes to prove at the penalty phase, 18 U.S.C. § 3593(a). *See, e.g.*, *Taylor*, 648 F. Supp. 2d at 1241 (discretion "is limited and guided by the requirements of the FDPA's scheme"); *Bowers*, 2020 WL 1675916, at *3 (similar). Courts have also noted that, independent of the FDPA, the decisional process within the Department of Justice ("DOJ") "contains numerous safeguards built into an articulated death penalty protocol." *Sampson*, 486 F.3d at 24 (citing United States Attorneys' Manual ("Manual") §§ 9–10.000). That protocol structures internal deliberations on whether to seek the death penalty, requiring that evidence as to aggravating factors be "substantial, admissible, and reliable," and that ambiguity as to the strength of aggravating and mitigating factors be resolved "in favor of the defendant," Manual § 9-10.000. *See, e.g.*, *United States v. Henderson*, 485 F. Supp. 2d 831, 860 (S.D. Ohio 2007) (protocol sets forth "lengthy decision-making process"); *United States v. Aquart*, No. 06 Cr. 160, 2010 WL 4363414, at *3 (D. Conn. Oct. 26, 2010) (attorney general and DOJ "follow delineated procedures"); *Bowers*, 2020 WL 1675916, at *3 (similar).

jury, generally rests entirely in his discretion."). There are two main reasons for such deference. First, prosecutorial decision exercised by the executive branch, informed by factors such as enforcement priorities, resource allocation, and the strength of the case, is "particularly ill-suited to judicial review" and "not readily susceptible to the kind of analysis the courts are competent to undertake." *Wayte*, 470 U.S. at 607. Second, judicial supervision of prosecutorial decision-making "threatens to chill law enforcement." *Id.* Courts thus normally defer to prosecutorial decisions as to whom to prosecute and whether to seek the death penalty. *See McCleskey*, 481 U.S. at 296 ("[T]he policy considerations behind a prosecutor's traditionally wide discretion suggest the impropriety of our requiring prosecutors to defend their decisions to seek death penalties . . . ." (citation omitted)).

McBean argues that prosecutorial discretion as to whether to seek the death penalty "invites abuse." Mem. at 24. But "the mere opportunity to act improperly does not compel the assumption that all—or even a significant number of"—seek decisions are improper. *Rumery*, 480 U.S. at 397 (rejecting argument that release-dismissal agreements are *per se* unconstitutional because "tradition and experience justify our belief that the great majority of prosecutors will be faithful to their duty"); *see also Gregg*, 428 U.S. at 225 (White, J., concurring) ("Absent facts to the contrary, it cannot be assumed that prosecutors will be motivated in their charging decisions by factors other than the strength of their case and the likelihood that a jury would impose the death penalty if it convicts."). McBean also argues that the increase in authorized death penalty cases during the past year bespeaks arbitrary decision-making by "the new administration." Mem. at 9. But enforcement priorities permissibly change by administration—such is the nature of democracy. *See Rumery*, 547 U.S. at 396 ("prosecutors also must consider other tangible and

13

intangible factors, such as government enforcement priorities"). The Government's change in enforcement priorities over time does not make its decisions impermissibly arbitrary.

In what appears to be an as-applied challenge, McBean separately terms arbitrary the decision to seek the death penalty in his case. Mem. at 26–27. He points to defendants whom he claims "were charged with comparable or worse conduct" than here but who did not face the death penalty. *Id.* at 26 (citing, *e.g.*, shooter of 23 shoppers at a Walmart in Texas; gang enforcer who orchestrated more than a dozen murders over six years in Missouri; two members of the MS-13 gang charged with a collective 15 murders in New York). That argument also fails. The Eighth Amendment requires that punishment be "proportioned to the offense." *Graham v. Florida*, 560 U.S. 48, 59 (2010) (quoting *Weems v. United States*, 217 U.S. 349, 367 (1910)) (cleaned up). But, in the capital context, the Supreme Court has held that this proportionality principle does *not* require that a court, before imposing the death penalty, examine the penalties imposed in similar cases—an inquiry known as comparative proportionality review. *See Pulley v. Harris*, 465 U.S. 37, 43–44 (1984). Rather, it has held, concerns about arbitrary imposition of the death penalty are properly addressed by use of "a carefully drafted statute that ensures that the sentencing authority be given adequate information and guidance." *Id.* at 46 (quoting *Gregg*, 428 U.S. at 195). And in *Aquart*, the Second Circuit held that the FDPA contained "precisely the sort of checks" that "obviate the need for proportionality review." *Aquart*, 912 F.3d at 52. It thus rejected a challenge to a death sentence on the ground that it could not be squared with sentences in similar cases. *Id.* at 51.

*Aquart*'s reasoning, in rejecting a challenge to imposition of a death sentence, applies with even greater force to a challenge to the prosecutorial decision to pursue the death penalty. As noted, the Supreme Court has rejected arbitrariness challenges to prosecutorial discretion

with respect to pursuing the death penalty. *Gregg*, 428 U.S. at 199. It has instead made the focus whether "death sentences are . . . *imposed* capriciously or in a freakish manner." *Id.* at 195 (emphasis added). If the Constitution does not require comparative proportionality review in assessing a jury's decision to impose the death penalty, *a fortiori*, such is not required in assessing a prosecutor's decision to seek that penalty.

*United States v. Littrell*, 478 F. Supp. 2d 1179 (C.D. Cal. 2007), on which McBean relies, does not compel the contrary result. The Government there sought the death penalty against a low-level member of the Aryan Brotherhood for a murder committed on behalf of the group, but declined to seek the death penalty against leaders of the group charged with ordering numerous murders, including that committed by the defendant. *Id.* at 1190. It also declined to seek the death penalty against defendants with "similar culpability" to the defendant. *Id.* at 1191. Based on such points of comparison, the Court held that no rational decision-maker would have sought the death penalty against the defendant, and struck the Government's death notice as arbitrary and capricious. *Id.* at 1191–92. *Littrell*, however, is contrary to the body of law reviewed above. And it has been widely criticized by federal courts. *See, e.g.*, *United States v. Montgomery*, No. 11 Cr. 20044, 2014 WL 1453527, at *15 (W.D. Tenn. Apr. 14, 2014); *United States v. Cooya*, No. 08 Cr. 70, 2011 WL 3608611, at *3 (M.D. Pa. Aug. 16, 2011); *United States v. Taylor*, 648 F. Supp. 2d 1237, 1244 (D.N.M. 2008); *United States v. Sablan*, No. 00 Cr. 531, 2007 WL 4116117, at *6 (D. Colo. Nov. 16, 2007). In any event, *Littrell* is factually far afield from this case. Unlike Littrell, McBean does not claim that the decision to pursue the death penalty against him cannot be squared with decisions as to his co-defendants. It clearly can, including because McBean, as alleged, conceived and orchestrated the murder plot. Instead, he argues that the Government's seek decision here is arbitrary based on comparisons to murder

15

defendants across the country as to whom the death penalty was not sought. Such comparative proportionality review, however, was rejected by the Second Circuit in *Aquart*. *See* 912 F.3d at 51.

The Court thus rejects McBean's challenge based on the discretion the FDPA gives prosecutors in pursuing capital punishment. *See, e.g.*, *United States v. Pitera*, 795 F. Supp. 546, 568 (E.D.N.Y. 1992) (prosecutorial discretion argument has been "explicitly rejected by the Supreme Court"); *Schlesinger*, 2021 WL 5578900, at *9 (rejecting argument that prosecutorial discretion makes FDPA unconstitutional); *Bowers*, 2020 WL 1675916, at *3 (same); *Taylor*, 648 F. Supp. 2d at 1241 (same); *United States v. Mitchell*, 502 F.3d 931, 982 (9th Cir. 2007) (same).

### c.    *Juror Information Overload*

McBean next argues that capital jurors experience "information overload"—that they receive "too much information" and make "sub-optimal decision[s]." Mem. at 30 (quoting Katie Morgan & Michael J. Zydney Mannheimer, *The Impact of Information Overload on the Capital Jury's Ability to Assess Aggravating and Mitigating Factors*, 17 Wm. & Mary Bill Rts. J. 1089, 1089 (2009) ("Morgan & Mannheimer")). He relies on a 2009 law review article, which argued that, at the penalty phase, juries receive "virtually limitless" aggravating and mitigating evidence, which they must process in an unfamiliar and emotional environment under time constraints, in addition to applying a complex legal framework. Morgan & Mannheimer at 1098, 1122–26. Such jurors, it argued, may "simply pick an option to end the decision[-]making process instead of choosing the best option," or "check out" of the decision-making process altogether. *Id.* at 1116–17, 1126. This, McBean argues, results in unreliable and arbitrary death-penalty verdicts. Mem. at 31.

16

Because McBean's is a facial challenge, he must show that no set of jury instructions would enable a capital jury to reliably perform their task under the FDPA. *See United States v. Salerno*, 481 U.S. 739, 745 (1987) (facial challenge is "the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid"). For multiple reasons, the article on which he relies does not permit this conclusion. First, it was not based on empirical research related to capital juries; the few studies it cited focused on consumer decision-making (*e.g.*, a consumer's choice among houses). It acknowledged this gap: "We do not, and perhaps cannot, know whether and to what extent capital jurors experience information overload." *Id.* at 1121. Second, the article did not consider the FDPA, which differs from state laws. *See Sampson*, 2015 WL 7962394, at *24 (studies entitled to less weight where defendant "has not shown" that state data "can be generalized to apply to the FDPA"). It did not support that federal capital juries are presented with an "unlimited amount of evidence relating to aggravating and mitigating factors." *Id.* at 1092. Third, the article did not consider whether the risk of information overload can be redressed by measures such as careful jury instructions for weighing aggravating and mitigating factors. It thus does not support that information overload impairs, let alone systematically or unavoidably, decision-making by capital juries.[8]

---

[8] Courts have rejected arguments along these lines in federal capital cases. *See, e.g.*, *Sampson*, 2015 WL 7962394, at *23–24 (studies of state capital jurors, which found large percentage not to understand jury instructions and/or to consider mitigating evidence, unhelpful because they did not relate to the federal context; jurors were interviewed years after trial; and jurors did not have access to written jury instructions or the ability to ask trial judge questions during deliberations); *United States v. Llera Plaza*, 179 F. Supp. 2d 444, 450 n.5 (E.D. Pa. 2001) (studies showing that concepts of aggravating and mitigating factors were not "immediately intuitive" to jurors did not establish that such concepts "bear such a degree of intrinsic incomprehensibility as to render them incapable of clarification through adequate jury instructions" (cleaned up)).

McBean's argument that juror informational overload makes the FDPA facially infirm is, further, in conflict with two lines of settled authority.

First, "juries are presumed to follow their instructions." *Richardson v. Marsh*, 481 U.S. 200, 211 (1987); *see also United States v. Pforzheimer*, 826 F.2d 200, 205 (2d Cir. 1987) ("It is a fundamental proposition that a jury is presumed to follow the instructions of the trial judge."). McBean does not explain why jurors in capital cases are unable to do the same. On the contrary, the capacity for "careful instructions on the law" to effectively guide jurors' exercise of discretion in capital cases was a central premise of the Supreme Court's decision rejecting that the death penalty is *per se* unconstitutional. *See Gregg*, 428 U.S. at 193 ("It is quite simply a hallmark of our legal system that juries be carefully and adequately guided in their deliberations.").

Second, "[a]mbiguity in capital-sentencing instructions gives rise to constitutional error only if 'there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence.'" *Kansas v. Carr*, 577 U.S. 108, 120 (2016) (quoting *Boyde v. California*, 494 U.S. 370, 380 (1990)) (emphasis omitted). "A meager possibility of [juror] confusion is not enough." *Id.* (citation omitted). McBean has not shown a substantial risk, in all or most cases, of juror confusion based on information overload. *See Saipov*, 2023 WL 371531, at *7 (defendant's "position on confusion is pure speculation, based on conclusory assertion that it is unreasonable to expect jurors to parse the FDPA" (cleaned up)).

In the event this case reaches the penalty phase and the jury returns a death sentence, McBean will be free to argue—on the record in this case, including the Court's instructions to the jury—that the FDPA's sentencing procedures were arbitrary as applied to him. His facial

18

challenge based on a claim of juror confusion, however, fails. *See, e.g.*, *id.* at *7 (rejecting juror confusion argument because "jury is capable of following the FDPA's structure"); *United States v. Llera Plaza*, 179 F. Supp. 2d 444, 450 (E.D. Pa. 2001) (aggravating factors under the FDPA "all are susceptible of focused delineation in carefully drawn jury instructions"); *Sampson*, 2015 WL 7962394, at *24 (similar); *Bowers*, 2020 WL 1675916, at *2 (similar); *Taylor*, 635 F. Supp. 2d. at 1247 (similar); *United States v. Sablan*, No. 00 Cr. 531, 2006 WL 1028780, at *8 (D. Colo. Apr. 18, 2006) (similar); *United States v. Regan*, 228 F. Supp. 2d 742, 746–47 (E.D. Va. 2002) (similar).

### 3.    Whether the FDPA Violates the Eighth Amendment's Prohibition Against Cruel and Unusual Punishment

McBean's next facial challenge to the FDPA is under the Eighth Amendment. He argues that conditions on death row, exacerbated by the duration of pre-execution detention, constitute cruel and unusual punishment. Mem. at 32–36.

At the threshold, the Court rejects the Government's argument that this challenge is not ripe for review. *See* Opp'n at 41. To assess whether an issue is ripe for adjudication, "a court must make a fact-specific evaluation of 'both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *United States v. Fell*, 360 F.3d 135, 139 (2d Cir. 2004) ("*Fell I*") (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)). Precisely because McBean's is a facial challenge, it is ripe for review. And the Second Circuit so held in *Fell I*. There, it considered whether a pretrial facial challenge to the FDPA— based on the evidentiary standard governing the penalty phase, which the defendant contended violated due process—was ripe for adjudication. *Id.* at 139. It held the defendant's challenge ripe. A challenge to the facial constitutionality of a criminal statute, it noted, is a "pure question of law," fit for judicial review. *Id.* at 140 (quoting *United States v. Quinones*, 313 F.3d 49, 59–

19

60 (2d Cir. 2002)).  It reasoned that a defendant "suffers practical and legally cognizable disadvantages by postponing a facial challenge to the death penalty until after trial," including being deprived the opportunity to "know in advance whether he will be risking his life by going to trial" and "forced into trial tactics that are designed to avoid the death penalty but that have the consequence of making conviction more likely."  *Id.* (quoting *Quinones*, 313 F.3d at 59–60).

McBean's facial challenge to the FDPA under the Eighth Amendment likewise presents a pure question of law.  And its pretrial resolution could affect trial procedures—were McBean's claim granted, it would dramatically affect the jury selection process and both sides' strategy. Accordingly, McBean's challenge is ripe for consideration.  *See, e.g.*, *id.* ("hypothetical evidentiary decision that may never be required" was "ripe for consideration"); *Quinones*, 313 F.3d at 59 (pretrial facial challenge to FDPA, based on risk of wrongful execution of innocent individuals, was "ripe for consideration" even though defendants "had not yet been tried, let alone convicted or sentenced to death").

On the merits, however, McBean's argument fails.  As the parties agreed is proper, the Court assumes *arguendo* the accuracy of the factual record developed on *Fell*.  The defendant there brought a broad-ranging Eighth Amendment challenge to the FDPA.  As pertinent here, the district court distilled that record to reflect that persons on federal death row experience punitive and isolating conditions, and often suffer trauma, depression, and social withdrawal.  *Fell*, 224 F. Supp. 3d at 346.  A social psychologist testified that such prisoners are held in the Special Confinement Unit at the United States Penitentiary, Terre Haute, where they are isolated from the general prison population; held in windowless cells more restrictive than most solitary confinement units; forced to remain in their cells for 23 out of every 24 hours; and rarely able to interact with other prisoners or receive visitors.  *Id.* at 346–47.  Despite these findings, the

20

district court, whose earlier ruling invalidating the FDPA on other grounds had been overturned in *Fell I*, denied Fell's Eighth Amendment challenge in light of binding precedent. *Id*. at 359 ("Institutional authority to change this body of law is reserved for the Supreme Court.").

McBean urges this Court to hold the FDPA invalid, under the Eighth Amendment, based on the conditions depicted in *Fell*. Mem. at 32–36. But whatever the merits might be of an Eighth Amendment challenge to present-day conditions on federal death row, such would not support finding the FDPA facially unconstitutional. The FDPA supplies the framework for imposing and implementing the death penalty. It does not speak to the manner of detention for defendants sentenced to death. And it does not require that defendants be held in isolation—the condition of confinement at the heart of this claim. *See generally* 18 U.S.C. § 3591 *et seq*. A federal prisoner who contends that his conditions of confinement violate the Eighth Amendment has remedies, including a petition under 28 U.S.C. § 2241. *See Kingsley v. Bureau of Prisons*, 937 F.2d 26, 30 n.5 (2d Cir. 1991) ("challenges to the length, appropriateness or conditions of confinement are properly brought under 28 U.S.C. § 2241"). A pretrial facial challenge to the statute that authorizes the federal death penalty is not one of them. *See, e.g.*, *Bowers*, 2020 WL 1675916, at *3 ("potential for solitary confinement does not support" facial constitutional challenge, because it goes to "manner of confinement").

McBean's facial challenge to the FDPA under the Eighth Amendment based on the duration of time that convicted defendants spend on death row likewise fails. The Supreme Court has not held that prolonged confinement on death row violates a defendant's constitutional rights. And federal circuit courts have uniformly rejected this argument, reasoning that such delays are largely the result of constitutionally mandated safeguards—such as the appellate process and habeas review—that benefit defendants and are a "function of the desire of our

courts . . . to get it right." *Chambers v. Bowersox*, 157 F.3d 560, 570 (8th Cir. 1998) (although "delay in capital cases is too long," it does not violate Eighth Amendment); *see, e.g.*, *Stafford v. Ward*, 59 F.3d 1025, 1028 (10th Cir. 1995) (no Eighth Amendment violation where "lengthy delays in this case were incurred largely at the behest of Appellant himself, who sought the repeated stays to pursue his legal remedies"); *McKenzie v. Day*, 57 F.3d 1493, 1494 (9th Cir. 1995) ("A defendant must not be penalized for pursuing his constitutional rights, but he also should not be able to benefit from the ultimately unsuccessful pursuit of those rights." (citation omitted)); *White v. Johnson*, 79 F.3d 432, 439 (5th Cir. 1996) (state's interest in "swift punishment" must be balanced against the interest in "insuring that those who are executed receive fair trials"); *Thompson v. Sec'y for Dep't of Corr.*, 517 F.3d 1279, 1284 (11th Cir. 2008) (similar). In all events, because a facial challenge requires that the statute be invalid in all applications, these decisions—underscoring the sound reasons that may exist for a prisoner to be incarcerated on death row for an extended period—preclude granting McBean's challenge. *See, e.g.*, *Sampson*, 2015 WL 7962394, at *31 (defendant "has not proven that the federal system is generally so slow that a finding that the FDPA is unconstitutional is warranted").

The Court thus denies McBean's facial challenge to the FDPA based on the Eighth Amendment's prohibition against cruel and unusual punishment.

### 4. Whether the Death Qualification Process Under the FDPA Violates the Sixth Amendment

McBean next argues that the process of death qualification violates the Sixth Amendment. Mem. at 27–28. Death qualification is the process by which prospective jurors are "excluded for cause in light of their inability to set aside their views about the death penalty." *Buchanan v. Kentucky*, 483 U.S. 402, 406 n.6 (1987). A prospective juror in a capital case may be excluded when his views "would prevent or substantially impair the performance of his duties

as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 420 (1985) (cleaned up). A juror may not be excluded, however, merely because he expresses "general objections to," or "conscientious or religious scruples against," the death penalty. *Witherspoon v. State of Ill.*, 391 U.S. 510, 522 (1968). McBean argues that death qualification results in juries that are prone to convict defendants and lacking in diversity (racial, gender, religious, political, and sexual orientation); yields unreliable death sentences; and is contrary to the common-law conception of juries. Mem. at 27–30, 49–51.

These challenges are foreclosed by *Lockhart v. McCree*, 476 U.S. 162 (1986). The Court there considered whether the Constitution prohibits death qualification of guilt-phase jurors. The Eighth Circuit had found, based on social science studies, that death qualification violated the Sixth Amendment's fair-cross-section and impartiality requirements because it resulted in "conviction-prone juries." *Id.* at 168. For several reasons, the Supreme Court rejected this holding.

First, the Court explained, the fair-cross-section principle requires the jury panel or venire (*i.e.*, the group of prospective jurors from whom the petit jury is selected) to reflect "the composition of the community at large." *Id.* at 173 (citing *Duren v. Missouri*, 439 U.S. 357, 363–64 (1979) and *Taylor v. Louisiana*, 419 U.S. 522, 538 (1975)). It does not, however, apply to the petit jury itself. *Id.* at 173–74. Accordingly, the Court held, the fair-cross-section principle is not violated by a petit jury that, as a result of death qualification, does not reflect communal attitudes toward the death penalty.

Second, the Court found that, even were it to extend the fair-cross-section requirement to petit juries, death qualification would still be constitutional. The "essence" of a fair-cross-section claim, the Court stated, is "the systematic exclusion of a 'distinctive group.'" *Id.* at 174

23

(quoting *Duren*, 439 U.S. at 364).  The Court noted its prior holdings that the exclusion of distinctive groups (such as African Americans, Mexican Americans, and women) was "completely unrelated" to their ability to serve as jurors and thus "contravened" the purposes of the fair-cross-section requirement.  *Id.* at 175.  In contrast, the Court noted, the exclusion of prospective jurors based on their fundamental opposition to the death penalty was "carefully designed" to serve a legitimate state interest in obtaining a capital jury that could impartially apply the law at the guilt and sentencing phases.  *Id.*  The Court accordingly held that such individuals did not constitute a "distinctive group," and that their exclusion did not implicate the fair-cross-section requirement.  *Id.* at 176–77.

Third, the Court rejected the argument that death qualification violates a defendant's right to an impartial jury by slanting the jury toward conviction.  *Id.* at 177.  An impartial jury, the Court stated, "consists of nothing more than 'jurors who will conscientiously apply the law and find the facts.'"  *Id.* at 178 (quoting *Witt*, 469 U.S. at 421) (emphasis omitted).  It accordingly held that a jury is constitutionally adequate where it is comprised of jurors capable of performing those tasks, regardless of whether they are predisposed toward one result.  *Id.* at 184 ("it is simply not possible" to define jury impartiality "by reference to some hypothetical mix of individual viewpoints").

For these reasons, the Court in *McCree* held death qualification prior to the guilt phase of a capital trial constitutional.  The Court reaffirmed that holding in ensuing cases.  *See, e.g.*, *Buchanan v. Kentucky*, 483 U.S. 402, 415 (1987) ("The Court's reasoning in *McCree* requires rejection of petitioner's claim that 'death qualification' violated his right to a jury selected from a representative cross section of the community."); *see also Holland v. Illinois*, 493 U.S. 474, 482

24

(1990) ("The fundamental principle underlying today's decision is the same principle that underlay [*McCree*] . . . .").

*McCree* binds this Court. It precludes McBean's argument that death qualification is unconstitutional because it results in "whiter, more conservative, [and] more sexist and homophobic" juries in capital cases. Mem. at 28.[9] And it forecloses the argument, based on recent empirical evidence, that capital juries are biased toward conviction because of death qualification. *Id.* at 30. *McCree* expressly considered this possibility. It "assume[d] for purposes of [its] opinion" that studies provided by McCree showed that death qualification results in conviction-prone juries. 476 U.S. at 173. But, it stated: "We hold, nonetheless, that the Constitution does not prohibit the States from 'death qualifying' juries in capital cases." *Id.*

Accordingly, the Court rejects McBean's challenges to the death qualification process. *See, e.g.*, *United States v. Bin Laden*, 109 F. Supp. 2d 211, 221 (S.D.N.Y. 2000) (rejecting challenge to death qualification based on new sociological research because *McCree* "assumed the validity of similar social science research"), *aff'd sub nom. In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 93 (2d Cir. 2008); *Schlesinger*, 2021 WL 5578900, at *4 (data adduced in *Fell* "do not provide this Court with the authority to overlook Supreme Court precedent establishing that the process of death-qualification does not violate a defendant's rights"); *United States v. Mills*, 388 F. Supp. 3d 895, 901 (E.D. Mich. 2019) (rejecting fair-cross-section challenge because death qualification does not result in "unreasonable

---

[9] *See Taylor*, 419 U.S. at 538 (finding "no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population"); *see also Buchanan*, 483 U.S. at 416 n.17 (because individuals opposed to death penalty do not constitute a distinctive group, there is "no reason to address" argument that death qualification changes the sexual, racial, age, and political makeup of juries).

underrepresentation of a distinctive group in the jury venire"); *Bowers*, 2020 WL 1675916, at *2 (similar); *Sampson*, 2015 WL 7962394, at *27 (similar).

### 5.     Whether the FDPA Violates the Fifth Amendment's Indictment Clause

McBean next argues that the FDPA violates the Fifth Amendment's Indictment Clause because it does not expressly require a grand jury to vote on the statutory aggravating factors or intent elements that determine whether a defendant is death eligible. His argument proceeds in two steps. First, citing *Apprendi v. New Jersey*, 530 U.S. 466 (2000), *Ring v. Arizona*, 536 U.S. 584 (2002), and ensuing decisions, he argues that, because these factors increase the available sentence, they are elements that must be alleged in the indictment and found by the grand jury. Second, he argues, because the FDPA does not itself require that the grand jury so find, leaving it for the prosecutor to decide whether to submit those elements to the grand jury, the statute is facially unconstitutional. Mem. at 3–7.

McBean's logic is correct at the first step but faulty at the second. The Court first sets out the governing legal framework. It then assesses the constitutionality of the FDPA under that framework.

In 2000, the Supreme Court decided *Apprendi*. There, a state trial court at sentencing found, by a preponderance, that the defendant's non-capital crime had been motivated by racial animus. 530 U.S. at 471. The applicable hate-crime enhancement doubled the defendant's maximum available sentence, and the court imposed a sentence that exceeded by two years the maximum had there not been an enhancement. *Id.* at 471, 474. The Supreme Court reversed. It held that the enhanced sentence violated the defendant's right that a jury decide, beyond a reasonable doubt, whether he was guilty as to every element of the crime charged. *Id.* at 477. Where a law conditions an increase in a defendant's authorized punishment on a factual finding,

26

the Court held, that fact is an element that must be found by a jury beyond a reasonable doubt. *Id.* at 482–83. That the state statute termed the element a "sentence enhancement" was irrelevant; the inquiry turned not on "form" but on "effect." *Id.* at 476, 494.

Two years later, in *Ring*, the Supreme Court applied *Apprendi* in the capital context. There, a state jury deadlocked on a premeditated murder charge but convicted the defendant of felony murder. 536 U.S. at 591. The state's death penalty statute provided that the defendant could not be sentenced to death unless the sentencing judge, at a non-jury hearing, found at least one aggravating circumstance that was not outweighed by any mitigating circumstances. *Id.* at 592–93. After such a hearing, the sentencing judge found that the defendant had killed the victim himself, and that the balance of aggravating and mitigating factors favored the death penalty, and sentenced the defendant to death. *Id.* at 594–95. The Supreme Court reversed. Under *Apprendi*, it held, the aggravating factors defined in the state law are "the functional equivalent of an element" of an offense carrying greater punishment (*i.e.*, the death penalty). *Id.* at 609. The Sixth Amendment, it held, requires that these be found by a petit jury. *Id.*

The FDPA requires the Government to charge aggravating factors in a notice of intent to seek the death penalty, and it requires that aggravating (and mitigating) factors be found by the petit jury. *See* 18 U.S.C. § 3593. The FDPA is silent, however, as to the indictment process. It does not speak to whether a grand jury must find the aggravating factors. As a matter of practice since *Ring*, however, the Department of Justice has submitted statutory intent and aggravating factors to the grand jury as part of the indictment to be voted upon. *See United States v. Allen*, 406 F.3d 940, 949 (8th Cir. 2005), *cert. denied*, 549 U.S. 1095 (2006).

The starting premise of McBean's argument—that, after *Ring*, at least one statutory aggravating factor must be found by a grand jury—is correct. The Second Circuit has so held, in

upholding indictments in which grand juries found at least one statutory aggravating factor.  In *In re Terrorist Bombings of U.S. Embassies in East Africa,* the Circuit held that, because statutory aggravating and intent factors are elements triggering greater punishment, "*Ring* establishes that . . . [these] must be alleged in the indictment."  552 F.3d 93, 109 (2d Cir. 2008) (citation omitted); *see also Quinones*, 313 F.3d at 53 n.1 (same).

McBean's argument fails, however, at the second step.  He argues that the FDPA is unconstitutional because it does not require, but merely permits, prosecutors to submit the intent and statutory aggravating factors to the grand jury in an indictment for approval.  But that process has been uniformly upheld by the federal courts of appeals over Fifth Amendment challenges.  As the Eighth Circuit has summarized:

> While it is true that the FDPA directs the government to charge these factors in a notice of intent to seek the death penalty, nothing in the Act precludes the government from also submitting them to the grand jury for inclusion in the indictment.  This is the practice that the Department of Justice has adopted after *Ring,* and it preserves the constitutionality of FDPA prosecutions.

*Allen*, 406 F.3d at 949; *see also Sampson*, 486 F.3d at 21 ("[T]here is no irredeemable conflict between the FDPA and *Ring*.  . . . No provision of the FDPA prohibits a grand jury from considering those factors necessary for imposition of a death sentence.  The statute simply is silent with respect to the function of the grand jury.  It thus is not rendered facially unconstitutional by *Ring*."); *United States v. Barnette*, 390 F.3d 775, 788–90 (4th Cir. 2004) (same), *vacated on other grounds*, 546 U.S. 803 (2005); *United States v. Bourgeois*, 423 F.3d 501, 507–08 (5th Cir. 2005) (same); *United States v. Brown*, 441 F.3d 1330, 1367 (11th Cir. 2006) (same), *cert. denied*, 549 U.S. 1182 (2007); *United States v. Fell*, 531 F.3d 197, 236 n.27 (2d Cir. 2008) ("*Fell II*") (noting that every federal court of appeals to have considered McBean's argument has rejected it).  And taken to its logical extreme, McBean's argument

28

would appear to facially void all mandatory sentencing enhancement statutes—*e.g.*, for drug quantity, 21 U.S.C. § 841(b)(1)(A)–(B), or use of a firearm in connection with a crime of violence or drug-trafficking offense, 18 U.S.C. § 924(c)—insofar as these statutes, too, do not textually oblige federal prosecutors to submit such factors to a grand jury, but instead are silent on the point.

The Court thus holds, consistent with unanimous circuit authority, that the FDPA does not violate the Fifth Amendment's Indictment Clause.[10]

### 6. Whether the FDPA Violates the Separation-of-Powers or Non-Delegation Doctrines

McBean next argues that Congress, in the FDPA, impermissibly delegated to the executive branch the power to decide when to seek the death penalty and which aggravating factors to allege. This, he argues, violates the separation-of-powers and non-delegation doctrines.

---

[10] McBean does not argue that the Indictment in this case failed to charge at least one statutory intent factor and at least one statutory aggravating factor, as *Ring* requires. The Indictment does so. *See* S3 Indictment at 6 (charging one statutory intent factor and three statutory aggravating factors). And it is undisputed that the Indictment was returned by a grand jury. *See id*. at 7 (redacting signature of foreperson). Under the case law, no more is required.

McBean also does not argue that the Indictment is defective because it alleges a subset of the statutory intent and aggravating factors listed in the death notice. *See* Death Notice at 2 (alleging additional statutory intent factor of intentional act of violence with knowledge of grave risk of person's death, under 18 U.S.C. § 3591(a)(2)(D), and additional statutory aggravating factor of prior violent felony conviction involving firearm, under 18 U.S.C. § 3592(c)(2)). *Ring* does not require that more than one intent factor and one statutory aggravating factor be alleged in the Indictment, because additional such factors would not increase the maximum available punishment, which is already death. *See, e.g.*, *Allen*, 406 F.3d at 943 ("[A]t least one of the statutory aggravating factors found by the petit jury in imposing the death sentence must have been one of the statutory aggravating factors charged by the grand jury in the indictment. The same is true of the mens rea requirement." (citation omitted)); *United States v. Purkey*, 428 F.3d 738, 749 (8th Cir. 2005) (same); *Higgs*, 353 F.3d at 299–300 (similar); *Brown*, 441 F.3d at 1367 (similar).

This argument is quickly put aside.  Every court to consider such challenges, including multiple courts of appeals, has rejected them, and for good reason.

In *United States v. Jones*, for example, the Fifth Circuit held that the FDPA's instruction that the executive branch choose which aggravating factors, including non-statutory ones, to allege falls "squarely within the [executive branch's] broad prosecutorial discretion, much like the power to decide whether to prosecute an individual for a particular crime."  132 F.3d 232, 239 (5th Cir. 1998), *aff'd on other grounds*, 527 U.S. 373 (1999).  It held that it had been reasonable for Congress to set out a non-exclusive, rather than an exhaustive, list of aggravating factors, because future cases would likely present unforeseen circumstances supporting capital punishment.  *Id.*  And, the Circuit noted, the FDPA cabins the executive branch's authority in at least four ways: (1) § 3593(a) requires that the Government provide meaningful notice to the defendant of any aggravating factors it alleges; (2) due-process jurisprudence requires that any aggravating factors "genuinely narrow" the class of death-eligible persons, *see, e.g.*, *Zant v. Stephens*, 462 U.S. 862, 877 (1983); (3) the district court's gatekeeping function under the Federal Rules of Evidence, including Rule 403, excludes impermissibly prejudicial evidence; and (4) § 3593(d) requires that the petit jury find at least one statutory aggravating factor beyond a reasonable doubt.  *Id.* at 239–40.  In combination, the Circuit held, these features supply "intelligible principle[s]" limiting the executive branch's discretion, making the delegation constitutional.  *Id.*

The other courts to consider such arguments have also rejected them.  *See, e.g.*, *United States v. Tipton*, 90 F.3d 861, 895 (4th Cir. 1996) ("Assuming, without deciding, that by specifically authorizing consideration of non-statutory aggravating factors noticed by prosecutors, Congress actually delegated a legislative function to the Executive Branch, as

30

opposed to merely recognizing a traditionally shared function with that branch, . . . any delegation involved was sufficiently circumscribed by 'intelligible principles' to avoid violating separation of power principles."); *United States v. Paul*, 217 F.3d 989, 1003 (8th Cir. 2000) (no separation-of-powers violation because "prosecution was adequately limited in its power" by factors listed in *Jones*); *United States v. McCullah*, 76 F.3d 1087, 1106–07 (10th Cir. 1996) (prosecution's selection of non-statutory aggravating factors sufficiently cabined by court's evidentiary gatekeeping role and requirement that jury find mens rea and at least one statutory aggravating factor); *United States v. Quinones*, No. 00 Cr. 761, 2004 WL 1234044, at *2 (S.D.N.Y. June 3, 2004) ("[A]llowing the prosecution to present non-statutory factors does not offend the non-delegation doctrine since 'the sentencing function long has been a peculiarly shared responsibility among the Branches of Government and has never been thought of as the exclusive constitutional province of any one Branch.'" (quoting *Zant*, 462 U.S. at 878)); *Saipov*, 2023 WL 371531, at *5 ("even if the Federal Rules of Criminal Procedure did not allow the Government to present the aggravating factors to a grand jury—which they most certainly do—[defendant] offers no persuasive argument as to why any separation of powers principle, or similar concern he raises, would make it unconstitutional for the Government to present the aggravating factors as it did here" (cleaned up)); *see also Fell I*, 360 F.3d at 140–47 (favorably citing *Jones*' holding "that government's authority to define non-statutory aggravating factors is not an unconstitutional delegation").

In a separate argument that he casts as a non-delegation challenge, McBean argues that *United States v. Jackson*, 390 U.S. 570 (1968) and *Hurst v. Florida*, 577 U.S. 92 (2016) assist him, insofar as they support that where a statute is unconstitutional, it cannot be salvaged by discretionary prosecutorial practices, such as asking a grand jury to vote upon the charged

31

sentence-enhancing features (*e.g.*, aggravating factors). Mem. at 7–12. As reviewed above, however, McBean's premise—that the FDPA is unconstitutional because it is silent on the presentation of statutory sentence-enhancement factors to a grand jury—is wrong. And *Jackson* and *Hurst* are clearly inapposite.

In *Jackson*, the Supreme Court invalidated the death-penalty provision of the Federal Kidnapping Act, 18 U.S.C. § 1202(a). 390 U.S. at 581–85. It read that statute to authorize the death penalty only against defendants who went to trial. As such, it held, the statute infringed the Fifth Amendment right not to plead guilty and the Sixth Amendment right to trial by jury. *Id.* It rejected the Government's contrary claim that the statute implicitly authorized the death penalty against defendants who pled guilty or waived a jury trial, insofar as a trial judge could convene a special jury to decide whether to impose the death penalty for such defendants. *Id.* at 572–74. The Court declined to "create from whole cloth [that] complex and completely novel procedure and to thrust it upon unwilling defendants for the sole purpose of rescuing a statute from a charge of unconstitutionality." *Id.* at 580. Adapting the FDPA to *Ring*, however, does not present any such complex or novel problem. The FDPA requires that its sentence-enhancing factors be found by the petit jury, while being silent as to grand jury practice. All that is needed to ensure compliance with *Ring* is thus that these factors be voted on by the grand jury. *See Sampson*, 486 F.3d at 22. *Hurst* is even farther afield. There, the Court invalidated Florida's capital sentencing scheme because it required judges, not juries, to make the final determination whether to impose the death penalty, and thus squarely conflicted with *Ring*. 577 U.S. at 94. In contrast, here, "[n]o provision of the FDPA prohibits a grand jury from considering those factors necessary" to make a defendant death eligible. *Sampson*, 486 F.3d at 21.

32

The FDPA does not violate the separation-of-powers or non-delegation doctrines.  *See,*

*e.g.*, *Jones*, 132 F.3d at 239; *Tipton*, 90 F.3d at 895; *Paul*, 217 F.3d at 1003; *McCullah*, 76 F.3d

at 1106–07; *Quinones*, 2004 WL 1234044, at *2; *Saipov*, 2023 WL 371531, at *5.

**B.      As-Applied Constitutional Challenges to These Grand Jury Proceedings**

McBean next makes two as-applied constitutional challenges related to the grand jury

proceedings in this case.

**1.      Whether the Fifth Amendment Required the Grand Jury to Be
Informed that the Indictment Would Render McBean Death-Eligible**

McBean postulates that, in presenting the Indictment, the Government did not notify the

grand jury that the charges it was being asked to return would expose him to capital punishment.

He argues that this breached the Fifth Amendment, because, to fulfill its constitutional role as a

check against prosecutorial overreach, a grand jury must be so notified.  Mem. at 13–17.

That argument is without merit, as the case law is clear that a grand jury need not be

informed about the punishment the proposed charges carry.  The Supreme Court has repeatedly

held that "an indictment is sufficient if it (1) contains the elements of the offense charged and

fairly informs a defendant of the charge against which he must defend, and (2) enables him to

plead an acquittal or conviction in bar of future prosecutions for the same offense."  *Hamling v.*

*United States*, 418 U.S. 87, 117 (1974) (cleaned up); *see also Hagner v. United States*, 285 U.S.

427, 431 (1932); *United States v. Debrow*, 346 U.S. 374, 376 (1953).

Applying that principle in the capital context, courts in this Circuit and elsewhere have

uniformly rejected the argument that a grand jury must be informed that the charges before it

would support capital punishment.  *See, e.g.*, *Saipov*, 2023 WL 371531, at *6 ("Grand juries do

not make findings or recommendations concerning punishment or sentencing and such

considerations should not influence their decision.  It is for the petit jury to make that

determination." (citation omitted)); *United States v. Matthews*, 246 F. Supp. 2d 137, 147 (N.D.N.Y. 2002) (same); *United States v. Aquart*, No. 06 Cr. 160, 2010 WL 4363414, at *1 (D. Conn. Oct. 26, 2010) (same).[11]  McBean does not identify any contrary authority.  Nor can the Court find any case support for McBean's argument that—because a death-qualified petit jury may not represent "the conscience of the local community or its rich diversity"—a grand jury must be so notified.  Mem. at 16.  On the contrary, McBean's premise, that death qualification makes a petit jury constitutionally problematic, is foreclosed by *McCree*.  *See* 476 U.S. at 166–67 (capital jury selection does not violate Sixth Amendment's fair-cross-section requirement).

### 2.    Whether the Non-Statutory Aggravating Factors Were Required to Be Charged in the Indictment

McBean next moves to strike the non-statutory aggravating factors of victim impact and future dangerousness.  He argues that the allegation of these in the death notice but not in the Indictment, which charges only statutory intent and aggravating factors, violates the Fifth and Sixth Amendments.

McBean's argument—that non-statutory aggravating factors are "essential" to the imposition of the death penalty and thus must be approved by the grand jury—is foreclosed by *Fell II*.  The Second Circuit there rejected the argument that the Fifth Amendment required the Government to include non-statutory aggravating factors in the indictment.  531 F.3d at 236–38.  The FDPA, the Circuit noted, requires "only that the jury sentencing [the defendant] find mental culpability and at least one statutory aggravator, both charged in the [] indictment, before finding

---

[11] *See also Jacques*, 2011 WL 1675417, at *10 (no authority "dictates that the grand jury must be informed that its special findings might make the defendant eligible for the death penalty"), *aff'd in part, vacated in part*, 684 F.3d 324 (2d Cir. 2012); *United States v. Haynes*, 269 F. Supp. 2d 970, 981 (W.D. Tenn. 2003) (same); *United States v. Natson*, 444 F. Supp. 2d 1296, 1305 (M.D. Ga. 2006) (same); *United States v. Lecco*, No. 05 Cr. 107, 2007 WL 1074775, at *2–3 (S.D. W.Va. 2007) (same).

him 'eligible' for the death penalty." *Id.* (quoting 18 U.S.C. § 3593(e)).  And the non-statutory aggravating factors did "not change the maximum sentence authorized under the statute," which, given the statutory aggravating factors, was already death.  *Id.*  Although *Fell II* addressed only a Fifth Amendment claim, the Circuit's analysis forecloses McBean's Sixth Amendment argument to the same effect, insofar as it held that these factors are not essential to death eligibility.

McBean counters that the Supreme Court's decision in *Hurst* overruled *Fell II*'s premise that "only those factors which comprise death eligibility—intent and statutory aggravation— must be included in the indictment because those factors must be found before imposition of the maximum authorized penalty." *Fell II*, 531 F.3d at 238.  He argues that *Hurst* collapsed the distinction between factors related to statutory death eligibility and those bearing on the jury's decision to impose a death sentence.  Reply at 10–12.  That misreads *Hurst*.  As reviewed above, *Hurst* held that juries must decide any facts necessary to impose the death penalty.  577 U.S. at 94.  It did not hold that facts relevant to the jury's decision whether to vote for a death sentence, including non-statutory aggravating factors listed in a death notice, must be included in an indictment.  And the Supreme Court's discussion of *Hurst* four years later, in *McKinney v. Arizona*, 589 U.S. 139 (2020) drove the point home.  *Hurst*, the Court stated, had held only that "a jury must find the aggravating circumstance that makes the defendant death eligible." *McKinney*, 589 U.S. at 144.  And, it held, "*Ring* and *Hurst* did not require jury weighing of aggravating and mitigating circumstances." *Id.* at 145.  *McKinney* thus defeats McBean's claim that *Hurst* eliminated the distinction between death-eligible factors and facts germane to the jury's sentence selection.  All seven circuits to address this issue have held likewise.[12]

---

[12] *See Sampson*, 486 F.3d at 31; *United States v. Runyon*, 707 F.3d 475, 516 (4th Cir. 2013); *United States v. Fields*, 483 F.3d 313, 345–46 (5th Cir. 2007); *United States v. Gabrion*, 719 F.3d 511, 533 (6th Cir. 2013); *United States v. Purkey*, 428 F.3d 738, 749–50 (8th Cir. 2005);

35

The Court thus rejects McBean's premise that the Fifth and Sixth Amendments require non-statutory aggravating factors to be alleged in the indictment, and denies his motion to strike these from the death notice.

### C.    Motion to Strike the Death Notice as Untimely Under 18 U.S.C. § 3593(a)

McBean next moves to strike the death notice as not having been filed "a reasonable time before the trial." 18 U.S.C. § 3593(a). He relies on the Fourth Circuit's application of that statute in *United States v. Ferebe*, 332 F.3d 722 (4th Cir. 2003). Under *Ferebe*, McBean argues, the "time before the trial" refers to the period between the date the Government filed the death notice and the date at which the defendant's trial was scheduled *as of the notice's filing*. Using that test, McBean argues, the period between the filing of the death notice as to him (June 6, 2025) and his then-scheduled trial date (July 28, 2025) was 52 days. He argues that it was objectively unreasonable for the prosecution to file the death notice that close to the trial date for various reasons, including because the prosecution had been aware, prior to the filing of the death notice, of the key facts relevant to liability and punishment; and because the statutory and non-statutory aggravating factors in the death notice, by nature, require lengthy preparation by the defense and access to additional discovery. McBean argues that, to cure the Government's violation of § 3593(a), the Court must strike the death notice. It was not adequate, he argues, for the Court, upon the death notice, to sever McBean's trial from that of his co-defendants and to put McBean's trial on a schedule suited to the needs of a capital trial.

McBean's argument lacks merit. As the Government notes, *Ferebe* is an outlier decision. Its approach to § 3593(a) has been rejected by other courts, including the Second Circuit. Under

---

*United States v. Fields*, 516 F.3d 923, 950 (10th Cir. 2008); *United States v. Mitchell*, 502 F.3d 931, 993–94 (9th Cir. 2007).

the test applicable in this Circuit, the Government's death notice was timely under § 3593(a), in that (1) it was filed eight months after the first indictment that named McBean, well below the national average of 14 months between a capital indictment and the filing of a death notice; (2) nearly half of that period (some three-and-a-half months) are attributable to McBean, whose counsel did not submit, until February 3, 2025, the mitigation materials the Government had invited shortly after return of the capital indictment; and (3) as a result of the Court's prompt severance of McBean's trial from that of his co-defendants upon the filing of the death notice—a decision supported by McBean's counsel—and its solicitude thereafter to McBean's scheduling preferences, McBean will have ample opportunity to prepare for the as-yet unscheduled capital trial.

The Court begins by reviewing *Ferebe*, its application within the Fourth Circuit, and the alternative constructions of § 3593(a) by other courts, including the Second Circuit. It then applies § 3593(a), as construed by the Second Circuit, to this case.

### 1.    Case Law Interpreting 18 U.S.C. § 3593(a)'s Timing Requirement

Section 3593 of Title 18 establishes procedures for the penalty phase of capital trials. It states, in relevant part:

> (a) Notice by the government.—If, in a case involving an offense described in section 3591 [*i.e.*, punishable by death], the attorney for the government believes that the circumstances of the offense are such that a sentence of death is justified under this chapter, the attorney shall, *a reasonable time before the trial* or before acceptance by the court of a plea of guilty, sign and file with the court, and serve on the defendant, a notice—
>
> > (1) stating that the government believes that the circumstances of the offense are such that, if the defendant is convicted, a sentence of death is justified under this chapter and that the government will seek the sentence of death; and
> >
> > (2) setting forth the aggravating factor or factors that the government, if the defendant is convicted, proposes to prove as justifying a sentence of death.

> The factors for which notice is provided under this subsection may include factors concerning the effect of the offense on the victim and the victim's family, and may include oral testimony, a victim impact statement that identifies the victim of the offense and the extent and scope of the injury and loss suffered by the victim and the victim's family, and any other relevant information. The court may permit the attorney for the government to amend the notice upon a showing of good cause.

18 U.S.C. § 3593(a) (emphasis added). The statute does not set out a standard to assess whether the period between a death notice and trial is "reasonable," or the remedies for untimely death notices. *See United States v. Robinson*, 473 F.3d 487, 491 (2d Cir. 2007).

> *a.*    Ferebe

The Fourth Circuit, in *Ferebe*, was the first court of appeals to address § 3593(a)'s timing requirement. The case's highly unusual procedural history warrants emphasis.

In September 1997, a grand jury indicted Ferebe and a co-defendant on federal drug, gun, and murder charges, based on the killings of two victims. In May 1998, the prosecution notified the defense and the trial judge that the Attorney General had authorized the death penalty against Ferebe, but not his co-defendant, for one of the two murders. The prosecution did not, however, file a formal death notice at that time. The district court severed Ferebe's trial from that of his co-defendant. At Ferebe's request, it continued his trial indefinitely, pending his appeal from a conviction in a related case, for which he was already serving a life sentence. In September 1999, the Fourth Circuit affirmed that conviction and life sentence, and, in early 2000, the Supreme Court denied certiorari. In approximately June 2000, the prosecution offered Ferebe a plea deal in his pending capital case, under which he would have received concurrent life sentences. In October 2000, Ferebe rejected the offer. In December 2000, the district court scheduled Ferebe's capital trial for September 2001. *Ferebe*, 332 F.3d at 724–26.

On May 28, 2001—four months before the scheduled capital trial—the prosecution sought the Attorney General's approval to pursue the death penalty for Ferebe's murder of the

second victim (in addition to the first). While the Attorney General's review was ongoing, Ferebe's counsel informed the prosecution that Ferebe wished to plead guilty, subject to mandatory concurrent life sentences but not the death penalty. On June 7, 2001, less than two weeks later, the Department of Justice issued a new policy, which required prosecutors to obtain the Attorney General's approval before entering into plea agreements with death-eligible defendants. On June 19, 2001, the parties entered into a conditional plea agreement—subject to the Attorney General's approval—under which the Government, consistent with the earlier plea offer and Ferebe's plea request, would no longer pursue the death penalty. On July 6, 2001, now two months before the scheduled trial date, however, the Attorney General authorized the death penalty against Ferebe for the second murder, in addition to the first. On July 26, 2001—six weeks before trial—the Attorney General rejected the conditional plea agreement. *Id.*

On July 31, 2001, the district court held a conference, at which Ferebe stated that he wished to plead guilty to the charges in the indictment without a plea agreement. Because a death notice had yet to be filed, these carried a maximum sentence of life imprisonment. The next day—now some four weeks before trial—the prosecution filed a death notice for both murders. Ferebe then moved to strike the death notice as untimely under § 3593(a). On September 12, 2001, the district court orally denied the motion, finding that Ferebe had not been prejudiced by the date on which the expanded death notice had issued. Ferebe appealed. *Id.* at 724–26, 730 n.3.

The Fourth Circuit vacated the denial of Ferebe's motion to strike the death notice and remanded. It first held that the denial was immediately appealable under the collateral-order doctrine. Section 3593(a), it explained, did not merely protect a defendant from being convicted or executed without reasonable notice that the prosecution was seeking the death penalty. *Id.*

39

at 726–30.  Rather, it held, the statute is "prophylactic," giving a defendant the right not "to endure a capital trial for which he was provided inadequate notice to prepare his defense."  *Id.* at 727.  The statute, it held, thus requires "an inquiry into the objective reasonableness of the time between issuance of the Death Notice and the trial itself," not a "post-trial assessment of prejudice to the accused."  *Id.* (emphases omitted).  And because the statutory right is to not stand capital trial without adequate notice, the notice's timeliness was "collateral to the question of guilt."  *Id.* at 728.

On the merits, the Fourth Circuit held that the district court had misapplied § 3593(a).  *Id.* at 730 & n.3.  The district court had used "a post-trial, harmless error inquiry" into whether Ferebe had been prejudiced by the timing of the death notice, analogizing to the speedy trial right under 18 U.S.C. § 3161.  *Id.*  But, the Fourth Circuit stated, the correct inquiry would have assessed the "pre-trial, objective reasonableness" of the death notice's timing.  *Id.*  It stated that, unlike the speedy trial right, which "belongs to *both* the defendant *and* society," § 3593(a) protects only the defendant.  *Id.* at 734 (emphases in original).  The statutory right thus "closely resembles" the constitutional double-jeopardy right, as to which prejudice is irrelevant.  *Id.* at 736.  Thus, it held, if a death notice was unreasonable delayed, the defendant's rights under § 3593(a) were denied at that pretrial point.  *Id.* at 732.

The Fourth Circuit set out four non-exhaustive factors bearing on whether the timing of a death notice had been objectively reasonable:

> (1) the nature of the charges presented in the indictment; (2) the nature of the aggravating factors provided in the Death Notice; (3) the period of time remaining before trial, measured at the instant the Death Notice was filed and irrespective of the filing's effects; and (4) the status of discovery in the proceedings.

*Id.* at 737 (cleaned up).  These, it stated, inform "whether sufficient time exists following notice and before trial for a defendant to prepare his death defense."  *Id.*  It stated that the third factor—

40

the period between the death notice and trial—should be calculated based on the trial date as set at the time of the notice. That is because the right conferred by § 3593(a) "is violated *at the time that a defendant is required to proceed to trial for his life with insufficient time to prepare." Id.* at 737 n.6 (emphasis in original). And the alternative approach, "based on an after-the-fact review for prejudice, would allow notice *never* to be given and the notice requirement *still* to be satisfied." *Id.* (emphases in original). In remanding, the Fourth Circuit noted that the record did not indicate whether a specific trial date for Ferebe had been set as of "the instant the Death Notice was filed" against him. *Id.* at 738–40. It directed the district court, on remand, to calculate the period between the notice and trial, and to apply the above factors. *Id.*

On remand, the district court found that the trial date had still been September 10, 2001 as of when the death notice was filed on August 1, 2001. *United States v. Ferebe*, No. 97 Cr. 329, 2005 WL 1429261, at *6–7 (D. Md. June 16, 2005). It found, as the prosecution conceded, that Ferebe could not have prepared for a capital trial on the second murder during the 39-day window between the notice date and the trial date. *Id.* at *7–8. The factors identified by the Fourth Circuit all favored finding the notice's timing unreasonable. The murder added by the death notice (of an innocent high school student) was qualitatively different than the first, making Ferebe's defense "much more difficult." *Id.* at *7. The non-statutory aggravating factors added by the notice—future dangerousness and victim impact—required the defense (and possibly also the prosecution) to retain psychiatric and prison experts. *Id.* Although discovery for the guilt phase had been produced, the prosecution had not yet produced penalty-phase discovery. *Id.* And the jury questionnaire process, incomplete as of the death notice, would itself have taken the Clerk's Office more than the remaining 39 days to complete. *Id.* The

41

district court thus held that the prosecution had not filed the death notice a reasonable time before trial, as required by § 3593(a), and struck the notice. *Id.* at *7–8.

                b.              *Application of* Ferebe *by District Courts in the Fourth Circuit*

District courts in the Fourth Circuit have differed in applying *Ferebe*. As to the first and second *Ferebe* factors (the nature of the charges and aggravating factors), some have examined these from the defense perspective—to wit, whether these would enable an adequate defense to be prepared in the period between the death notice and the scheduled trial date. *See, e.g.*, *United States v. Breeden*, 2003 WL 22019060, at *3–4 (W.D. Va. Aug. 22, 2003) (factors supported notice's reasonableness because "[t]he legal and factual issues alleged do not appear so complex or atypical such that five months would be an unreasonably short period of time to prepare a defense"), *aff'd*, 366 F.3d 369 (4th Cir. 2004); *United States v. Le*, 311 F. Supp. 2d 527, 534–36 (E.D. Va. 2004) (similar). Viewed thusly, the less complex and challenging the charges and aggravating factors, the more permissible a death notice closer to a trial date. Other courts have assessed reasonableness from the prosecution's viewpoint—to wit, whether, given the charges and aggravating factors, the prosecution should have filed the death notice sooner than it did. *See, e.g.*, *United States v. Hatten*, 276 F. Supp. 2d 574, 578–79 (S.D.W. Va. 2003) (factors disfavored notice's reasonableness where charges and aggravating factors were "straightforward" and prosecution knew relevant facts long before filing notice); *United States v. Ponder*, 347 F. Supp. 2d 256, 264–66 (E.D. Va. 2004) (although charges and aggravating factors were simple, timing of notice was reasonable because the decision to pursue the death penalty was based on DNA testing "completed only days before" that decision and on other "newly discovered evidence"); *United States v. Constanza-Galdomez*, 787 F. Supp. 3d 131, 141–43 (D. Md. 2025) (factors disfavored reasonableness because facts underlying the charges and

aggravating factors had been the same "since the case's inception" years before filing of notice).

Viewed thusly, the simpler and more static the case, the less reasonable a later notice.

District courts in the Fourth Circuit have also split on how to treat the third *Ferebe* factor: the interval between death notice and trial. As to the timing of the notice, such courts have read *Ferebe* to require using the date the notice was formally filed—regardless whether the defense had earlier learned the prosecution would seek the death penalty. *See Hatten*, 276 F. Supp. 2d at 579. As to the date of trial, most courts in that circuit have read *Ferebe* to direct using the trial date as of the filing of the death notice, even if that date was contingent on a non-capital trial. *See, e.g.*, *Hatten*, 276 F. Supp. 2d at 579; *Breeden*, 2003 WL 22019060, at *2; *Le*, 311 F. Supp. 2d at 532 & n.10; *Constanza-Galdomez*, 787 F. Supp. 3d at 143. But one court has held that *Ferebe* does not require such a mechanistic approach, where the court and the parties had been "reasonably aware" that, were the death penalty sought, "the matter [would] not actually proceed[] to trial on that date." *Ponder*, 347 F. Supp. 2d at 267. And it read *Ferebe* to permit courts to consider, in assessing the reasonableness of the death notice, the possibility that other developments could require moving the trial date. *Id.* In that case, the trial date, as of the death notice, had been less than a month away. But the court had earlier told the parties that that date was unrealistic for unrelated reasons, and that it was maintaining the trial date to speed along the Department of Justice's death-penalty decision. The court held the third *Ferebe* factor to favor the prosecution because (1) any realistic trial date would be at least three months after the death notice, (2) the prosecution had complied with the deadline the court had set to file any death notice, and (3) the defense had not objected to that deadline, "which had the practical effect of ratifying the reasonableness of the deadline imposed." *Id.* at 270.

District courts in the Fourth Circuit agree that *Ferebe* requires, as the remedy for an untimely death notice, striking the notice. *See, e.g.*, *Breeden*, 2003 WL 22019060, at *2 ("This court reads [*Ferebe*] to mean that a court cannot continue a case for the purpose of allowing the government to file a timely Death Notice."); *Le*, 311 F. Supp. 2d at 532 & n.10 ("[A]n untimely Death Notice cannot be rescued by delaying the trial date."); *Ponder*, 347 F. Supp. 2d at 267 ("[I]f a trial date is continued because the filing of the Death Notice is too close to the trial date, the Death Notice is *per se* unreasonable."); *Constanza-Galdomez*, 787 F. Supp. 3d at 145 ("In this Circuit, the only remedy for an untimely death notice is to strike the notice, without any prejudice inquiry.").

### c.    Applications of § 3593(a) in the Second Circuit

The Second Circuit and two district courts within it have not followed *Ferebe*. The Court reviews these decisions chronologically.

In *United States v. Pepin*, 367 F. Supp. 2d 315, 316 (E.D.N.Y. 2005), the prosecution filed a death notice less than four months before trial. After the defense indicated that it could not prepare a capital defense by that trial date, the district court adjourned the trial by more than five months. *Id.* The defense moved to strike the death notice as untimely, urging the court to apply *Ferebe*.[13] The district court found "unpersuasive" *Ferebe*'s reasoning that "a court may not effectively address the concerns raised by a motion to strike a death notice as untimely by postponing the trial." *Id.* at 318 (cleaned up). *Ferebe*'s outlier approach, it noted, may have resulted from the "unusual and potential inequitable pre-trial chronology" there. *Id.* In *Pepin*, by contrast, the district court noted that, notwithstanding having set a trial date prior to the death notice, it "had made it plain that it would provide the parties with as much time as necessary for

---

[13] *Pepin* involved 21 U.S.C. § 848(h)(1), which employed "identical language [as § 3593(a)] regarding the service of notice a reasonable time before trial." *Pepin*, 367 F. Supp. 2d at 317.

pre-trial preparation." *Id.* at 319.  It construed the defense motion to strike the death notice as conveying "that the defendant need[ed] more time to prepare for trial." *Id.*  And there was "no indication" the prosecution had delayed filing the death notice or acted in bad faith. *Id.*  Rather, "[a]ny delays were due to the importance of full consideration of this vital matter here and in Washington." *Id.*  The court thus denied the motion to strike, finding that, in light of the trial adjournment, the timing of the death notice had been reasonable. *Id.*

A motion to strike a death notice was likewise denied in *United States v. McGriff*, 427 F. Supp. 2d 253 (E.D.N.Y. 2006).  The court had set a trial date "contingent on the case proceeding as a non-capital case." *Id.* at 259 (cleaned up).  Twelve days before that date, the prosecution filed a death notice against defendant McGriff, with aggravating factors based on two murders. *Id.* at 261.[14]  On a motion to strike the notice as untimely, the court found the period between notice and trial unreasonably short to enable defense preparation for a capital trial, particularly given the complexity of the charges. *Id.* at 269.  But, it held, the remedy for the violation of § 3593(a) was a continuance of the trial—not striking the death notice.  It noted that the notice had been filed 14 months after the indictment for one murder and nine months after charges were added for the second—both outside the then–eight-month national average interval between the return of capital-eligible charges and such notices. *Id.* at 270.  But that lag, it found, was partly attributable to the defense, which submitted a mitigation memorandum some 11 months after the original indictment. *Id.*  And, it found, the prosecution could not be faulted for not making a death-penalty recommendation before McGriff's mitigation submission. *Id.* at 271.  Given the

---

[14] The statutory aggravating factors were that the defendant (1) had paid for the murders; (2) used substantial planning and premeditation; (3) had been convicted of engaging in a continuing criminal enterprise; and (4) as to one murder, knowingly created grave risk of death to others besides the victim. *McGriff*, 427 F. Supp. 2d at 261.  The non-statutory aggravating factors were future dangerousness and victim impact. *Id.*

timing of that submission and the reasonable period of time the Government took thereafter to reach its decision, the court held, a trial continuance was the proper remedy for the untimely death notice. *Id.* at 271–72.

The Second Circuit affirmed. It rejected McGriff's argument, based on *Ferebe*, that the denial of the motion to strike was immediately appealable. *United States v. Robinson*, 473 F.3d 487, 490–91 (2d Cir. 2007). It rejected *Ferebe*'s holding that § 3593(a) "creates a right not to be tried." *Id.* at 491. The statute, the Circuit stated, is silent as to how to assess reasonableness, and as to the remedy for an unreasonably timed death notice. *Id.* The Supreme Court, the Circuit noted, has interpreted the final-judgment rule of 28 U.S.C. § 1291 to require "courts of appeals to view claims of a 'right not to be tried' with skepticism, if not a jaundiced eye." *Id.* (quoting *Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 873 (1994)). In the absence of "an explicit statutory or constitutional guarantee that trial will not occur," it stated, there are not "grounds for an immediate appeal of right under § 1291." *Id.* (quoting *Digital Equip. Corp.*, 511 U.S. at 874) (cleaned up). Congress, the Circuit noted, had "neither included such a right in the text of [§ 3593], nor so much as suggested that such a right exists." *Id.*

The Circuit pointedly distinguished a defendant's right under § 3593(a) from those under the Constitution's Double Jeopardy, and Speech and Debate, Clauses. McGriff, it noted, was not disputing the Government's authority to try him on the charges brought, but only the penalties available upon conviction. *Id.* As such, it reasoned, "the protection that § 3593(a) affords a defendant . . . more closely resembles the protection afforded by any number of pretrial rights that involve notification or disclosure for the purpose of allowing the defendant to prepare his case." *Id.* at 491–92. "None of these rights amounts to a right not to stand trial" or "supplies a

46

basis for interlocutory review under the collateral order doctrine." *Id.* at 492. Rejecting

*Ferebe*'s reasoning, the Circuit stated:

> Because we conclude that § 3593(a) does not create a right not to be tried, *it necessarily follows that the section cannot be read to authorize, as an exclusive remedy for the government's violation of the statute, that the defendant may avoid trial altogether.*

*Id.* (emphasis added). In light of its holding that the district court's denial of the motion to strike

was not immediately appealable, the Circuit did not decide whether the district had been correct

in finding the notice untimely, or that a continuance was a proper remedy for such. *Id.*[15]

### d.    Applications of § 3593(a) in Other Circuits

Three other circuit courts have addressed § 3593(a)'s timing requirement. None has

adopted the Fourth Circuit's approach in *Ferebe*.

**Eleventh Circuit**: In *United States v. Wilk*, the Eleventh Circuit held, consistent with

*Ferebe*, that the denial of a motion to strike a death notice is immediately appealable, and that

the test of whether notice was reasonable under § 3593(a) is objective, based on the totality of

the circumstances. 452 F.3d 1208, 1220–21 (11th Cir. 2006). It identified six factors as relevant

but not exhaustive:

> (1) what transpired in the case before the formal Death Notice was filed; (2) the period of time remaining for trial after the Death Notice was filed; (3) the status of discovery and motions in the proceedings; (4) the nature of the charges in the indictment; (5) the nature of the aggravating factors claimed to support the death penalty; and (6) the anticipated nature of the defense, if known.

*Id.* at 1221. Applying those factors, however, the Eleventh Circuit rejected *Ferebe*'s analysis

and outcome.

---

[15] McGriff was convicted at trial of substantive and conspiracy charges of murder-for-hire, *see United States v. McGriff*, No. 20 Cr. 3157, 2022 WL 893731, at *1 (2d Cir. Mar. 28, 2022) (summary order), but the jury, at the penalty phase, returned a verdict of life imprisonment, *see United States v. McGriff*, No. 4 Cr. 966, Dkt. 704 (S.D.N.Y. Feb. 9, 2007).

First, it rejected *Ferebe*'s approach of using, as the measure for the reasonableness of the timing of the death notice, the trial date as it stood on the date of the notice.  That methodology, the Circuit stated, "ignores the fact that § 3593(a) states that the Death Notice must be filed 'a reasonable time before the *trial*,' not a reasonable time before the date the trial was scheduled to begin when the Death Notice was formally filed."  *Id.* at 1222 (emphasis in original).  "Simply put, there is nothing in § 3593 that restricts courts to counting only the days between the Death Notice and a scheduled trial date at the time of the filing of the Death Notice."  *Id.* at 1223.

The Circuit also held that a continuation of trial is a proper remedy for an untimely notice.  It explained:

> [T]he obvious purpose of the § 3593(a) notice requirement is to make sure a defendant has adequate time to prepare for a death defense.  Continuing the trial after the Death Notice is filed does not undermine but rather preserves the defendant's statutory right not to stand trial for his life without reasonable notice of the government's intent to seek the death penalty.  Where a district court determines that the Death Notice was filed at a time when either party, particularly the defense, would reasonably be unprepared for a capital trial on the previously scheduled trial date, a continuance of the trial is appropriate.

*Id.* at 1223.  The Circuit listed "practical reasons" why a continuance is appropriate.  Doing so permits the prosecution to receive input from the defense before deciding whether to seek the death penalty "with full and cautious deliberation," while "accomplishing the goal of § 3593(a) to assure that defendants have adequate time to prepare a defense to the death penalty."  *Id.* at 1224–25.  In contrast, reading § 3593(a) to deny *sub silentio* the district court the ability to move the trial date "unduly restricts the district court's ability to manage its cases."  *Id.*  "District courts should have the ability to set trial dates to move the case along while it is a more simple murder case but then continue the trial date if and after a Death Notice is actually filed."  *Id.* at 1225.

48

The Circuit also rejected the approach, taken by some district courts applying *Ferebe*, of examining whether "the amount of time the government took to make a decision about whether to pursue the death penalty was reasonable." *Id.* at 1223 n.26 (citing *Ponder* and *Hatten*, *supra*). Section 3593(a), it held, was "designed to protect the defendant from having to stand trial for his life without reasonable notice and time to prepare adequately." *Id.*  Whether the Government could or should have decided to seek the death penalty sooner was thus irrelevant. *Id.*[16]

Applying this framework, the Circuit affirmed the denial of Wilk's motion to strike the death notice against him.  The prosecution had filed the death notice two months before Wilks's non-capital trial was scheduled to begin. *Id.* at 1214–15.  The district court had continued the trial for an additional four months, to enable both sides to prepare for a capital trial, thus giving the defense six months between the notice and the trial. *Id.*  The Circuit found that all six factors it had listed favored finding the death notice reasonably timed.  First—as to pre-notice activity in the case—Wilk's defense counsel, who had "extensive capital crimes experience," had assumed the prosecution would likely seek the death penalty and thus undertook significant preparation for a death defense long before the notice. *Id.* at 1222.  Second—as to the interval between the notice and trial—the Circuit calculated this period based on the adjourned trial date. *Id.* at 1222–23 & n.28.  Six months was "clearly adequate" to prepare a death defense—indeed, the Government had given "objectively reasonable notice on this basis alone." *Id.* at 1222.  The Circuit "dispense[d] quickly with the third, fourth, and fifth factors" (*i.e.*, the status of discovery and motions, the nature of the charges, and the nature of the aggravating factors). *Id.* at 1225.  Six months was "more than enough time" to complete outstanding discovery and motions. *Id.*

---

[16] The Circuit also noted that there was no indication that the Government had intentionally delayed filing a death notice to reduce Wilk's time to prepare for trial.  452 F.3d at 1223 n.26.

Although the seven-count, 19-page indictment contained "serious and lengthy allegations" spanning nearly four years, and implicated evidence requiring expert access and review, the six-month period was reasonable. *Id.* And the statutory and non-statutory aggravating factors were "straightforward." *Id.* Finally—as to the anticipated defense—six months was "clearly more than sufficient time no matter what approach the defense decide[d] to take." *Id.*

**Ninth Circuit**: In *United States v. Williams*, 318 F. App'x 571 (9th Cir. 2009), the Ninth Circuit likewise upheld a death notice. After the prosecution had filed the notice 75 days before trial, the district court had adjourned the trial, first by seven months and, later, by another three. *Id.* at 572. Finding the notice reasonably timed under these circumstances, the Circuit rejected *Ferebe* and approved *Wilk*'s approach. A court assessing reasonableness under § 3593(a), it held, is not limited to considering "the interval between the time the notice was filed and the trial date at the time of that filing, irrespective of any trial continuances." *Id.* The statute's "obvious intent," it reasoned, "is to ensure that both parties, especially the defendant, have adequate time to prepare for a capital trial." *Id.* at 573. By continuing the trial, "the district judge sought to ensure that the defendants' rights under § 3593 were protected." *Id.* (cleaned up). And the eventual trial date—more than a year after the notice—made the notice's timing reasonable. *Id.*[17]

---

[17] The First Circuit has also upheld a death notice under § 3593(a), but the circumstances did not require it to choose among its peer courts' approaches to the statute. In *United States v. Ayala-Lopez*, 457 F.3d 107, 107–09 (1st Cir. 2006), it affirmed the denial of a motion to strike a death notice. The prosecution had filed the initial notice years before trial, a first amended notice nine months before trial, and a second amended notice (against which the defense moved) two months before trial. *Id.* at 108. The Circuit assumed *arguendo* that the appeal was immediately appealable. *Id.* It held that, even if the inquiry were limited to "objective" factors and (per *Ferebe*) not to permit it to consider prejudice, the notice's timing was reasonable because it was substantively identical to the prior notice issued nine months before trial.

### 2.    Analysis

McBean, seizing on the outlier *Ferebe* precedent, argues that the Justice Department's issuance of the death notice for him 52 days before his scheduled trial date requires striking the notice and precluding the Government from pursuing the death penalty.

That argument fails.  Under governing law, the death notice in McBean's case was clearly issued "a reasonable time before the trial."  18 U.S.C. § 3593(a).  And the Second Circuit's decision in *Robinson* squarely rejected *Ferebe*'s non-textual gloss on § 3593(a): that it gives a defendant "a right not to be tried," such that where a mechanistic comparison of the date of the notice with the then-scheduled trial date yields the conclusion that a notice was untimely, the statute may prevent the Government from pursuing the death penalty, notwithstanding Congress's authorization of it for the capital crime charged.  473 F.3d at 491.

Instead, as the Second Circuit (joined by the Ninth and Eleventh) has recognized, § 3593(a) mandates that the defendant be given reasonable pretrial notice that the Government will pursue the death penalty, to "allow[] the defendant to prepare his case," mindful of the transformative impact of that decision on the nature and conduct of a trial.  *Id*.; *see also Wilk*, 452 F.3d at 1225; *Williams*, 318 F. App'x at 573.  And the courts applying § 3593(a) outside the Fourth Circuit have likewise taken a pragmatic approach to the statute.  Whether finding § 3593(a) complied with, or that a trial adjournment adequately remedied the violation of that statute, these courts have centrally focused on whether the timing of the notice, in practice, gave the defendant a sufficient ability to prepare for a capital trial.

Applied to this case, the factors considered by these courts emphatically support that McBean has received adequate notice that the Government is pursuing capital charges.  It would

51

be difficult, in fact, to conceive of a case in which a defendant has more clearly received timely pretrial notice that he faces capital charges.

*Time remaining before trial*:  This factor—the most important one—strongly supports the timeliness of the notice.  The Court has at no point set a date for a *capital* trial of McBean. The July 28, 2025 trial date that was in place as of the June 6, 2025 death notice was explicitly premised on a *non-capital* trial, at which McBean would be tried alongside Harris and Smith. All parties understood that, in the event of a death notice, McBean's trial would be severed from the others' and adjourned.  And in the 11 months since the notice, the Court, at the defense's request, has deferred scheduling a trial date.  The explicit purpose for that has been to enable McBean to fortify his trial team; litigate pretrial motions; seek, secure, and review penalty-phase discovery; and explore a pretrial resolution.  Realistically, given the complexities of jury selection for such a case in this District, a capital trial in this case, at the very earliest, will not commence until early 2027—more than at least 18 months after the death notice.  And the Court remains open, in setting a trial date, to reasonable defense arguments as to the necessary time to prepare.

In these circumstances, the timing of the death notice relative to trial—the central inquiry commanded by § 3593(a)—is eminently reasonable.  No non-frivolous claim could be made that McBean, by virtue of the timing of the death notice, was inhibited in his trial preparation.  Only based on the artificial measure used in *Ferebe*—in which the Fourth Circuit used the trial date as of the notice to govern the timing inquiry—could the death notice in this case be found untimely. And that measure does not follow from the statute.  *See Wilk*, 452 F.3d at 1222–23 (§ 3593(a) requires that the Death Notice "must be filed 'a reasonable time before the *trial*,' not a reasonable time before the date the trial was scheduled to begin when the Death Notice was

formally filed"; "there is nothing in § 3593 that restricts courts to counting only the days between the Death Notice and a scheduled trial date at the time of the filing of the Death Notice"); *Williams*, 318 F. App'x at 573 ("the obvious intent of § 3593(a) is to ensure that both parties, especially the defendant, have adequate time to prepare for a capital trial"; adjourning the earlier trial date following a death notice can "ensure that the defendant's rights under § 3593 [are] protected" (cleaned up)).

Indeed, even *Ferebe* is not nearly the straitjacket that McBean portrays. His brief casts that decision to hold inexorably that the "existing trial date—and not a potential future trial date, if a motion for continuance were to be granted—is the key date for purposes of the timeliness analysis." Mem. at 38. But the Fourth Circuit did not announce such a rule for all cases. It certainly did not consider the context here, in which the scheduled trial date was premised on non-capital charges and the trial court had explicitly provided that the date would be adjourned in the event of a death notice. On the contrary, the Fourth Circuit stated that "the scheduled trial date *may* constitute the trial date for purposes of analysis under section 3593(a)." *Ferebe*, 332 F.3d at 737 n.6 (emphasis added); *see also Ponder*, 347 F. Supp. 2d at 267 (*Ferebe* does not compel use of the scheduled trial date in calculating the interval between notice and trial where parties were "reasonably aware" that the scheduled trial date was a placeholder).

This case could not be more different than *Ferebe*. There, the Justice Department issued a significantly expanded death notice, upending a conditional plea agreement, eight weeks before a long-scheduled capital trial. In contrast, here, from the outset, the parties proceeded (and a non-capital trial date was set) on the shared assumption that the Justice Department would likely not pursue the death penalty. At the first conference with McBean, held October 29, 2024, the Government stated that it had invited a mitigation submission; McBean's counsel stated that it

would submit one promptly and expected the Government to file a no-seek letter "rather quickly." Oct. 29, 2024 Tr. at 22–25. McBean's counsel assented to the setting of a trial date on that premise, and agreed with the Court it was appropriate to set an "ordinary" (*i.e.*, non-capital) trial schedule, with the "caveat" that it would be "adapt[ed]" if the capital-review process developed unexpectedly. *Id.*; *see also id*. at 33 (McBean's counsel: "We're operating under the same assumption that we have a footnote with regard to the disposition of the capital [aspect of the case]"). At another conference, on May 20, 2025, the Court again took up with McBean's counsel the effect on the July 28 trial date of a potential death notice as to him. The Court stated: "[A]s a practical matter, if the government were to make a seek determination, it's simply impractical to have [McBean] tried on the current schedule." May 20, 2025 Tr. at 20. McBean's counsel responded: "[T]hat's correct." *Id.* The Court then stated:

> I would like to pursue the rest of the conversation [regarding the then-scheduled July 28 trial] on the premise there's a "no-seek" decision. If there is a "seek" decision, I expect that we will promptly convene this entire group for a conference to figure out the implications of it, including setting a schedule relating to Mr. McBean that would presumably be different from the schedule that currently exists.

*Id.* at 20–21. At argument on this motion, McBean's counsel confirmed that his defense team had always understood that the July 28 trial date had been "premised on a no-seek decision." Oral Arg. Tr. at 9 (cleaned up).

The date of "trial," for purposes of § 3593(a), is thus not July 28, 2025, but a date in the future (no earlier than 2027) to be set with solicitude for the defense's pretrial preparation needs. No court has found a period of that length (at least 18 months following the death notice) impermissible under § 3593(a). Numerous have found much shorter intervals between a death notice and trial reasonable. *See, e.g.*, *Le*, 311 F. Supp. 2d at 534–35 (less than four months); *Ponder*, 347 F. Supp. 2d at 270 (less than four months); *Wilk*, 452 F.3d at 1222 (six months);

*United States v. Breeden*, 366 F.3d 369, 373–75 (4th Cir. 2004) (seven months); *Ayala-Lopez*, 457 F.3d at 108–09 (nine months).

*Events before filing of the death notice*:  The circumstances preceding the death notice reinforce the reasonableness of its timing, in that they reflect that the Justice Department made that decision with relative dispatch.  Shortly after the indictment naming McBean was unsealed on October 17, 2024, the Government invited his counsel to make a mitigation submission. Defense counsel made its 19-page submission on February 3, 2025.  On March 24, 2025, McBean's counsel met with the Department's Capital Case Committee in Washington, D.C.  On May 20, 2025, the Court, noting the July 28, 2025 trial date, urged the Government to reach a decision by June 3, 2025.  May 20, 2025 Tr. at 12–19.  On June 6, 2025, the Government filed the death notice as to McBean.

The Government thus filed the death notice some eight months after McBean's indictment.  Three and a half months of that period are fairly attributed to defense counsel's preparation of a mitigation submission, and more to the ensuing Capital Case Committee meeting with defense counsel.  *See, e.g.*, *Wilk*, 452 F.3d at 1224 ("That the government's decision-making process affords an opportunity for input by the defendant through counsel is a good thing, but it adds to the protracted nature of the decisional process."); *Pepin*, 367 F. Supp. 2d at 319 ("[a]ny delays were due to the importance of full consideration of this vital matter here and in Washington").  The eight months between the indictment and the notice is slightly more than half the national average of 14 months between a capital indictment and filing of a death notice.  *See* Dkt. 133-1 ¶ 4 (declaration by Matthew Rubenstein, director of Capital Resource Counsel project).  These facts are consistent with the expectation that the Justice Department will balance the interest in promptly reaching a seek decision with the full deliberation merited by the

55

gravity of that decision.  *See McGriff*, 427 F. Supp. 2d at 271.[18]  Before the notice issued, the

Government had not at any time communicated a different outcome to the defense.[19]

This pre-notice history of McBean's case is thus far afield from those that have struck

death notices as untimely.  In nearly all those cases—in addition to there being a shorter interval

between the notice date and the actual trial date—the seek decision reversed an express

commitment not to seek the death penalty.  *See, e.g.*, *United States v. Cole*, 799 F. Supp. 3d 438,

450, 460 (D.V.I. 2025) (striking death notice where prosecution had initially filed no-seek notice

by court-ordered deadline, and then filed death notice more than 16 months after that deadline,

52 days before trial); *United States v. Spurlock*, 782 F. Supp. 3d 987, 991 (D. Nev. 2025) (same

where prosecution filed death notice "almost eight months after its formal no-seek decision, and

just 12 days before [defendant's] firmly-set trial was scheduled to commence"), *appeal

dismissed*,2025 WL 2319947 (9th Cir. June 11, 2025); *Constanza-Galdomez*, 787 F. Supp.

3d at 135 (same where prosecution initially "assured the Defendants and this Court, in writing,

that it would not seek the death penalty," but, almost 13 months later, "changed its mind" and

filed death notices 109 days before trial).  In others, courts striking the death notices noted

prosecutorial irregularities.  *See, e.g.*, *Ferebe*, 2005 WL 1429261, at *1–3 (striking death notice

---

[18] It is no indicator of unreasonableness that the Government filed the death notice three days after the date by which the Court urged it to decide.  The Court so recommended to attain clarity as to the contours of the case to be tried on July 28.  The Department's decision gave sufficient clarity to the parties and counsel.

[19] The defense based its expectation that the Government would not seek the death penalty on its experience, not on representations from the prosecution in this case.  *See, e.g.*, Oct. 29, 2024 Tr. at 24–25 (McBean's counsel: "[I]n my experience, Judge, and I've been on the capital panel for quite some time now, this is not a case that the Southern District of New York is going to proceed with the death penalty on. . . .  I would think that [a no-seek decision] would come back rather quickly just given the fact pattern." (cleaned up)); May 20, 2025 Tr. at 16 ("This is not a case where the Department of Justice ordinarily seeks the death penalty.  It's just not that fact pattern.").

where prosecution had entered into conditional plea agreement without death penalty, but withdrew plea agreement and filed death notice 39 days before trial); *United States v. Cuong Gia Le*, 316 F. Supp. 2d 343, 350–55 (E.D. Va. 2004) (striking amended death notice filed 94 days before trial, which added non-statutory aggravating "history of violence" factor with "nine violent incidents" that would "require considerable time to investigate," including a separate murder).

The case's pre-notice history thus reinforces that the notice was reasonably timed. *See, e.g.*, *Wilk*, 452 F.3d at 1224–25; *Pepin*, 367 F. Supp. 2d at 319; *McGriff*, 427 F. Supp. 2d at 271.

***Status of discovery and pretrial motions***:  The status of discovery and pretrial motions also favors finding the death notice timely.  As of the notice, the Government was compliant with its Rule 16 discovery obligations—consistent with the impending trial date—and the only motions then scheduled were evidentiary motions *in limine*.[20]  After the notice, the Government promptly committed to meet the discovery obligations triggered by the aggravating factors set out in the notice (*e.g.*, evidence bearing on McBean's criminal history and future dangerousness). *See, e.g.*, Dkt. 229 at 2.  The substantial period between the notice and the (as-yet-unset) trial date supplies ample time for the Government to access and produce, and the defense to review, additional discovery.  As to motions, the Court solicited guidance from counsel as to a motions schedule, set a schedule for the instant motions, and has scheduled a conference for June 2026 at which it expects to put in place, consistent with the parties' joint recommendation, a schedule for further motions (including ones *in limine* and ones relating to

---

[20] After the Court severed McBean's trial and co-defendant Harris pled guilty, the Court, in a lengthy bench opinion, resolved such motions as brought by the Government and co-defendant Smith.  *See* Dkt. 152 ("July 15, 2025 Tr.") at 4–43.

jury selection) and trial. *See* Dkt. 133 ("Joint Ltr.") at 2. Such a schedule will amply meet McBean's trial preparation needs.

This factor too supports the reasonableness of the death notice's timing. *See, e.g.*, *Wilk*, 452 F.3d at 1225; *Breeden*, 2003 WL 22019060, at *3; *Le*, 311 F. Supp. 2d at 535.

***Nature of the charges and aggravating factors***: There is nothing about the charges against McBean or the aggravating factors added in the death notice that make the timing of the notice unreasonable.

As noted, courts have taken different approaches to this factor. Some inquire, from the perspective of the defense, whether, given the complexity of the new charges and/or aggravating factors, the notice would give the defense adequate time to meet these at trial. *See, e.g.*, *Breeden*, 2003 WL 22019060, at *3–4; *Le*, 311 F. Supp. 2d at 534–36. Others inquire whether the charges and/or aggravating factors justified the period it took the prosecution to file the death notice. *See, e.g.*, *Hatten*, 276 F. Supp. 2d at 578–79; *Ponder*, 347 F. Supp. 2d at 264–66; *Constanza-Galdomez*, 787 F. Supp. 3d at 141–43. McBean draws on the latter line of cases. He argues that the death notice was unreasonably delayed because the Government ostensibly knew "nearly all" relevant facts supporting the charges and aggravating factors "since Spring 2024 at the latest." Mem. at 48.

In fact, measured under either approach, McBean's challenge based on the nature of the charges and aggravating factors falls far from the mark.

From the defense perspective, the death notice does not change the charges against McBean at all. These were returned earlier in the S3 (and S2) Indictment. McBean had been prepared to meet them at the trial scheduled for July 28, 2025. See S3 Indictment ¶¶ 1–4. And these three counts do not present special complexity. They arise from a compact series of events

and a finite pool of evidence. The charges centrally allege that in December 2023, McBean, in the MDC awaiting sentencing on other charges, used a contraband cellphone to plot with Harris, Smith, and unidentified gunmen to murder Williams; that an initial shooting attempt on December 24, 2023 failed; and that a second attempt, on December 26, 2023, resulted in the shooting of Williams and the murder of Burgos. The Indictment further alleges that, thereafter, McBean conspired with others to intimidate and harass Williams on social media; and conspired to destroy records, including destroying a contraband cellphone in the MDC and causing co-conspirators to delete text messages and other electronic data. At conferences, the Government has set out the Rule 16 evidence bearing on these charges, which largely consists of electronic communications. It is unremarkable in nature and scale.

As to special findings and aggravating factors, the S3 Indictment alleges the following special findings: that McBean (1) was 18 years or older at the time of the offense; and (2) intentionally participated in an act, contemplating that a person would be killed, intending that lethal force would be used in connection with a person other than one of the participants in the offense, and causing a victim to die. It alleges three statutory aggravating factors: that McBean had (1) knowingly created a grave risk of death to others; (2) procured the commission of the offense by payment; and (3) committed the offense after substantial planning and premeditation to cause a person's death. The death notice adds the statutory intent factor of an intentional act of violence with knowledge of grave risk of person's death; the statutory aggravating factor that McBean was earlier convicted of a violent federal felony involving a firearm; and the non-statutory aggravating factors of victim impact and future dangerousness. For the most part, these findings and factors are derivative of McBean's alleged offense conduct. Preparing to meet these will not pose an unusual hurdle for defense preparation. Those that

focus on McBean's criminal history and future dangerousness, and impact on victims such as Burgos's family and friends, will require additional preparation, but the 18-month period between the death notice and the earliest realistic trial date will amply enable such preparation. *See, e.g.*, *Wilk*, 452 F.3d at 1225 (seven-count indictment charging capital murder, obstruction, and child pornography possession spanning nearly four years contained "serious and lengthy allegations," but timing of death notice six months before capital trial gave defendant "more than enough time" to prepare); *Breeden*, 2003 WL 22019060, at *3 (reasonable for defense to prepare for capital trial involving multiple robbery charges and murder of one victim where notice was filed less than seven months before trial); *Le*, 311 F. Supp. 2d at 534–35 (113-day period between death notice and capital trial reasonable where charges and aggravating factors related to single incident involving two murders); *cf. Ferebe*, 2005 WL 1429261, at *7 (finding, on remand, that death notice's addition of new murder victim—an "innocent high school student"—made the defense's preparation "much more difficult" and favored finding the 39-period between the notice and trial unreasonable).

The same result inheres when the charges and aggravating factors are evaluated from the prosecution's perspective. There is no credible basis to contend that the Government tarried in pursuing the first indictment against McBean, returned less than 10 months after the Burgos murder. And, for the reasons above, McBean's claim that the Government delayed in filing the notice is unpersuasive. As noted, it filed the notice eight months after the Indictment—slightly more than half the national average of 14 months—and with good reason. Three and half months of that period were taken up by the defense's preparation of a mitigation submission; and a meeting some eight weeks later between defense counsel and the Justice Department's Capital Case Committee likely also protracted the period before a final decision. *See Wilk*, 452 F.3d

60

at 1224 ("opportunity for input by the defendant through counsel is a good thing, but it adds to the protracted nature of the decisional process"); *Pepin*, 367 F. Supp. 2d at 319 (similar).

Moreover, specific to this case, the acts of obstruction by McBean and his co-conspirators alleged in the Indictment undoubtedly lengthened the Government's investigation and thus the time the Justice Department took to reach a death penalty decision. These acts included McBean's destruction of the contraband cellphone which he allegedly used to plot the shootings of Williams; deletions by Harris, Smith, and Bartholomew of electronic communications and other data concerning that plot; and Bartholomew's noncompliance with a grand jury subpoena duces tecum. As of this writing, the Government has not yet apprehended the three gunmen who shot Williams and Burgos more than two years ago. The difficulties developing the evidentiary record here, to the extent attributable to obstruction, are not properly laid at the prosecution's doorstep.

The Court accordingly rejects McBean's claim that it took unreasonably long for the Government to bring the charges, and reach a determination as to the death penalty, as to him. *See Ponder*, 347 F. Supp. 2d at 265–66 (nature of charges and aggravating factors did not indicate that prosecution "should have acted sooner to file the Death Notice," where it had obtained evidence supporting these during complex investigation); *cf. Constanza-Galdomez*, 787 F. Supp. 3d at 142 (death notice filed 109 days before trial—reversing no-seek notice filed more than a year earlier—objectively unreasonable where "the nature of the facts underlying the charges has been the same since the case's inception" and the defense lacked adequate time before trial to prepare).

*Anticipated nature of the defense*: The defense, appropriately, has chosen not to preview its trial strategy. It has not, however, identified any line of defense—or evidence—that is apt to

be unavailable, or less available, to McBean on account of the period between the Indictment and the filing of the death notice. Nor has it identified any defense effort that would require more time to develop than the 18-month period between the death notice and the earliest potential date of a capital trial. The Court has appointed for McBean a highly experienced and well-resourced four-lawyer defense team, comprised of estimable members of the District's Criminal Justice Act panel with capital experience. The strength of the defense team reinforces that it is reasonable for McBean to meet the charges against him in the time allocated. *See, e.g.*, *Wilk*, 452 F.3d at 1225 (six months between death notice and trial, in far more complex case, was "clearly more than sufficient time no matter what approach the defense decide[d] to take").

    ***Prejudice to McBean***: For the same reasons, McBean has not identified concretely any prejudice to him from the timing of the death notice. He does not contend that he will have insufficient time to prepare, or that any witness or evidence that could assist his cause has ceased to be available. Nor can he argue an impingement on his liberty interests as a result of the time between indictment and his capital trial. Dating back to before the Indictment—indeed, before the offense conduct—McBean has been in federal custody on unrelated charges, for which he has since been sentenced to serve a 12.5-year sentence. *See United States v. McBean*, 20 Cr. 260, Dkt. 146 (E.D.N.Y. May 14, 2024) at 2. It was during such custody, at the MDC, that McBean is alleged to have orchestrated the Burgos murder and Williams shootings. And he has agreed to waive time under the Speedy Trial Act for each continuance through to the present. *See Williams*, 318 F. App'x at 573 (finding no conflict between the right to a speedy trial and the right to reasonable notice under § 3593 where defendant "stipulated to waive time under the Speedy Trial Act before the district court continued the trial date"). He argues instead that prejudice is irrelevant. Mem. at 38 (citing *Ferebe*). The law of this Circuit, however, is that

§ 3593(a) does not "create a right not be tried," and that a defendant claiming an untimely death notice must instead establish prejudice.  McBean has not done so.

*Overall assessment*:  For the reasons above, all factors identified in the assembled case law applying § 3593(a) support that the timing of the death notice in this case was reasonable. Considering the circumstances in totality, the Court finds that the notice was reasonably timed, in compliance with § 3593(a).  *See, e.g.*, *Wilk*, 452 F.3d at 1225; *Williams*, 318 F. App'x at 573; *Pepin*, 367 F. Supp. 2d at 319; *Le*, 311 F. Supp. 2d at 535; *Breeden*, 366 F.3d at 373–75; *Ponder*, 347 F. Supp. 2d at 270.

### D.    Motion for an Informative Outline

McBean seeks production, within 60 days, of an "exhaustive informative outline."  The outline he envisions would identify the evidence the Government intends to offer at the punishment phase of trial in support of two non-statutory aggravating factors (victim impact and future dangerousness) and one statutory aggravating factor (grave risk of death to a person). Discovery Mem. at 1–2, 6–8; Oral Arg. Tr. at 35.[21]  The Government opposes.  It argues that McBean is not entitled to such an outline under the Constitution or the FDPA.  It represents that it has produced all discovery in its possession related to these factors.  Discovery Opp'n at 1–3.

#### 1.    Relevant Case Law

A defendant's constitutional right to notice of the charges against him is well established.  *Gray v. Netherland*, 518 U.S. 152, 167 (1996) (citing *In re Ruffalo*, 390 U.S. 544, (1968) and *Cole v. Arkansas*, 333 U.S. 196 (1948)).  But, the Supreme Court has held, the Constitution does not give a defendant—even one facing capital charges—a right to "notice of

---

[21] McBean's motion requested an outline as to victim impact and future dangerousness, but, at argument, his counsel asked that the outline also cover grave risk of death.  Oral Arg. Tr. at 35.

63

the *evidence* that the [Government] plans to use to prove" those charges.  *Id.* at 168 (emphasis in original) (citing *Wardius v. Oregon*, 412 U.S. 470, 474 (1973) and *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977)); *see also United States v. Agurs*, 427 U.S. 97, 112 n.20 (1976) ("it has always been the Court's view that the notice component of due process refers to the charge rather than the evidentiary support for the charge"), *reversed on other grounds by United States v. Bagley*, 473 U.S. 667 (1985).

Consistent with these precepts, every circuit to have addressed the issue has held that, although the Constitution and FDPA require a capital defendant to receive adequate notice of the aggravating factors the Government intends to establish, they do *not* require notice of the specific evidence that the Government will use to support these.  *See United States v. Higgs*, 353 F.3d 281, 325 (4th Cir. 2003); *United States v. Lee*, 274 F.3d 485, 495–96 (8th Cir. 2001); *United States v. LeCroy*, 441 F.3d 914, 929 (11th Cir. 2006) (citing *United States v. Battle*, 173 F.3d 1343, 1347 (11th Cir. 1999)).  Although the Second Circuit has not ruled on this issue, district courts within the Circuit have uniformly held the same.  *See, e.g.*, *United States v. Williams*, No. 00 Cr. 1008, 2004 WL 2980027, at *17 (S.D.N.Y. Dec. 22, 2004) (death notice sufficient because it "need not list specific evidence"), *aff'd on other grounds*, 506 F.3d 151 (2d Cir. 2007); *United States v. Kee*, No. 98 Cr. 778, 2000 WL 863119, *9 (S.D.N.Y. June 27, 2000) (similar); *United States v. Wilson*, No. 04 Cr. 1016, 2013 WL 1338710, at *7 (E.D.N.Y. Apr. 1, 2013) (similar).

There is, however, case authority in capital cases to the effect that courts have inherent authority to order the Government to provide specific information to the defense.  Such orders may enable adequate preparation for trial by the defense and/or informed pretrial evidentiary rulings by the Court.  *See, e.g.*, *United States v. Gendron*, No. 22 Cr. 109, 2024 WL 3647779,

at *2–3 (W.D.N.Y. Aug. 2, 2024) (informative outline may enable defense to better understand and defend against "broadly worded aggravating factors," and may assist the court in its role as evidentiary gatekeeper); *United States v. Karake*, 370 F. Supp. 2d 275, 279–80 (D.D.C. 2005) (where defense has not been given sufficient notice as to aggravating factors, court has authority to require Government "to provide more specifics in order to give the defendant the opportunity to prepare for the penalty phase" and "to provide the court with a frame of reference for ruling on objections to the death penalty notice"); *see also United States v. Kaczynski*, No. 96 Cr. 259, 1997 WL 34626785, *19 (E.D. Cal. Nov. 7, 1997); *United States v. Hammer*, 96 Cr. 239, 2011 WL 6020157, at *3 (M.D. Pa. Dec. 1, 2011).

### 2. Application

At this early pretrial stage, McBean is not entitled to an informative outline. As noted, the Court, at both sides' request, has not yet scheduled McBean's capital trial. That trial will occur in early 2027 at the earliest—some eight months after this decision. And the Government has thus far complied with all its discovery obligations. The Court has held regular conferences with counsel, at which it has probed in detail the status of discovery. At each, the Government has represented that it is current on its discovery obligations and will promptly produce new discovery. *See, e.g.*, Oral Arg. Tr. at 52; Dkt. 198 ("Dec. 15, 2025 Tr.") at 3–11. The defense has not disputed—and does not here dispute—that the Government has done so. *See, e.g.*, Oral Arg. Tr. at 34 (defense counsel: "[The Government has] disclosed what they are required to disclose."); Dec. 15, 2025 Tr. at 11–15. McBean nonetheless moves for an order directing the Government to (1) repackage, in an outline format, the information within this discovery that the Government would use to support the three aggravating factors, and (2) take steps to obtain, and thereafter disclose and add to the outline, additional evidence—as-yet outside the Government's

65

knowledge—bearing on the three aggravating factors.  Drawing on the case law above, he argues that this outline is necessary to facilitate his preparation for trial, and to inform the Court's resolution of pretrial evidentiary motions.

The Court denies McBean's motion, without prejudice to renewal later in the case.  The Government is in full compliance with its discovery obligations.  A trial date has not yet been set, nor has a schedule for motions *in limine*.[22]  As a result of the prosecutions of his three indicted co-conspirators Harris, Smith, and Bartholomew—which have encompassed bail motions, suppression hearings, and briefing and rulings on motions *in limine*—McBean has informally received an unusually detailed preview of the Government's guilt and punishment theories and the evidence supporting these.  McBean has also received substantial amplification from the Government as to the three aggravating factors on which his motion relies.  And, as the review of these factors demonstrates, McBean has not demonstrated a need for further information at this stage.[23]

***Victim impact***:  The death notice states that McBean "caused injury, harm, and loss to the family and friends of Clarisa Burgos," "evidenced by [Burgos's] personal characteristics and by the impact of [her] death upon her family and friends."  Death Notice at 3.  McBean seeks an

---

[22] *See* Dkt. 230 (commissioning joint letter, due May 29, 2026, that sets out the parties' proposed pretrial schedule and addresses whether the Court should set a trial date at the upcoming pretrial conference).

[23] McBean's May 18, 2026 letter cites a transcript of a hearing in a different case in which the Government stated that an informative outline would be necessary were it to pursue the death penalty.  *See* Dkt. 246 at 1–2 (quoting transcript of May 4, 2026 conference in *United States v. Mata*, 25 Cr. 76 ("May 4, 2026 *Mata* Tr.")).  As the full transcript makes clear, that statement was keyed to that particular case.  *See* May 4, 2026 *Mata* Tr. at 9 (stating that an outline "would be appropriate *in this case*" (emphasis added)).

outline that would detail how these individuals would describe the loss they experienced if they were to testify at the penalty phase. *See, e.g.*, Oral Arg. Tr. at 26.

To an unusual degree, McBean already has access to this information, as a result of the sentencing hearings of his indicted co-conspirators. In connection with these, the Government supplied the Court with numerous written victim impact statements from Burgos's family and friends. These are accessible on the docket of this case. *See* Dkts. 189-2 ("Harris VIS") at 1–9, 212-1 ("Bartholomew VIS") at 1–2, 222-1 ("Smith VIS") at 1–14. These letters recount, from each writer's perspective, Burgos's personal characteristics, and the loss that the writer, and others, experienced.[24]

In addition, at Harris's sentencing, Burgos's cousin and aunt both spoke. Each described, at length, Burgos and the impact of her murder on her family—including on her young son.[25] Burgos's cousin earlier testified at Smith's bail hearing,[26] and testified again at Bartholomew's

---

[24] *See, e.g.*, Smith VIS at 1 (Burgos "lifted others up just by being in the room" and "was a devoted mother, a caring daughter, and a loyal friend"; "[s]he left behind her four-year-old son, . . . who still asks for his mother and doesn't yet understand why she isn't coming back"), 6 ("There's an empty seat at the table that will always be there. Every time we see her son, we see both her beauty and our grief reflected in his face. . . . This was the destruction of an entire family's joy, peace, and sense of safety."), 7 (Burgos "was a vibrant, loving soul who lit up every room . . . [h]er smile was infectious and had a way of softening even the hardest of days").

[25] *See, e.g.*, Dkt. 202 ("Harris Sent'g Tr.") at 34 (Burgos's "son is going to grow up without his mother, and he will never get to even understand half of who she was, [] because he was too young when she died"), 37 ("We just had Thanksgiving dinner at my home, . . . and [Burgos's] picture is there with a candle, and the whole time [Burgos's son] just kept touching the picture. [When] another cousin touched the picture, he said, "No. Don't touch that picture. That's my mommy." (cleaned up)).

[26] *See* Dkt. 60 ("Smith Bail Hr'g Tr.") at 52–54 (Burgos was "a regular girl . . . trying to be a realtor[, who was] just trying to get her stuff together"; "This is something that we are living with every day of our lives. . . . Every day we mourn. . . . Nothing is happy for us. Life is totally different. She was a big part of all of our lives." (cleaned up)).

sentencing.[27]  The transcripts of these proceedings are available to McBean's counsel.  *See* Oral

Arg. Tr. at 25 (defense counsel, acknowledging having obtained "substantial number of victim

impact statements . . . [from] the public docket"); Dkt. 200-2 (Government letter to defense,

dated August 19, 2025, summarizing evidence related to victim impact) ("Aug. 19 Letter") at 3.

This case is thus a far cry from the capital cases in which courts have ordered the

Government to disclose victim impact information before trial.  Those courts each relied on

factors absent here, including that (1) the defense had not yet received any victim impact

information, (2) there were a large number of victims, including foreigners, and/or (3) trial was

approaching.[28]  In contrast, here, there is a finite number of victims—Burgos's family and

---

[27] *See, e.g.*, Dkt. 237 ("Bartholomew Sent'g Tr.") at 13 ("it [has] been a living hell for us since [Burgos] passed away"; "she had her whole life ahead of her"; "we're still picking up the pieces [of] my cousin's life" (cleaned up)).

[28] *See, e.g.*, *United States v. Bin Laden*, 126 F. Supp. 2d 290, 304–05 (S.D.N.Y. 2001) (ordering, in prosecution for terrorist bombings with "extraordinary number of victims . . . most all located abroad," that Government disclose number of victim-witnesses and "particularized categories" of harm suffered), *aff'd sub nom. In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 93 (2d Cir. 2008); *United States v. Saipov*, 17 Cr. 722, Dkt. 482 (Aug. 11, 2022) (ordering Government to produce informative outline one month before jury selection, where defendant had murdered eight people, including multiple foreign tourists); *Gendron*, 2024 WL 3647779, at *1, 5 (ordering Government to provide victim impact information, where defendant had shot ten people); *United States v. Wilson*, 493 F. Supp. 2d 364, 368 (E.D.N.Y. 2006) (same, concerning murder of two undercover detectives, to be produced less than two weeks before jury selection); *United States v. Jacques*, No. 08 Cr. 117, 2011 WL 1675417, at *29 (D. Vt. May 4, 2011) (same, four months before trial, concerning kidnapping and killing of 12-year-old child), *aff'd in part, vacated in part*, 684 F.3d 324 (2d Cir. 2012); *Hammer*, 2011 WL 6020157, at *2–3 (same, where case had changed substantially in decade-plus between indictment and trial, during which it had become unclear whether victim's family was willing to testify); *United States v. Savage*, No. 07 Cr. 550, 2013 WL 1934531, at *3, 11 (E.D. Pa. May 10, 2013) (same, concerning numerous murders committed between 1997 through 2010); *United States v. Pleau*, No. 10 Cr. 184, 2013 WL 1673109, at *4 (D.R.I. Apr. 17, 2013) (same, less than five months before jury selection); *United States v. Solomon*, 513 F. Supp. 2d 520, 524, 535 (W.D. Pa. 2007) (same, two months before jury selection); *United States v. Cooper*, 91 F. Supp. 2d 90, 110–11 (D.D.C. 2000) (same, less than three weeks before trial, where defendant was charged with three murders).

friends—whom the Government might call; the defense is privy to the detailed, public statements of a number of them; trial remains many months away; and there is no basis to contend (and McBean does not contend) that the Government has withheld any victim impact information from the defense).[29]

There is thus no good reason to order that McBean be given an informative outline concerning victim impact. *See, e.g.*, *Wilson*, 2013 WL 1338710, at *8–9 (denying defense request for additional victim impact information, where defense was already aware of "general subject matter of these witnesses' possible testimony" and their relationship with the victims); *United States v. James*, No. 02 Cr. 778, 2005 WL 8161681, at *17 (E.D.N.Y. Oct. 12, 2005) (same, where "the [victim-related] information already disclosed [was] more than adequate for the defendants to prepare for trial"); *United States v. Bowers*, No. 18 Cr. 292, 2023 WL 3979375, at *10 (W.D. Pa. June 13, 2023) (denying defense request for "written statements describing potential testimony" by victim impact witnesses); *United States v. Lujan*, No. 05 Cr. 924, 2010 WL 11546103, at *2–5 (D.N.M. Nov. 30, 2010) (similar).

***Future dangerousness***:  The death notice states that McBean "presents a future danger as demonstrated by his ability and willingness to orchestrate a murder-for-hire scheme while in federal custody, as well as his criminal history that includes multiple offenses committed while on court supervision, including his role in a 2017 shooting while on parole for state charges."

---

[29] The Government also notes—reasonably, given the distant trial date—that it has not yet decided which family members or friends to call to testify.  As it notes, "victim impact is not static, and [] Burgos's family members could describe the pain and suffering they have endured very differently months from now."  Discovery Opp'n at 3.  The Government has stated that it is willing to discuss with the defense a mechanism—consistent with victim safety—by which it could share with defense counsel the names of the Burgos relatives and friends who would testify at a penalty-phase hearing.  Oral Arg. Tr. at 53.  The defense has not yet pursued this offer.  *See id.* at 29.  Pending such discussions, there is no occasion for the Court to take up this issue.

Death Notice at 3. McBean acknowledges that the Government has, to date, produced to the defense all discoverable information related to this factor. Oral Arg. Tr. at 34. He instead seeks clarification as to whether the Government's theory for this factor is that McBean poses a future danger not only to other prisoners or staff physically located within Bureau of Prisons facilities, but also to individuals outside these facilities, *i.e.*, the public at large. *Id.* at 33–34.

At argument, the Government answered this question. It stated that, at the penalty phase, it will seek to establish that McBean presents a future danger to both groups of people. *Id.* at 59. Beyond that, as is undisputed, the Government has identified for the defense the incidents, and the discovery relating to them, on which it plans to base its claim of future dangerousness. *Id.* at 60; *see also* Aug. 19 Letter (summarizing relevant materials in defense's possession, including the August 4, 2025 suppression hearing transcript, McBean's criminal history, presentence investigation reports from his prior criminal cases, and his disciplinary reports from the Bureau of Prisons and Westchester County Jail).

This case thus is also far afield from the capital cases in which courts have ordered the Government to disclose information about its intended proof as to future dangerousness. *See, e.g.*, *Hammer*, 2011 WL 6020157, at *3 (so ordering, where "new evidence" and other developments, including the availability of multiple potential witnesses, had substantially changed the contours of capital case pending for more than a decade); *United States v. Glover*, 43 F. Supp. 2d 1217, 1227–28 (D. Kan. 1999) (so ordering, where Government intended to prove future dangerousness based on unadjudicated prior bad acts, but had not identified such to the defense); *United States v. Lujan*, 530 F. Supp. 2d 1224, 1271 (D.N.M. 2008) (ordering Government to summarize the "general nature" of the evidence it planned to use to prove future dangerousness, where it had not done so). The circumstances here instead are like those in many

70

cases denying such requests. *See, e.g.*, *Wilson*, 2013 WL 1338710, at \*6–7 (by identifying the incidents it intended to use to prove future dangerousness, the Government "met—and likely exceeded—its disclosure obligations concerning the evidence it seeks to introduce in support of" that factor); *United States v. Wilson*, 493 F. Supp. 2d 364, 376–77 (E.D.N.Y. 2006) (in same case years earlier, denying request where the Government had informed defense that it intended to rely on "the acts charged in the indictment, the defendant's prior convictions[,] and his well-documented prison infractions"); *United States v. Montgomery*, 10 F. Supp. 3d 801, 837 (W.D. Tenn. 2014) (similar); *United States v. Briseno*, No. 11 Cr. 77, 2014 WL 12682281, at \*2–3 (N.D. Ind. Nov. 14, 2014) (similar); *Savage*, 2013 WL 1934531, at \*17 (similar); *United States v. Cooya*, No. 08 Cr. 70, 2011 WL 5878382, at \*2 (M.D. Pa. Nov. 23, 2011) (similar).

*Grave risk of death to additional persons*:  The death notice states that McBean, in conspiring to commit murder for hire resulting in death, "knowingly created a grave risk of death to one or more persons in addition to the victim of the offense." Death Notice at 2. In his brief, McBean did not seek additional information as to this factor, but, at argument, sought the names of bystanders to the two shootings. Oral Arg. Tr. at 35–36. The Government responded that it has produced to the defense all information it has about "potential bystanders that were present at the time of the two shootings." *Id.* at 64. It stated that the discovery materials bearing on this include the New York City Police Department's case file for the shootings, including surveillance videos depicting people "walking around both before and after" the shootings; and witness statements of bystanders, including the bouncer and a waitress at the adjacent nightclub. *Id.* at 65. The Government also committed to promptly disclose names of additional bystanders, when and if it learns them. *Id.*

71

On the basis of the record before the Court, the defense thus presently has all information in the hands of the Government relating to this factor, and a commitment by the Government to disclose further such information it acquires.  And the Government's theory of why McBean's alleged offense conduct supports an inference of his future dangerousness is readily grasped.  It does not turn on the identities or accounts of bystanders.  The Government contends that McBean orchestrated, from prison, a sequence of shootings in public places by multiple gunmen aimed at killing a perceived rap-music rival.  Similar offenses, it contends, could recur were McBean sentenced to prison time as opposed to put to death.  There is no basis for the Court to direct the Government to produce an informative outline with respect to this factor.  *United States v. Burkhalter*, No. 18 Cr. 36, 2021 WL 3519281, at *8 (W.D. Mo. Aug. 10, 2021) (denying capital defendant's request for informative outline regarding grave risk of death to additional persons, where Government had produced surveillance video of the alleged shooting); *United States v. Lawrence*, No. 05 Cr. 11, 2005 WL 8159642, at *5–6 (S.D. Ohio Nov. 23, 2005) (same, where Government had stated that, to prove this factor, it intended to introduce evidence that the defendant fired several rounds that "narrowly miss[ed] a number of innocent people"); *United States v. George*, No. 17 Cr. 201, 2020 WL 2812864, at *6 (E.D. La. May 29, 2020) (same, where Government had produced surveillance footage of the shooting, which had "self-evident[ly]" placed bystanders at risk).

***Overall assessment***:  In sum, as to all three aggravating factors, McBean—as he largely concedes—has received from the Government, or otherwise has ready access to, all information in the Government's possession at this relatively early pretrial phase.  There is no good reason to require the Government to reorganize this information for his lawyers in a written outline.  The

72

Court thus denies the motion for an informative outline.  The denial is without prejudice to

McBean's right to renew this motion closer to trial, on a more substantial factual basis.

## CONCLUSION

For the above reasons, the Court denies McBean's motions challenging the FDPA, the

grand jury proceedings, and the death notice.  It also denies his motion for an informative

outline, without prejudice to any such renewed motion closer to trial.  The Clerk of Court is

respectfully directed to terminate the pending motions at dockets 162 and 200.

All deadlines set in the March 27, 2026 Order, Dkt. 230, remain as scheduled.


SO ORDERED.

PAUL A. ENGELMAYER
United States District Judge


Dated: May 18, 2026
      New York, New York