UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-v.-

DAJAHN MCBEAN,

Defendant.

24 Cr. 541 (PAE)

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT DAJAHN MCBEAN'S MOTION TO COMPEL SUPPLEMENTAL NOTICE OF AGGRAVATING FACTORS**

Ezra Spilke
Elizabeth Macedonio
Mark S. Demarco
Anthony Ricco
64 Wall Street, Suite 212
Norwalk, CT 06850

*Counsel for Dajahn McBean*

Submitted: October 9, 2026

# TABLE OF CONTENTS


**TABLE OF AUTHORITIES ........ II**

**INTRODUCTION ........ 1**

**ARGUMENT ........ 2**

- **I. As to Victim-Impact Evidence, the Government Should Supply a Penalty-Phase Witness List and Testimonial Summaries Well in Advance of Trial .... 2**
- **II. The Government Should Disclose the Identities of the Victim-Impact Witnesses Who Have Provided Information to the Court ........ 11**
- **III. The Government Should Amend Its Disclosure as to Grave Risk of Death.. 13**
- **IV. The Government's Proffer as to Future Dangerousness Is Overinclusive and Should Be Amended Within Thirty Days ........ 17**

**CONCLUSION ........ 21**

# TABLE OF AUTHORITIES

Cases

*Bland v. Sirmons*, 459 F.3d 999 (10th Cir. 2006) ........ 3

*Booth v. Maryland*, 482 U.S. 496 (1987) ........ 3

*Bosse v. Oklahoma*, 580 U.S. 1 (2016) ........ 3

*California v. Trombetta*, 467 U.S. 479 (1984) ........ 19

*Gardner v. Florida*, 430 U.S. 349 (1977) ........ 2, 19

*Godfrey v. Georgia*, 446 U.S. 420 (1980) ........ 14

*Gregg v. Georgia*, 428 U.S. 153 (1976) ........ 14

*Jones v. United States*, 527 U.S. 373 (1999) ........ 5

*Kelly v. California*, 555 U.S. 1020 (2008) ........ 7

*Le v. Mullin*, 311 F.3d 1002 (10th Cir. 2002) ........ 2, 3

*Payne v. Tennessee*, 501 U.S. 808 (1991) ........ 3, 5

*Proffit v. Florida*, 428 U.S. 242 (1976) ........ 14

*Simpson v. Carpenter*, 2018 WL 6802636 at *26 (10th Cir. 2018) ........ 3

*United States v. Barnette*, 211 F.3d 803 (4th Cir. 1999) ........ 14, 15

*United States v. Bin Laden*, 126 F. Supp. 2d 290 (S.D.N.Y. 2001) ........ 16

*United States v. Cheever*, 423 F. Supp. 2d 1181 (D. Kan. 2006) ........ 15

*United States v. Con-Ui*, No. 3:CR-13-123, 2016 WL 9331115, at *19 (M.D. Pa. Jan. 28, 2016) ........ 19

*United States v. Fell*, 360 F.3d 135 (2d Cir. 2004) ........ 7

*United States v. Gendron*, 183 F.4th 162 (2d Cir. 2026) ........ 3

*United States v. Gendron*, 800 F. Supp. 3d 503 (W.D.N.Y. 2025) ........ 8, 16

*United States v. Gendron*, No. 22-CR-109-LJV, 2024 WL 3647779, at *6 (W.D.N.Y. Aug. 2, 2024)........................................................................................................................ 20

*United States v. Glover*, 43 F. Supp. 2d 1217 (D. Kan. 1999)........................................................ 8

*United States v. Henderson*, 485 F. Supp. 2d 831 (S.D. Ohio 2007)...................................... 8, 10

*United States v. Jacques*, 684 F.3d 324 (2d Cir. 2012) ............................................................. 18

*United States v. Johnson*, 362 F. Supp. 2d 1043 (N.D. Iowa 2005) .............................................. 2

*United States v. McCluskey*, No. CR 10-2734 JCH, 2013 WL 12330210, at *3 (D.N.M. June 11, 2013)........................................................................................................................... 9

*United States v. McVeigh*, 153 F.3d 1166 (10th Cir. 1998)........................................................... 6

*United States v. Northington*, 2013 WL 2147947, at *5 (E.D. Pa. May 16, 2013) ....................... 8

*United States v. Plaza*, 179 F. Supp. 2d 464 (E.D. Pa. 2001)...................................................... 18

*United States v. Pleau*, 2013 WL 1673109, at *7 (D.R.I. Apr. 17, 2013) ................................... 19

*United States v. Regan*, 228 F. Supp.2d 742 (E.D. Va. 2002) ..................................................... 14

*United States v. Sampson*, 335 F. Supp. 2d 166, 188 (D. Mass. 2004) ......................................... 9

*United States v. Sampson*, 486 F.3d 13 (1st Cir. 2007) ................................................................. 9

*United States v. Sampson*, No. CR 01-10384-LTS, 2016 WL 11573959, at *2 (D. Mass. Aug. 26, 2016)........................................................................................................................... 9

*United States v. Savage*, 970 F.3d 217 (3d Cir. 2020)................................................................... 7

*United States v. Savage*, No. CRIM.A. 07-550-03, 2013 WL 1934531, at *6 (E.D. Pa. May 10, 2013)........................................................................................................................... 1

*United States v. Smith*, No. 3:16-CR-00086-SLG-1, 2020 WL 6536208, at *5 (D. Alaska Nov. 5, 2020)........................................................................................................................... 9

*United States v. Solomon*, 513 F. Supp. 2d 520 (W.D. Pa. 2007)................................................ 10

*United States v. Wilson*, 493 F. Supp. 2d 491 (E.D.N.Y. 2007) ............................................. 8, 10

Statutes

18 U.S.C. § 1958(a) ........................................................................................................... 18

18 U.S.C. § 3591(a)(2)......................................................................................................... 17

18 U.S.C. § 3592(c)(5)......................................................................................................... 13

18 U.S.C. § 3593(a) ............................................................................................................. 5

18 U.S.C. § 3593(f).............................................................................................................. 3

8 U.S.C. § 3593(c) ............................................................................................................... 7

Other Authorities

American Bar Association, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, *reprinted in* 31 Hofstra L. Rev. 913 (2003)................................ 11, 12

Blume, Garvey & Johnson, *Future Dangerousness in Capital Cases: Always "At Issue,"* 86 Cornell L. Rev. 397, 398 (2001) ....................................................................................... 19

Constanzo & Constanzo, *Jury Decision Making in the Capital Penalty Phase*, 16 Law & Hum. Behav. 185, 188–89 (1999)................................................................................................ 19

Docket Entry, *United States v. Gendron*, 22-cr-00109-LJV-1 (W.D.N.Y. June 18, 2026), ECF 602 ...................................................................................................................................... 8

Docket Entry, *United States v. Smith*, No. 3:16-CR-00086-SLG-1 (D. Alaska June 17, 2021), ECF 1087............................................................................................................................ 9

Docket Entry, *United States v. Wilson*, 04-cr-01016-NGG (Jan. 16, 2007), ECF 352................. 10

Eighth Circuit Court of Appeals, *Model Jury Instructions—Criminal*, Instr. 12.07E (2023 ed.). 15

Gov't's Informational Outlines, *United States v. Con-Ui*, No. 3:13-cr-00123-ARC (Nov. 7, 2016), ECF No. 922-1 ........................................................................................................ 12

Justice Manual, § 9-10.080 (A)(4)(6) and (7) ........................................................................ 21

Leonard B. Sand, 1 *Modern Federal Jury Instructions*, Instr. 9A-10 (2024) .............................. 15

Letter from Federal Defenders to the Court, *United States v. Saipov*, 17 Cr. 722 (VSB) (Feb. 16, 2023), ECF 730 ........................................................................................................ 11

*United States v. Bowers*, No. 18-cr-292-RJC, ECF No. 1556 at 33-34 (W.D. Pa. Aug. 23, 2023) ........................................................................................................................ 16

*United States v. Duran-Gomez*, No. H-10-459, ECF No. 529 (S.D. Tex. Feb. 24, 2020) ............ 20

*United States v. Sampson*, Case No. 01-cr-10384, Docket Item 2430 at 4 & n.3 (D. Mass. Aug. 26, 2016) ........................................................................................................................ 8

*United States v. Schlesinger*, No. CR-18-2719, ECF No. 432 (D. Ariz. June 3, 2022) ............... 20

*United States v. Tsarnaev*, No. 13-cr-10200-GAO, ECF No. 1418 at 33-34 (D. Mass. May 14, 2015) ........................................................................................................................ 16

## INTRODUCTION

Dajahn McBean, by and through his attorneys, respectfully submits this motion requesting supplemental disclosures as to certain of the government's proposed statutory and non-statutory aggravating factors alleged in its Notice of Intent to Seek the Death Penalty ("NOI"), Dkt. 119. The defense also respectfully requests oral argument.

The task of policing the boundary between permissible and unduly prejudicial or unconstitutional evidence at a penalty-phase trial is entrusted to district courts. "In exercising its gatekeeping function with respect to capital sentencing proceedings, a district court is empowered to preclude the [g]overnment from offering evidence in support of aggravating factors to the extent the court determines that constitutional rights would be violated." *United States v. Savage*, No. CRIM.A. 07-550-03, 2013 WL 1934531, at *6 (E.D. Pa. May 10, 2013).

This motion addresses the statutory aggravator of grave risk of death to additional persons and the non-statutory aggravators of victim impact and future dangerousness. The victim-impact statements are anonymized and irrelevant or constitutionally impermissible. The government's current grave-risk proffer would render that aggravator overbroad as applied. And the government's proffer as to future dangerousness, in particular Mr. McBean's criminal and disciplinary history, is massively overinclusive. Additionally, the government's disclosures concerning these aggravators are scattered across filings and hearing transcripts.[1]

The Court needs a clear account of the proposed proof to determine its admissibility. Thus, "[d]istrict courts have the discretion in determining whether the [g]overnment must

---

[1] Unless otherwise noted, this memorandum refers to the government's latest disclosure as to a given aggravator.

provide greater specificity to support the factors outlined in its Notices of Intent." *Id*.

## ARGUMENT

### I. As to Victim-Impact Evidence, the Government Should Supply a Penalty-Phase Witness List and Testimonial Summaries Well in Advance of Trial

"It is a hallmark of a fair and civilized justice system that verdicts be based on reason, not emotion, revenge, or even sympathy." *Le v. Mullin*, 311 F.3d 1002, 1015 (10th Cir. 2002). In capital cases specifically, "[i]t is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." *Gardner v. Florida*, 430 U.S. 349, 358 (1977).

Victim-impact evidence is unique among aggravators in its ability to provoke an emotional response from the jury. After presiding over a trial at which the jury heard victim-impact testimony, Chief District Court Judge Mark Bennett wrote that it was

> without hesitation . . . the most forceful, emotionally powerful, and emotionally draining evidence that I have heard in any kind of proceeding in any case, civil or criminal, in my entire career as a practicing trial attorney and federal judge spanning nearly 30 years. Indeed, I cannot help but wonder if *Payne v. Tennessee*, which held that victim impact evidence is legitimate information for a jury to hear to determine the proper punishment for capital murder, would have been decided the same way if the Supreme Court Justices in the majority had ever sat as trial court judges in a federal death penalty case and had observed first hand, rather than through review of a cold record, the unsurpassed emotional power of victim impact testimony on a jury. It has now been over four months since I heard this testimony in the *Honken* trial and the juror's sobbing during the victim impact testimony still rings in my ears . . . [S]uch potent, emotional evidence is a quintessential example of information likely to cause a jury to make a determination on an unrelated issue on the improper basis of inflamed emotion and bias—sympathetic or antipathetic, depending on whether one is considering the defendant or the victims' families.

*United States v. Johnson*, 362 F. Supp. 2d 1043, 1107 (N.D. Iowa 2005) (internal citation omitted).

Evidence offered to support an aggravator may be excludable in two ways. Statements in the first category are *per se* inadmissible and must be excluded under any circumstance. The

other category is evaluated under the FDPA and the constitution as to whether a given piece of evidence is unduly prejudicial.

As to the first category, a family member's "characterization of and opinions about the crime, the defendant, and the appropriate sentence," *Bosse v. Oklahoma*, 580 U.S. 1, 2 (2016) (quoting *Payne v. Tennessee*, 501 U.S. 808, 830 n.2 (1991)), are *per se* inadmissible under the Eighth Amendment. "The admission of [such] emotionally charged opinions as to what conclusions the jury should draw from the evidence clearly is inconsistent with the reasoned decisionmaking we require in capital cases." *Booth v. Maryland*, 482 U.S. 496, 508-09 (1987), *overruled on other grounds by Payne v. Tennessee*, 501 U.S. 808 (1991).

So are comparisons between the life of the defendant and that of the victim. *See, e.g.*, *Simpson v. Carpenter*, 2018 WL 6802636 at *26 (10th Cir. 2018) ("[I]t is prosecutorial misconduct for the prosecution to compare the plight of the victim with the life of the defendant in prison [and the] statement here was an improper comment designed to stir the jurors' emotions and elicit sympathy for the victims."); *Bland v. Sirmons*, 459 F.3d 999, 1028 (10th Cir. 2006) (same); *cf. Payne*, 501 U.S at 823 (the prosecution must not encourage jurors "to find that defendants whose victims were assets to their community are more deserving of punishment than those whose victims are perceived to be less worthy"). Such appeals improperly "make light of the penalty of life in prison," *id.*, and constitute an impermissible appeal to sympathy for the victim, encouraging the jury to fail to consider mitigating evidence. *Mullin*, 311 F.3d at 1015-16. The "race, color, religious beliefs, national origin, or sex" of the victim or defendant are likewise prohibited considerations in sentencing a defendant to death. 18 U.S.C. § 3593(f); *see also United States v. Gendron*, 183 F.4th 162, 169 (2d Cir. 2026) ("[T]he government may not present an aggravating factor that requires the jury to take account of a victim's or defendant's

race.”).

Here, the government has given notice that it intends to prove that “the victim’s personal characteristics and . . . the impact of the victim’s death upon her family and friends” are factors “justifying a sentence of death with regard to Count One.” Dkt. No. 119. Much of the victim impact evidence now available falls into the first category. According to the government, the statements it intends to offer can be found in the record, in particular “written victim impact statements from Clarisa Burgos’s family and friends, as well as transcripts from the testimony of Burgos’s family members at prior proceedings.” Joint Letter 3, May 29, 2026, Dkt. No. 249; *see also* Gov’t Br. 14, Dkt. 210 (emphasis added) (“McBean’s counsel has docket access to all the written victim impact statements that Burgos’s family submitted to the Court in advance of Chelsey Harris’s sentencing (Docket No. 189-2), which further preview *the expected testimony*.”). But those statements, prepared for sentencings that lacked the heightened due process concerns of the penalty phase of a capital trial, are *per se* excludable or are difficult to map onto a potential penalty phase for Mr. McBean.

The statements are replete with opinions and characterization of the crime, the defendants and the appropriate punishment, including:[2]

- “you did a very cruel thing”; “trying to get a target that’s still walking the streets”; “I hope that you rot in jail.”
- “deliberate and calculated plan”; “these cowards”; “come into this courtroom with attitude”; “You helped to set the trap”; “wanted to be one of the shooters”; “planned this not once, but twice”; “you stalked and tracked the location”; “a CANCER”; “Karl Smith should be held fully

[2] The statements are found in Docket Entries 212-1, 222-1 and 226-1, and the transcripts of the December 19, 2025, sentencing hearing of Chelsey Harris (pp. 32-40) and February 27, 2026, sentencing hearing of Julissa Bartholomew (pp. 12-14).

accountable"; "especially with him doing more than she did."

- "Who raised you. Straight garbage."
- "I hope that you rot in jail."
- "She should have life, death penalty, from my opinion"
- "This Woman should receive 100 years to life No parole"
- "The Bible says forgive your enemies, But reality is … I believe she should have the death penalty."

There are several statements that would encourage a jury to consider religious beliefs. *E.g.*, ("YOU STILL HAVE TO ANSWER TO GOD!!!"). And they contain numerous prohibited life comparisons, including:

- "he still has the opportunity to one day come home. We lost that."
- "while again, you all get to exist"; "you're over there breathing … while she lies in a grave"
- "This Monster individual … will still live she will able to talk, smile, laugh, cry, dance and one day unfortunately have freedom. While my nephew grows up without his mother."
- "she gets to talk to her mother, her father, her siblings … She get to smile … She gets to live a full life and maybe one day be released from prison."

To be relevant under the FDPA, the evidence must speak to "the extent and scope of the injury and loss suffered by the victim and the victim's family." 18 U.S.C. § 3593(a). Victim-impact evidence is meant to provide the jury "a quick glimpse of the life which a defendant chose to extinguish" and the loss to victims' loved ones. *Payne*, 501 U.S. at 822. "It is designed to show" the victim's "uniqueness as an individual human being." *Id.* at 823; *see also Jones v. United States*, 527 U.S. 373, 399 (1999) ("In the context of considering the effect of the crime on the victim's family, it would be more natural to understand 'personal characteristics' to refer to those aspects of the victim's character and personality that her family would miss the most.");

*United States v. McVeigh*, 153 F.3d 1166, 1219 (10th Cir. 1998) ("[T]he unique qualities of a murdered individual and his or her life accomplishments constitute the core impact evidence.").

It may well be the government's intention to offer victim-impact statements in line with the statements already submitted to the Court either in writing or orally. Indeed, the government characterized these statements as a "preview [of] the expected testimony." Gov't Br. 14, Dkt. 210. To clarify the proposed testimony, the defense wrote to the government on June 17, 2026, requesting revised victim-impact statements tailored to Mr. McBean's penalty phase and consistent with *Payne* and the FDPA. The government declined to provide the requested information.

If the government persists in offering the testimony in line with the statements already submitted, then large swathes of them are excludable, and the defense will be prepared to move to exclude them shortly after receiving notice from the government that that is its plan. As illustrated above, the statements that, according to the government, constitute a preview of the expected testimony stray far afield from the victim's unique qualities, her life accomplishments, or the aspects of her character and personality that her family would miss the most.

But, assuming the government intends to offer victim-impact statements in line with the FDPA and the constitution, those statements will, by necessity, be leagues apart from those already submitted to the Court. And the Court cannot exercise its gatekeeping function until the government provides revised victim-impact statements.

Under the FDPA, "information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." 18 U.S.C.

§ 3593(c).[3] Even after the enactment of the FDPA, "judges continue their role as evidentiary gatekeepers and, pursuant to the balancing test set forth in § 3593(c), retain the discretion to exclude any type of unreliable or prejudicial evidence that might render a trial fundamentally unfair." *United States v. Fell*, 360 F.3d 135, 145 (2d Cir. 2004) (cleaned up) (quoting *United States v. Battle,* 264 F.Supp.2d 1088, 1106 (N.D. Ga. 2003)); *see also id.* (quoting *United States v. Johnson,* 239 F.Supp.2d 924, 946 (N.D. Iowa 2003) (holding that the FDPA "expressly supplants only *the rules of evidence,* not constitutional standards .... [The trial court] retains the authority under the statute to impose upon the parties any standards of admissibility *or fairness* dictated by the Fifth and Sixth Amendments") (emphasis in original)). "[A]pplying these rules requires a judge, inevitably, to engage in line-drawing." *United States v. Savage*, 970 F.3d 217, 300 (3d Cir. 2020); *see also Kelly v. California*, 555 U.S. 1020 (2008) (statement of Justice Stevens regarding the denial of certiorari) ("In the years since *Payne* was decided, [the Supreme Court] has left state and federal courts unguided in their efforts to police the hazy boundaries between permissible victim impact evidence and its impermissible, 'unduly prejudicial' forms.").

To assist in its gatekeeping function, the Court should direct the government to prepare written statements for its victim-impact witnesses. The Court can then comprehensively adjudicate the admissibility of the contents of each one individually and assess whether, in light

---

[3] It is worth noting that the government's burden is higher under § 3593(c) than it is under Rule 403 of the Federal Rules of Evidence, which excludes evidence only if the prejudice *substantially* outweighs its probative value. *See Fell*, 360 F.3d 135, 145 (2d Cir. 2004) ("[T]he presumption of admissibility of relevant evidence is actually narrower under the FDPA than under the FRE.").

of all the statements, the proposed presentation is unduly prejudicial.[4]

Numerous courts have taken this approach. In *United States v. Gendron*, the Court "require[d] the government to provide a written summary of the proposed testimony for each victim impact witness," reasoning that "the risk of prejudice to Gendron is high, and several district courts have adopted this procedure to protect against such prejudice." *United States v. Gendron*, 800 F. Supp. 3d 503, 520–21 (W.D.N.Y. 2025), *rev'd and remanded on other grounds*, 183 F.4th 162 (2d Cir. 2026) (collecting cases).[5] The Court directed that each statement be "thorough and complete, covering every topic about which the witness will testify" and allowed the statements to "be in the form of a victim impact statement written by the witness or a summary written by the government." *Id*. at 521. As to timing, the court ordered the government to provide the statements on May 1, 2026, *id.* at 520, which was forty-eight days before juror questionnaires were distributed. Docket Entry, *United States v. Gendron*, 22-cr-00109-LJV-1 (W.D.N.Y. June 18, 2026), ECF 602.

In *United States v. Smith*, the court directed the government to supplement its informational outline with descriptions of each witness's relationship to the victims and testimonial summaries for each witness. *United States v. Smith*, No. 3:16-CR-00086-SLG-1,

---

[4] As the defense will address closer to trial, the Court should also take appropriate measures to limit the likelihood of overly emotional breakdowns or outbursts in front of the jury.

[5] The cases that the *Gendron* court collected were *United States v. Sampson*, Case No. 01-cr-10384, Docket Item 2430 at 4 & n.3 (D. Mass. Aug. 26, 2016); *United States v. Northington*, 2013 WL 2147947, at *5 (E.D. Pa. May 16, 2013); *United States v. Wilson*, 493 F. Supp. 2d 491, 505-06 (E.D.N.Y. 2007); *United States v. Henderson*, 485 F. Supp. 2d 831, 849-50 (S.D. Ohio 2007); *United States v. O'Driscoll*, 203 F. Supp. 2d 334, 340-41 (M.D. Pa. 2002); and *United States v. Glover*, 43 F. Supp. 2d 1217, 1235 (D. Kan. 1999). *Sampson*, *Wilson*, and *Henderson*, among other cases not cited in *Gendron*, are discussed below.

2020 WL 6536208, at *5 (D. Alaska Nov. 5, 2020). The court envisioned the supplement to be provided "near the time the guilt phase of trial begins." Id. Ultimately, a supplement was not necessary because the government moved to withdraw the death penalty notice before trial began. Docket Entry, *United States v. Smith*, No. 3:16-CR-00086-SLG-1 (D. Alaska June 17, 2021), ECF 1087.

In *United States v. Sampson*, which was retried, the court twice directed the government to "outlin[e] the information that it intended to elicit from the [victim-impact] witnesses at trial," *United States v. Sampson*, 335 F. Supp. 2d 166, 188 (D. Mass. 2004) ("*Sampson I*"), and to "proffer any anticipated victim impact testimony that will touch upon a witness's experience since the first trial," *United States v. Sampson*, No. CR 01-10384-LTS, 2016 WL 11573959, at *2 (D. Mass. Aug. 26, 2016) ("*Sampson III*"). The timing of the disclosure for the retrial is unclear, but, at the first trial, the government appears to have made its proffer approximately one week before the penalty phase trial began. *See Sampson I*, 335 F. Supp. 2d at 188 (establishing October 27, 2003, as the disclosure date); *United States v. Sampson*, 486 F.3d 13, 19 (1st Cir. 2007) ("*Sampson II*") (noting that the jury returned a death verdict on December 23, 2003, after a six-week penalty-phase trial).

In *United States v. McCluskey*, the government disclosed the names of nine possible victim-impact witnesses and their relationships. *United States v. McCluskey*, No. CR 10-2734 JCH, 2013 WL 12330210, at *3 (D.N.M. June 11, 2013). The disclosure was 136 days before juror questionnaires were distributed. *Compare* Docket Entry, *id.*, (July 22, 2013) ECF 1135, *with*, Docket Entry, *id.*, (Sept. 14, 2012), ECF 670.

In *United States v. Solomon*, the court, "in the exercise of its inherent authority," ordered the government "to outline the type and scope of the 'devastating effect' suffered by each victim,

his or her family members, and other individuals as relevant, and the 'personal characteristics' of each victim that it intends to prove." *United States v. Solomon*, 513 F. Supp. 2d 520, 535 (W.D. Pa. 2007). The court "envision[ed] a document that [was] akin to an informative outline, but not a revelation of evidentiary detail or the [g]overnment's theory of its case." *Id.* The Solomon decision gives no indication of the timing of this proffer other than it was to be made "before trial begins." *Id.*

In *United States v. Henderson*, the government agreed to limit victim-impact testimony to "the personal characteristics of the victims . . . as well as the impact of these murders upon each witness" and to solicit from each witness his or her testimony, in writing, after the guilt phase should the government prevail. *Henderson*, 485 F. Supp. 2d at 849. The written statements would then be submitted to the court *ex parte* for *in camera* review. *Id.*

In *United States v. Wilson*, the court directed the government to provide the defense with "a written statement describing the proposed testimony as to each 'victim impact' witness." *Wilson*, 493 F. Supp. 2d at 506 (quoting *United States v. Glover*, 43 F. Supp. 2d 1217, 1235 (D. Kan. 1999)). The disclosure was ordered to take place on January 11, 2007, five days before the beginning of the penalty-phase trial. *See id.*; Docket Entry, *United States v. Wilson*, 04-cr-01016-NGG (Jan. 16, 2007), ECF 352.

In *United States v. Saipov*, Judge Broderick denied Saipov's requests for written summaries. But the defense renewed the request, including in the midst of the government's penalty-phase case-in-chief. The defense included the request as part of a motion for a mistrial and asked for the prepared statements to address objections before the testimony, presumably to avoid objecting in the midst of emotional testimony and risking the jury perceiving the defense as callous. Letter from Federal Defenders to the Court, *United States v. Saipov*, 17 Cr. 722

(VSB) (Feb. 16, 2023), ECF 730. The motion for a mistrial was denied. Ultimately, the jury returned a life verdict and the decision was not reviewed on appeal.

The goal of a capital sentencing proceeding is to reach a just result after scrupulously observing the constitutional requirements placed on the weighty determination of whether the defendant should live or die, not for family members to fully express their devastating loss or to have that loss acknowledged. The procedures and relief requested herein are designed to further that goal.

Accordingly, should the government elect to offer revised victim-impact statements, the Court should direct the government to provide a thorough and complete written disclosure for each witness describing the information that the government intends to elicit from that witness, the name of the witness and the witness's relationship to the victim.

In addition, the defense proposes the following schedule: the government to supply written disclosures ninety days before juror questionnaires are distributed to the venire; defense motions forty-five days after disclosure; government oppositions thirty days after the motions; and defense replies fourteen days after the opposition. This schedule is intended to complete briefing on this subject by the time juror questionnaires are distributed.

## II. The Government Should Disclose the Identities of the Victim-Impact Witnesses Who Have Provided Information to the Court

The government has submitted numerous victim-impact witness statements, almost all – including an in-court testimonial – anonymously. Withholding the identities of these witnesses hampers the preparation of Mr. McBean's trial defense. American Bar Association, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, *reprinted in* 31 Hofstra L. Rev. 913, 1018, 1020 (2003) ("2003 ABA Guidelines") ("an appropriate investigation" when there is a potential penalty phase includes potentially interviewing the

victim's family).

In addition, it prevents the defense from conducting victim outreach for the purpose of a potential settlement of the charges. *See id.* at 1027 ("[C]ounsel should consider making overtures to members of the victim's family—possibly through an intermediary . . . —to ascertain their feelings about the death penalty and/or the possibility of a plea."). "A very difficult but important part of capital plea negotiation is often contact with the family of the victim." *Id.* at 1042. That is "because the victim's family can be critical to achieving a settlement." *Id.*

On June 17, 2026, the defense wrote the government requesting "the identities of all victim-impact witnesses with contact information and relationship to the victim." The defense also demanded, under *Brady*, "the identities and full statements of family members (and of non-family, victim-impact witnesses to the extent the government intends to offer, at the penalty phase, statements from those witnesses as well) who oppose Mr. McBean's execution." *See* 2003 ABA Guidelines at 1067 n.307 ("[O]n the assumption that victim impact evidence in support of the death penalty would be admissible, there is conflicting case law in various states on whether the defense can call members of the victim's family to testify in opposition to the client's execution.").

As demonstrated above in the previous section, it is not unusual for the government to supply victim-impact witness information well in advance of trial, either by agreement or by court order. In addition to those cases, in *United States v. Con-Ui*, the government provided a list of victim-impact witnesses in March 2016, approximately thirteen months before juror questionnaires were distributed. *See* Gov't's Informational Outlines, *United States v. Con-Ui*, No. 3:13-cr-00123-ARC (Nov. 7, 2016), ECF No. 922-1 (outline reproduced in later filing); Scheduling Order, id., (Mar. 24, 2017), ECF 1004. And, here, the government itself committed

to making this information available. Mar. 26, 2026, Tr. at 51-52.

Accordingly, the Court should order the government to provide the requested information. The defense proposes the following schedule: (1) within seven days of the Court's order, the identities of the authors of the statements supplied to the Court; (2) the identities of all remaining victim-impact witnesses with contact information and relationship to the victim ninety days before juror questionnaires are distributed, or May 11, 2027; and (3) within thirty days of the Court's order and on a continuing basis thereafter, the identities and full statements of family members (and of non-family, victim-impact witnesses to the extent the government intends to offer, at the penalty phase, statements from those witnesses as well) who oppose Mr. McBean's execution.

## III. The Government Should Amend Its Disclosure as to Grave Risk of Death

Citing 18 U.S.C. § 3592(c)(5), the government states in its NOI that it intends to prove that Mr. McBean "knowingly created a grave risk of death to one or more persons in addition to the victim of the offense." Dkt. 119 at 2. Under § 3592(c)(5), the jury will consider whether Mr. McBean "in the commission of the offense, or in escaping apprehension for the violation of the offense, knowingly created a grave risk of death to 1 or more persons in addition to the victim of the offense." 18 U.S.C. § 3592(c)(5).

With respect to the grave-risk aggravator, the government notified the defense by email on September 30, 2026, as follows:

> We currently plan to argue that McBean created a grave risk of death to all bystanders on the street or sidewalk during: (1) the shooting at the Hush Lounge and Garden (at 70-10 Grand Avenue, Maspeth, NY) on or about December 24, 2023; and (2) the shooting at Xscape Lounge (in front of Sangha Optical Inc. at 127-14 Liberty Avenue, Queens, NY) on or about December 26, 2023, as well as any occupants of surrounding vehicles and buildings that are within range of a bullet (on Grand Avenue from approximately 69th Lane to 71st Street, and on Liberty Avenue from approximately 127th Street to approximately 128th Street), as such individuals were all in the range of stray bullets that were being fired by

the gunmen. These include, but are not limited to—

- During the shooting at Xscape Lounge:
    - Victim-1, who was shot multiple times but survived.
    - The occupant(s) of a black sedan stopped at the intersection of Liberty Avenue and 127th Street.
    - An individual standing in front of Xscape who then took cover in front of the neighboring bakery.
    - The occupants of the Xscape entranceway.
- During both incidents: individuals inside surrounding stores and the apartments above those stores.

But the government's offer of proof would render that factor unconstitutionally vague. *See Gregg v. Georgia*, 428 U.S. 153, 202 (1976) (opinion of Stewart, Powell, & Stevens, JJ.) (noting that, on its face, aggravating factor of "creating 'a great risk of death to more than one person' . . . might be susceptible of an overly broad interpretation…"). For this factor to pass constitutional muster, courts must construe it in a way that "channel[s] the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance.'" *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980) (quoting *Woodson v. North Carolina*, 428 U.S. 280, 303 (1976) (opinion of Stewart, Powell, & Stevens, JJ.)); *see also Gregg*, 428 U.S. at 202-03 (upholding Georgia's great risk of death aggravator based on limiting construction placed on it by Georgia Supreme Court); *Proffit v. Florida*, 428 U.S. 242, 256 (1976) (opinion of Stewart, Powell, & Stevens, JJ.) (upholding Florida's version of same aggravating factor based on state court's narrowing interpretation of statutory language).

The Fourth Circuit recognized the trial court's duty to channel the sentencer's discretion with respect to the FDPA in *United States v. Barnette*, 211 F.3d 803, 819 (4th Cir. 1999) (citing *Gregg* and *Proffit*); *see also United States v. Regan*, 228 F. Supp.2d 742, 748-49 (E.D. Va. 2002)

("In *Barnette*, the Fourth Circuit, relying on *Gregg*, acknowledged that this factor is unconstitutionally vague unless the court can narrowly instruct the jury with regard to how this factor applies to the facts of a specific case."). There, the court held that the constitutionality of the FDPA's statutory grave risk of death aggravator must be assessed "in the context of the factual allegations of the crimes" and in light of the judicial construction it is given through clarifying instructions to the jury. *Barnette*, 211 F.3d at 819; *see also United States v. Cheever*, 423 F. Supp. 2d 1181, 1202-03 (D. Kan. 2006) (noting that "vagueness is evaluated not only in light of the words used to define the aggravator, but also based on the construction given that factor by the courts . . . largely by the jury instructions"). So long as, on the facts of the particular case, those instructions are "not overly broad" and provide the jury with "a common sense core of understanding," the grave risk of death factor is not unconstitutionally vague. *Barnette*, 211 F.3d at 819 (citing *Tuilaepa v. California*, 512 U.S. 967, 973-75 (1994)).

The instruction given by the district court and approved by the Fourth Circuit in *Barnette* defined "grave risk of death" as "a significant and considerable possibility" of death created by the defendant's placing of other persons "in a zone of danger" through his commission of the capital crimes. *Id.* That definition finds additional support in pattern instructions. *See* Leonard B. Sand, 1 *Modern Federal Jury Instructions*, Instr. 9A-10 (2024) ("'Grave risk of death' means a significant and considerable possibility that another person might be killed . . . 'Persons in addition to the victims' include innocent bystanders in the zone of danger created by the Defendant's acts"); Eighth Circuit Court of Appeals, *Model Jury Instructions—Criminal*, Instr. 12.07E (2023 ed.) (same). And other district courts have adopted this definition. *See, e.g.*, *United*

*States v. Bowers*, No. 18-cr-292-RJC, ECF No. 1556 at 33-34 (W.D. Pa. Aug. 23, 2023)[6]; *United States v. Tsarnaev*, No. 13-cr-10200-GAO, ECF No. 1418 at 33-34 (D. Mass. May 14, 2015).

Here, it is not clear that each member of the government's asserted class – "all bystanders on the street or sidewalk during both shootings" – were within the zone of danger or faced a significant and considerable possibility that they would be killed in the commission of the murder-for-hire. Granted, the government may prove this factor without proving it as to *all* bystanders, *see, e.g.*, *Gendron*, 800 F. Supp. 3d at 512 n.3, and the government may assert that the target of the shootings – the person identified in the indictment as Victim-1 – was clearly within the zone of danger. But it is at least arguable whether an intended victim may serve as an additional person under § 3592(c)(5). And there is authority indicating that such a person may not. *United States v. Bin Laden*, 126 F. Supp. 2d 290, 300 (S.D.N.Y. 2001), *aff'd sub nom. In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 93 (2d Cir. 2008) (emphasis added) (noting that the grave-risk aggravator "relates to Defendants' mental state with respect to persons *who were not the intended victims of the bombings*").[7]

---

[6] The grave risk of death aggravating factor in *Bowers* was limited to twelve named public safety officers who arrived at the synagogue to arrest Bowers and were involved in an exchange of gunfire with him prior to taking him into custody. *See id.*, ECF Nos. 44 at 12, 86 at 3. The aggravator was not alleged as to the ten surviving civilian victims who were inside the synagogue when the decedents were killed and whom Bowers was charged with attempting to kill, two of whom were physically injured, nor as to the individuals in the parking lot of the synagogue at the time of the shooting who were uninjured. *See id.*

[7] Moreover, as to additional persons placed in grave risk of death because of the non-fatal shooting, Congress limited the grave-risk aggravator to the commission of the homicide. Section 3592(c)(5) states that the aggravator applies if the defendant knowingly created the risk "in the commission of the offense, or in escaping apprehension for the violation of the offense." The "offense" is defined above as "an offense described in section 3591(a)(2)." Here, the government

Should the government not amend or supplement its notice, the defense will be prepared to challenge the aggravator as alleged as unconstitutionally broad. However, the government should be directed to amend its notice. Specifically, the government should be directed to provide within thirty days of the Court's order a written proffer of its intended proof as to the grave-risk factor, including, at a minimum, the identity of each person (or, with sufficient specificity, each class of person) who faced a significant and considerable possibility that they might die as a result of Mr. McBean's actions. After disclosure, the government should be directed that it may not supplement its disclosure except for good cause shown. The defense proposes the following schedule for motions to limit or strike the grave-risk aggravator or its proposed supporting evidence: defense motion to be filed forty-five days after disclosure, government opposition to be filed thirty days thereafter, reply to be filed fourteen days thereafter.

## IV. The Government's Proffer as to Future Dangerousness Is Overinclusive and Should Be Amended Within Thirty Days

In its NOI, the government announced its intention to prove the non-statutory aggravating factor future dangerousness. Specifically, the government would prove that Mr. McBean "presents a future danger as demonstrated by his ability and willingness to orchestrate a murder-for-hire scheme while in federal custody, as well as his criminal history that includes multiple offenses committed while on court supervision, including his role in a 2017 shooting while on parole for state charges." Dkt. 119 at 3.

---

has charged intentional murder, and, as to that crime, § 3591(a)(2) provides that an "offense" is one during which the defendant "intentionally killed the victim." 18 U.S.C. § 3591(a)(2)(A). "Additional persons" are thus limited to bystanders to the murderous act (or escaping apprehension for the murderous act).

Whereas the government's intended proof has been a moving target as to the grave-risk aggravator, the government has taken a consistently maximalist approach to future danger. Specifically, the government maintains that it may use any of the incidents it listed in its opposition to Mr. McBean's motion for an informational outline to prove future danger. The list spans more than two single-spaced pages and includes incidents dating back to April 2012, when McBean was a boy of sixteen. Dkt. 210 at 16-19. For that conduct, he was adjudicated a juvenile delinquent and placed on probation for twelve months and made subject to an order of protection after engaging in a robbery of a cellphone. *Id.* at 16.

As recently as September 30, 2026, in response to the defense's query, the government reiterated its view that any of the listed incidents could be used to prove future danger. The defense responded that the list of criminal convictions and disciplinary history laid out in the government's brief was self-evidently over-inclusive.

Mr. McBean's conduct when he was a youth can hardly be relevant to his present character. And "[s]uch remoteness reduces the reliability of testimony as to the events' occurrences." *United States v. Jacques*, 684 F.3d 324, 327–28 (2d Cir. 2012).

Moreover, because the only alternative to the death penalty in this case is a life sentence, 18 U.S.C. § 1958(a), arguments about Mr. McBean's dangerousness outside of prison are irrelevant unless specifically tied to his capability to do harm from within prison. *See, e.g., United States v. Plaza*, 179 F. Supp. 2d 464, 487-88 (E.D. Pa. 2001) ("Lower courts have [held that] in the FDPA context, government arguments regarding 'future dangerousness' should be limited to the dangers posed by the defendants while serving a life sentence in prison. . . . Accordingly . . . the government will be requested to limit its sentencing phase evidence to that which is relevant to a context of life imprisonment."). Likewise, "not all disciplinary infractions

are sufficiently serious to be relevant to the capital sentencing decision." *United States v. Pleau*, 2013 WL 1673109, at *7 (D.R.I. Apr. 17, 2013).

Should the government persist in taking the maximalist approach, the defense will be prepared to move to strike entire categories of future-dangerousness evidence in short order. Before the Court rules, however, the defense must investigate and prepare to rebut every listed incident.

Future dangerousness is a critical factor for juries, demanding a full rebuttal from the defense. Studies of capital jurors' decision-making process demonstrate that the allegation of future dangerousness is the most compelling aggravating factor in the eyes of jurors. *See, e.g.*, Blume, Garvey & Johnson, *Future Dangerousness in Capital Cases: Always "At Issue,"* 86 Cornell L. Rev. 397, 398 (2001); Constanzo & Constanzo, *Jury Decision Making in the Capital Penalty Phase*, 16 Law & Hum. Behav. 185, 188–89 (1999). And whether addressed or not, future dangerousness is a question that nearly always weighs on the minds of capital jurors. Thus, further specificity not only allows the Court to fulfill its gatekeeping role; it also allows the defense to adequately prepare a complete defense. *See, e.g.*, *California v. Trombetta*, 467 U.S. 479, 485 (1984); *see also Gardner v. Florida*, 430 U.S. 349, 362 (1977) (denial of due process "when the death sentence was imposed, at least in part, on the basis of information which he had no opportunity to deny or explain").

Other courts have directed the government to provide more detail than the government is providing now. In *United States v. Con-Ui*, the defendant asked for:

> (1) A comprehensive (all-inclusive) list of each act and characteristic alleged; (2) a list of witnesses for each act and characteristic with a summary of each witness's proposed testimony; and (3) all evidence (documents, FBI 302 interviews, BOP records, exhibits, etc.) the government intend[ed] to introduce at trial.

*United States v. Con-Ui*, No. 3:CR-13-123, 2016 WL 9331115, at *19 (M.D. Pa. Jan. 28, 2016).

The court granted the defendant's request to provide the defendant with an informational outline to satisfy his request and notified the government that it could supplement its outline only upon good cause. *Id.*

Similar information was provided in voluntary or court-ordered informational outlines well before the start of trial. *See, e.g.*, *United States v. Gendron*, No. 22-CR-109-LJV, 2024 WL 3647779, at *6 (W.D.N.Y. Aug. 2, 2024) (informational outline to be provided in approximately one month after the Order and approximately one year before jury selection); *United States v. Burkhalter*, No. 18-36, letter from government to defense (W.D. Mo. Oct. 13, 2021) (ordered informational outline provided by government while no trial date pending; trial subsequently scheduled for two years later, in 2023); *United States v. Schlesinger*, No. CR-18-2719, ECF No. 432 (D. Ariz. June 3, 2022) (outline due July 28, 2022, in anticipation of trial date six months later, in January 2023; see ECF No. 220); *United States v. Duran-Gomez*, No. H-10-459, ECF No. 529 (S.D. Tex. Feb. 24, 2020) (government provided ordered outline while no trial date pending; trial subsequently scheduled for two years later, in 2022).

Here, the government should be directed to provide within thirty days of the Court's order a written proffer of a comprehensive list of each prior act it intends to prove and its connection specifically to the future dangerousness aggravator. After disclosure, the government should be directed that it may not supplement its disclosure except for good cause shown. For a motion directed to limiting or striking particular prior acts, the defense proposes the same schedule it proposed for challenging the grave-risk aggravator: defense motion to be filed forty-five days after disclosure, government opposition to be filed thirty days thereafter, reply to be filed fourteen days thereafter. The defense proposes litigating the manner of proof closer to trial or as part of the *in limine* process already scheduled.

Requiring production within thirty days would not be unduly burdensome or prejudicial to the government. Presumably it already has the information in its possession, because due process requires that such information be presented to the grand jury. Moreover, the memorandum the government submitted to the Capital Case Committee in accordance with the Justice Manual's procedures presumably included the information sought, because Justice Department procedures require that such a memorandum include an analysis of the applicable statutory aggravating factors. *See* Justice Manual, § 9-10.080 (A)(4)(6) and (7).

**CONCLUSION**

In light of the foregoing reasons, Mr. McBean respectfully requests this Court to order the government to supply written disclosures as follows:

- Within seven days of the Court's order, the identities of the authors of the statements already supplied to the Court;

- Within thirty days of the Court's order

    - and on a continuing basis thereafter, the identities and full statements of family members (and of non-family, victim-impact witnesses to the extent the government intends to offer, at the penalty phase, statements from those witnesses as well) who oppose Mr. McBean's execution;

    - a written proffer of its intended proof as to the grave-risk factor, including, at a minimum, the identity of each person (or, with sufficient specificity, each class of person) who faced a significant and considerable possibility that they might die as a result of Mr. McBean's actions. After disclosure, the government should be directed that it may not supplement its disclosure except for good cause shown;

    - a written proffer of a comprehensive list of each prior act it intends to prove and its connection specifically to the future dangerousness aggravator. After disclosure, the government should be directed that it may not supplement its disclosure except for good cause shown;

- Ninety days before juror questionnaires are distributed to the venire,

    - a thorough and complete written disclosure for each intended victim-impact witness describing the information that the government intends to elicit from that witness, the name of the witness and the witness's

relationship to the victim;

- the identities of all victim-impact witnesses whose names had not been provided previously (i.e., those who have not supplied statements to the Court) with contact information and relationship to the victim;

Further, Mr. McBean respectfully requests this Court to order the following briefing schedule on motions related to each of those disclosures:

- defense motion forty-five days after disclosure;
- government oppositions thirty days thereafter; and
- the defense's reply to follow fourteen days after the government's opposition.

Dated: Norwalk, Connecticut
October 9, 2026

Respectfully submitted,

/s/ Ezra Spilke
Ezra Spilke
Elizabeth Macedonio
Mark S. Demarco
Anthony Ricco

TO: James McDonald, Esq.
United States Attorney
Southern District of New York
Attn: Frank Balsamello, Andrew Chan, Dominic Gentile, Ryan Allison
Assistant United States Attorneys